*ORIGINAL*
*ORIGINAL*

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 09 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES, | * | |
| | * | Case No. |
| Plaintiff, | * | _____ |
| | * | |
| -vs- | * | **1:08-CV-0077** |
| | * | |
| RONALD M. ZACCARI, | * | **CAP** |
| individually and in his official | * | |
| capacity as President of Valdosta | * | |
| State University; VALDOSTA | * | Jury Trial Demanded |
| STATE UNIVERSITY; BOARD OF | * | |
| REGENTS OF THE UNIVERSITY | * | |
| SYSTEM OF GEORGIA; LAVERNE | * | |
| GASKINS, individually and in her | * | |
| official capacity as in-house counsel | * | |
| at Valdosta State University; KURT | * | |
| KEPPLER, individually and in his | * | |
| official capacity as Vice President | * | |
| for Student Affairs at Valdosta State | * | |
| University; RUSS MAST, | * | |
| individually and in his official | * | |
| capacity as Dean of Students at | * | |
| Valdosta State University; LEAH | * | |
| McMILLAN, individually and in | * | |
| her official capacity as a counselor | * | |
| at Valdosta State University; and | * | |
| VICTOR MORGAN, individually | * | |
| and in his official capacity as Director | * | |
| of the Valdosta State University | * | |
| Counseling Center, | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### PRELIMINARY STATEMENT

1.      On May 7, 2007, President Ronald M. Zaccari of Valdosta State University, without notice or any type of hearing, summarily expelled student T. Hayden Barnes on the pretextual claim that Barnes represented a "clear and present danger" to the campus. The decision was communicated in a letter from Zaccari that was slipped under Barnes' dorm room door. The supposed basis for Zaccari's outlandish claim was a collage that Barnes had posted on a webpage at Facebook.com to protest the environmental impact of a proposed parking garage planned for the university campus. The collage, which was attached to Zaccari's expulsion letter, contained no threats of any kind.

2.      However, Zaccari had become increasingly upset with Barnes since the student first distributed fliers on campus in March 2007 opposing the proposed construction. At all times, Barnes' statements on the issue of the parking garage focused on the environmental issues raised by encouraging an increase in automotive traffic and consumption of fossil fuels, and what he saw as the needless expense of committing more than $30 million in student fees to the project. Just as any citizen would do who wished to petition the

2

government, Barnes communicated his views via the fliers, a letter to the editor of the campus newspaper, and e-mails and telephone calls with policymakers. But Zaccari found these actions to be entirely unacceptable, and he took steps to suppress Barnes' exercise of his American birthright— the right to freedom of expression.

3.      Zaccari complained about Barnes's speech activities to other student groups, faculty members, and other administrators.  He ultimately summoned Barnes to a meeting in April 2007 in which he castigated the student for questioning his judgment about the parking garage, for "embarrassing" him, and for threatening "the legacy" of his building program.  When Barnes nevertheless wrote a letter to the editor despite President Zaccari's pressure tactics, stronger and more direct methods were employed to solve "the problem."

4.      Seizing upon the tragic school shootings at Virginia Tech University as a pretext, Zaccari took steps to brand Barnes as a "danger" because of his non-violent speech activities and to remove him from campus. Knowing that Barnes had availed himself of counseling services made available to all students by VSU, Zaccari secretly and repeatedly met with Barnes' counselor seeking to justify his decision to expel him.  What he learned from

3

both the campus counseling center and from Barnes' private psychiatrist who was consulted in the matter, however, was that Barnes had never exhibited any violent tendencies and that he did not represent any danger either to himself or to others.  Quite to the contrary, despite a background in which he had been forced to cope with some difficult family issues from an early age, Barnes had developed into an engaged student, was a licensed and decorated emergency medical technician, and was politically aware and involved.

5.      Notwithstanding these facts, and against the advice of counsel to the Board of Regents that unilateral action would violate basic due process rights, Zaccari proceeded with his plan to expel Barnes from VSU.  Such arbitrary and authoritarian action has no legitimate place on an American college campus or in any society governed by the rule of law.

## NATURE OF CASE

6.      This is a federal civil rights action pursuant to 42 U.S.C. § 1983.  The decision to expel Barnes from VSU and the methods employed to accomplish that objective violated rights protected by the First and Fourteenth Amendments of the United States Constitution, as well as rights protected by the Americans With Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the Georgia Constitution,

and the Health Insurance Portability Accountability Act, ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.).  Defendants' actions also constituted a breach of contract under Georgia law.  Barnes seeks, *inter alia*, an order declaring Defendants' actions in violation of the aforementioned statutes and constitutional provisions.  Barnes also seeks injunctive relief and nominal, compensatory, and punitive damages to be determined by an impartial jury, plus attorneys' fees and costs

## PARTIES

7.     Plaintiff T. HAYDEN BARNES ("Barnes") is a Georgia resident and former student at Valdosta State University.  He is currently enrolled at Kennesaw State University in Atlanta, Georgia.  During the 2005–2007 school years, Barnes resided near the VSU campus in Valdosta, Georgia.  Prior to his expulsion, Barnes was employed as an emergency medical technician in Valdosta, Georgia, in addition to his studies.  He now resides in Kennesaw, Georgia.

8.     Defendant RONALD M. ZACCARI ("Zaccari") is the President of Valdosta State University and, upon information and belief, resides in or around Valdosta, Georgia.

9. Defendant VALDOSTA STATE UNIVERSITY ("VSU") is a college-level institution of higher learning located in Valdosta, Georgia, and is a political subdivision of the State of Georgia with the capacity to sue or be sued.

10. Defendant BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA ("the Board") is a political subdivision of the State of Georgia with the capacity to sue or be sued. The Board operates and supervises thirty-five university and college institutions throughout the State of Georgia and is headquartered in Atlanta, Georgia.

11. Defendant LAVERNE GASKINS ("Gaskins") serves as in-house counsel to VSU and, upon information and belief, resides in or around Valdosta, Georgia.

12. Defendant KURT KEPPLER ("Keppler") is Vice President for Student Affairs at VSU and, upon information and belief, resides in or around Valdosta, Georgia.

13. Defendant RUSS MAST ("Mast") is Dean of Students at VSU and, upon information and belief, resides in or around Valdosta, Georgia.

14. Defendant LEAH MCMILLAN ("McMillan") is a counselor at VSU's student counseling center and, upon information and belief, resides in or around Valdosta, Georgia.

15.     Defendant VICTOR MORGAN ("Morgan") is Director of the VSU student counseling center and, upon information and belief, resides in or around Valdosta, Georgia.

### VENUE

16.     Because all defendants reside in the State of Georgia, with some defendants residing in this judicial district, venue is properly within this district pursuant to 28 U.S.C. § 1391(b)(1).

### JURISDICTION

17.     Jurisdiction for this suit is conferred in part by 42 U.S.C. § 1983, which provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

18.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202. *See also* Fed. R. Civ. P. 65.

19.     Attorney's fees are authorized by 42 U.S.C. § 1988, 29 U.S.C. § 794(b), and 42 U.S.C. § 12205.

20.   Under 28 U.S.C. §§ 1331 and 1343(a)(3) & (4), the Court can entertain an action to redress a deprivation of rights guaranteed by the United States Constitution, and the Court has jurisdiction under 28 U.S.C. § 1367 to hear an action to redress a deprivation of rights guaranteed by the laws and the Constitution of the State of Georgia.

## FACTUAL AND PROCEDURAL BACKGROUND

21.   The allegations set forth in paragraphs 1–20, *supra*, are incorporated herein by reference.

22.   In Fall 2005, Hayden Barnes enrolled at VSU. He attended paramedic school in Savannah in 2006 and re-enrolled at VSU in January 2007. From the beginning of his time at VSU, he actively engaged in student and political affairs, and did so without major interference by VSU officials. Prior to his first year of college, for example, Barnes started and organized a 150-plus-member "Meetup" (*i.e.*, meetup.com) group in Savannah that helped raise more than $50,000 locally for the Howard Dean presidential campaign. More recently, his primary concerns focused on protection of the environment and on sustainability issues.

23.     On March 22, 2007, the VSU student newspaper, the *Spectator*, ran a story regarding President Zaccari's plans to construct a large parking deck on campus.

24.     Barnes was concerned about the environmental implications of this plan, and particularly about the availability of more sustainable, less car-dependent transportation planning options for the University and community. Consequently, Barnes posted a series of fliers around VSU campus expressing his opposition to the planned parking decks during the three or four days following the publication of the *Spectator* article. The fliers noted the millions of dollars to be spent on the construction and listed other humanitarian and environmental uses to which those dollars could be put.

25.     Barnes also e-mailed his concerns to Zaccari, the student government association, the VSU Faculty Environmental Committee, and others on March 24, 2007. He received a number of enthusiastic responses from faculty and students and posted some of these responses on his Facebook page. (Facebook.com is a social networking site. Users may view pages of members of their social "network," which includes classmates, people with shared interests, and friends.)

9

26.    On or about March 26, 2007, Barnes was informed by classmates involved with a campus environmental advocacy organization called Students Against Violating the Environment ("S.A.V.E.") that President Zaccari was upset with Barnes's speech activities and had contacted the group to express his displeasure, particularly with the fliers.  Surprised by what he viewed as Zaccari's rather severe response to such noncontroversial speech activities, Barnes nevertheless chose to take down his fliers and delete his Facebook entries.  He also wrote a letter to Zaccari expressing a desire not to have an adverse response to his activities that might jeopardize S.A.V.E.'s interests or reduce whatever chance Barnes might have to influence the pending decision on the parking garage.

27.    Notwithstanding his desire to avoid offending the university president and his decision to withdraw the fliers, Barnes remained keenly interested in the issue. On or about April 13, 2007, he created a political collage protesting the parking garage, which he posted on his webpage on Facebook. The collage included photos of a multi-level parking structure, a bulldozer, a globe flattened by a tire tread, an asthma inhaler, a photo of Zaccari, and a picture of a public bus under a no-smoking-style "not allowed" red circle and slash.  It also included, *inter alia*, text such as "more smog," "bus system that

10

might have been," "climate change statement for president Zaccari," and "S.A.V.E.-Zaccari Memorial Parking Garage."

28.     On or about April 16, 2007, Barnes had a telephone conversation with Michael Miller, a VSU project manager, who informed him that the Board was scheduled to vote regarding the parking garage at its meetings the following day.   Familiar with the constituent practices of elected officials (*i.e.*, that officials often "tally" voter calls, letters and e-mails on current political controversies), Barnes called members of the Board, including Allan Vigil and Richard Tucker, to briefly explain his opposition and have it considered by the decisionmakers prior to the scheduled vote.

29.     On or about April 16, 2007, Board Vice Chancellor Linda Daniels contacted Zaccari to discuss Barnes's speech activities and to probe Zaccari regarding her "concerns" that Barnes might attend the meeting and "stage a protest" there.

30.     After talking with Daniels, Zaccari summoned Barnes to his office for a meeting with him and Defendant Mastthe afternoon of April 16.

31.     Barnes arrived at the meeting with a friend and requested that she be permitted to attend.   Zaccari refused, informing Barnes that the matter concerned him and Barnes alone.

11

32.    Barnes' meeting with President Zaccari took place the same day a gunman tragically took the lives of 32 fellow students and teachers at Virginia Tech University. The terrible events of that morning captivated the nation. However, Zaccari did not mention the tragic event and instead devoted his meeting with Barnes to explain and justify his plans for the parking garage.

33.    At the April 16, 2007 meeting in Zaccari's office, Zaccari told Barnes that Barnes's speech activities had embarrassed him, that he had thought Barnes had "gone away" when he withdrew his fliers, that Barnes had "made life hard" for Zaccari, and that he "could not forgive" Barnes for that embarrassment. Zaccari asked Barnes, "who do you think you are" to question my judgment?

34.    Zaccari asked if Barnes had plans to attend the Board's meeting on April 17, 2007 to continue his speech activities, and Barnes said that he did not, citing the fact that he had already expressed his views to the Board and that the meeting was being held across the state.

35.    After the April 16, 2007 meeting, Barnes sent Zaccari two follow-up e-mails, informing Zaccari that other colleges of similar sizes and profiles had established off-site, rather than on-site parking, and discussing his

12

environmental concerns with the planned parking garage. He received no response indicating that these messages were unwelcome.

36.     On April 19, 2007, the *Spectator* published Barnes' letter to the editor in which he expressed his views regarding the planned parking decks.

37.     On April 20, 2007, Zaccari attended a small breakfast with VSU administration officials and some members of the faculty. At the breakfast, Zaccari discussed Barnes (without naming him) with attendees and expressed substantial anger towards Barnes, especially regarding the fliers that previously were posted around campus but had been removed for weeks. One of the attendees, Dr. Michael Noll, a former professor of the plaintiff, suspected that Zaccari was talking about Barnes and asked whether that was the case. Zaccari confirmed his suspicions but immediately instructed Noll to drop the subject.

38.     On or about April 20, 2007, defendant Mast gave Zaccari a copy of the collage Barnes had posted on Facebook. On information and belief, Zaccari then decided to use the Facebook posting, along with his awareness that Barnes had availed himself of campus counseling services, to concoct a claim, in retaliation for Barnes's speech activities questioning his parking garage plans, that Barnes represented some kind of danger. Zaccari pursued this strategy with the assistance of defendants Gaskins, Keppler, Mast, McMillan and Morgan.

13

39.    On or about April 20, 2007, under orders from Zaccari, a VSU police officer contacted Defendant McMillan to inform her that, in Zaccari's view, Barnes had threatened him personally via the Facebook collage. McMillan responded that Barnes had not exhibited any violent tendencies and had made no threats of any kind.   McMillan contacted Barnes regarding Zaccari's concerns, and observed nothing that would confirm Zaccari's view.

40.    On or about April 23, 2007, Barnes posted a series of items on his Facebook page, including clips of Bill Maher and *The Daily Show* television programs regarding a variety of political issues; a *New York Times* article about processed foods; a note that Hayden was cleaning out his room; and a link to a Salon.com article (written in response to the Virginia Tech shootings the week prior) observing that the tragedy was "doubly depressing" because not only was the act tragic, but that in the author's view, people would thereafter irrationally associate the heinous acts of the shooter with all people with mental illness. Zaccari arranged to have Barnes' Facebook postings monitored.

41.    Ironically, Zaccari claimed to interpret Barnes' link to the Salon.com article as support for his cover story that Barnes was a threat. In fact, the author of the article made the opposite point — that because of the Virginia Tech tragedy, some people would be branded as dangerous when they were not.

In addition, Zaccari claimed that a link to a completely unrelated banner ad on Barnes' webpage supported his assertion because it advertised a web-based do-it-yourself film submission contest with the phrase: "Shoot it. Upload it. Get Famous. Project Spotlight is searching for the next big thing. Are you it?"

42.    On or about April 24, 2007, Zaccari began having a security detail follow him. That same day, he met yet again with McMillan to discuss Barnes's speech activities and treatment history. McMillan reiterated to Zaccari that Barnes had not exhibited violent tendencies in his meetings with her. Zaccari told McMillan that he would address the situation.

43.    On or about April 25, 2007, under the direction of Zaccari, defendant McMillan contacted Dr. Kevin Winders, Barnes's private psychiatrist, and requested that he assess Zaccari's asserted concerns. That same day, Dr. Winders responded by fax, explaining that Hayden's history included no record of threats, violence or even "significant confrontations."

44.    Dr. Winders has met with Barnes on-and-off since Barnes was a child. Their sessions have addressed common issues such as agoraphobia and anxiety. At no time have issues related to violence, threats of violence, or violent ideation arisen in these meetings.

45.    On April 26, 2007, Zaccari hand-delivered printouts of the Facebook pages he planned to use, as well as Barnes's letter to the editor, to McMillan.  Next to the "Project Searchlight" banner ad on one of the pages, Zaccari wrote: "This reference concerns me."

46.    Also on April 26, 2007, at Zaccari's request, defendant Gaskins inquired of an attorney for the Board, Betsey Neely, as to how a university president could file a complaint against a student "for violation of the Student Code of Conduct" and what processes would apply to such a situation.  Neely responded by cautioning Gaskins that "[i]t is not good practice for the President to be bringing a complaint against any student," as student-conduct issues "should be handled by staff in Student Affairs.  Once the President has made a decision in a matter, there is no due process at the campus level."

47.    At Zaccari's request, McMillan also met with Barnes on April 26, 2007.  According to McMillan's notes from the meeting, Barnes yet again neither exhibited nor expressed tendencies or proclivities to violence.

48.    On or about April 30, 2007, either at Zaccari's request or of her own volition, McMillan asked Dr. Winders to evaluate Barnes.  Dr. Winders and Barnes met that day.  Dr. Winders reported to McMillan that "[t]here was nothing during the interview that led [Winders] to think that [Barnes] was

16

dangerous to himself or others" and Barnes "specifically stated that he did not want to hurt anyone or himself."

49.     On May 1, 2007, Winders discussed the interview and his observations over the phone with McMillan, who, on information and belief, relayed them to Zaccari.  The following day, Winders sent a letter summarizing his observations to McMillan.  In that letter, he reiterated his view that Barnes posed no threat to himself or others.

50.     On May 2, 2007, notwithstanding the abundant evidence that any concerns about Barnes potentially engaging in violence were entirely unfounded, Zaccari directed that a meeting be held on May 3 to discuss his planned response to Barnes's protected speech activities.

51.     On May 3, 2007, Zaccari held a meeting regarding Barnes which, on information and belief, Gaskins, Mast, McMillan and Keppler attended.  At this meeting, Defendants — led by Zaccari — decided, unilaterally and without any process due to Barnes pursuant to the Constitution or to VSU and/or Board policies, to expel Barnes from VSU.

52.     On May 7, 2007, Zaccari expelled Barnes from VSU via letter. Barnes was informed of his expulsion when he discovered a copy of the letter slipped under the door to his dorm room.  The letter stated, in pertinent part:

17

Dear Mr. Barnes:

As a result of recent activities directed towards me by you, included [sic] but not limited to the attached threatening document [(the Facebook collage)], you are considered to present a clear and present danger to this campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 7, 2007.

The letter also informed Barnes that he would be reinstated at VSU after providing: (1) correspondence from a psychiatrist indicating that Barnes posed no danger to self or others; and (2) documentation from a "certified mental health professional" indicating that during his tenure at VSU, Barnes would receive ongoing therapy.

53.     Board of Regents policy 1902 states that any student "who clearly obstructs, or disrupts, or attempts to obstruct or disrupt" campus activities "shall be subject to disciplinary procedures, possibly resulting in dismissal" from VSU. This same policy is listed in the VSU student handbook under the title "Disorderly Assembly."

18

54.    At no time has Barnes ever obstructed, disrupted, or attempted to obstruct or disrupt any campus activities.

55.    VSU policies for student disciplinary procedures are set forth in the VSU student handbook. The handbook declares that student discipline has been delegated by the President to the Vice President for Student Affairs and the Dean of Students Office. These procedures include: (1) a "judicial committee" composed of either eleven VSU students or five faculty members and two students which will be assigned to hear a given case; (2) five days' prior notice in writing of the charges made against the student and the date, time and place of a hearing to be held regarding those charges; (3) the right to have an advisor accompany the student to the hearing; (4) the right to question any and all witnesses and to submit his or her own witnesses; (5) the right to open proceedings; and (6) the right to have the proceedings recorded. None of these due process requirements were followed by VSU.

56.    In a separate section of the student handbook, VSU provides for "mental health withdrawal." The procedure for such withdrawal includes: (1) a determination by a mental health professional (not an administrator) that a student may be of danger to himself or others; (2) recommendation by such a mental health professional that a hearing be held concerning the student; and (3)

19

a hearing conducted by the office of the Dean of Students, at which the student may present witnesses and evidence.  VSU followed none of these policies.

57.     No provision exists in either the VSU student handbook or in Board of Regents policies for unilaterally imposed "administrative withdrawal."

58.     Within days of receipt of the expulsion notice, Barnes satisfied the requirements Zaccari imposed for reinstatement.     He provided: (1) correspondence from Dr. Winders indicating that Barnes posed no danger to self or others; and (2) documentation from a "certified mental health professional" indicating that during his tenure at VSU, Barnes would receive ongoing therapy.  VSU ignored these documents and refused to reinstate Barnes.

59.     On May 8, 2007, defendant McMillan, in a letter to the Board of Regents and Zaccari confirmed her professional opinion that, like the opinion of Dr. Winders, she did not believe Barnes was "a threat, indirectly or directly to anyone on the VSU Campus (i.e. President, staff, faculty, students, others, or self)."  That same day, Dr. Winders submitted a similar letter, reiterating his view that Barnes posed no threat of violence to self or others.  He noted, "I am surprised that this action was taken with a good report from me and no further evaluation to contradict my findings."

20

60.     Despite this substantial and uncontradicted evidence that Barnes posed no threat whatsoever, Zaccari ignored the cumulative evaluations of the experts and, on May 9, 2007, issued a memorandum to VSU staff, notifying them of the expulsion and requiring Barnes to vacate his housing within 48 hours.  Barnes was not notified of this 48-hour deadline.

61.     On information and belief, Barnes was neither monitored nor escorted from the campus by security.

62.     On May 14, 2007, Barnes went to his dorm room to move his belongings but discovered that a boot had been placed on the door to prevent entry.  When he inquired of the Director of Housing, he learned for the first time that a week prior he had been given 48 hours to vacate but that VSU officials had not bothered to inform him of this requirement.

63.     On May 21, Barnes appealed his expulsion to the Board.

64.     On June 21, Zaccari submitted a letter explaining his decision to the Board, in which he defended his decision to build the garage, accused Barnes of "mocking" him, and justified his actions with reference to the various Facebook  pages and to the Virginia Tech tragedy, and by asserting without supporting evidence that he would have run the risk of "alert[ing] the campus to

21

a potential threat" and causing "alarm" if he had provided Barnes the due process rights guaranteed to him

65.    On or about August 7 and 8, 2007, the Board heard Barnes's appeal and referred the matter to an Administrative Law Judge at the Office of State Administrative Hearings.

66.    On or about December 17, 2007, the Board moved in the administrative proceedings for a continuation of the scheduled hearing so that it could reevaluate Barnes's appeal in a closed executive session.

67.    To this date, Barnes has been provided no hearing and no opportunity to be heard regarding his expulsion from VSU.

68.    Barnes has enrolled at Kennesaw State University in Kennesaw, Georgia, and has, as a result of Defendants' actions, been forced to relocate to the Atlanta, Georgia area, and to incur significant expenses

69.    Barnes has suffered significant emotional distress as a result of Defendants' discriminatory and unconstitutional actions.

70.    Each of the Defendants has acted under color of state law at all times.

## COUNT 1

## 42 U.S.C. § 1983: FREE SPEECH CLAUSE VIOLATION

## (ALL DEFENDANTS)

71.     Barnes realleges each fact set forth in paragraphs 1 through 70 of this complaint and incorporates them herein by reference.

72.     Barnes's activities on Facebook and on campus were speech acts protected from infringement by the First Amendment of the U.S. Constitution.

73.     Defendants' actions in conspiring to expel Barnes from VSU were taken in retaliation for Barnes's exercise of his First Amendment freedoms.

74.     Defendants' stated reasons for expelling Barnes from VSU were pretextual and had no rational basis, being wholly contradicted by the views of mental health professionals, communicated to Defendants, that Barnes posed no threat to self or others at any time.

75.     Because the law is clearly established in this area, and because Defendants had (and have) fair warning that expelling a student from a public university in retaliation for the exercise of First Amendment freedoms is unconstitutional, Defendants are liable, and the individual Defendants are liable in their official capacities, for violating Barnes's First Amendment rights.

23

76.     The denial of constitutional rights is irreparable injury per se, and Barnes is entitled to declaratory and injunctive relief.

## COUNT 2

## 42 U.S.C. § 1983: PROCEDURAL AND SUBSTANTIVE DUE PROCESS

## (ALL DEFENDANTS)

77.     Barnes realleges each fact set forth in paragraphs 1 through 76 of this complaint and incorporates them herein by reference.

78.     Article I, Section 1, Paragraph 1 of the Georgia Constitution, and the Due Process Clause of the Fourteenth Amendment, guarantee that no person shall be deprived of life, liberty or property without due process of law

79.     Students at public universities enjoy protected property interests in their education such that due process must be afforded them prior to the denial of those interests.  At a minimum, this includes notice and an opportunity to be heard.  *See Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Bd. of Curators v. Horowitz*, 435 U.S. 78, 86 (1978).

80.     At no time have Defendants provided Barnes with these essential rights.

81.     In light of the Board's and VSU's retaliatory actions and the injuries to Barnes arising therefrom, the State of Georgia's procedures will not

provide Barnes with an adequate pre- or post-deprivation remedy to cure the erroneous deprivation of his property rights and liberty interests

82.     Because the law is clearly established in this area, and because Defendants had (and have) fair warning that denying Barnes the right to a public education, as well as a fair and open hearing prior to expelling him from VSU was unconstitutional, Defendants are liable for violating Barnes's rights protected by the Fourteenth Amendment

83.     The denial of constitutional rights is irreparable injury *per se*, and Barnes is entitled to declaratory and injunctive relief.   In addition, Barnes is entitled to damages to be determined by an impartial jury.

## COUNT 3

## 42 U.S.C. § 1983: INDIVIDUAL LIABILITY

## FREE SPEECH CLAUSE VIOLATION

## (INDIVIDUAL DEFENDANTS IN PERSONAL CAPACITY)

84.     Barnes realleges each fact set forth in paragraphs 1 through 83 of this complaint and incorporates them herein by reference.

85.     Barnes's activities on Facebook and on campus were speech acts protected from infringement by the First Amendment of the U.S. Constitution.

86.    Defendants' actions in conspiring to expel Barnes from VSU were taken in retaliation for Barnes's exercise of his First Amendment freedoms.

87.    Defendants' stated reasons for expelling Barnes from VSU were pretextual and had no rational basis, being wholly contradicted by the views of mental health professionals, communicated to Defendants, that Barnes posed no threat to self or others at any time.

88.    Because the law is clearly established in this area, and because Defendants had (and have) fair warning that expelling a student from a public university in retaliation for the exercise of First Amendment freedoms is unconstitutional, the individual Defendants are personally liable in their individual capacities for violating Barnes's First Amendment rights.

89.    The denial of constitutional rights is irreparable injury per se, and Barnes is entitled to declaratory and injunctive relief and to compensatory damages to be determined by an impartial jury.  In addition, Barnes is entitled to punitive damages for Defendants' willful and malicious violation of his First Amendment rights.

COUNT 4

42 U.S.C. § 1983: PROCEDURAL AND SUBSTANTIVE DUE PROCESS

(INDIVIDUAL DEFENDANTS IN PERSONAL CAPACITY)

90.     Barnes realleges each fact set forth in paragraphs 1 through 89 of this complaint and incorporates them herein by reference.

91.     Article I, Section 1, Paragraph 1 of the Georgia Constitution; and the Due Process Clause of the Fourteenth Amendment guarantee that no person shall be deprived of life, liberty or property without due process of law.

92.     Students at public universities enjoy a protected property interest in their education such that due process must be afforded them prior to the denial of those interests.  At a minimum, this includes notice and an opportunity to be heard.  See *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Bd. of Curators v. Horowitz*, 435 U.S. 78, 86 (1978).

93.     At no time have Defendants provided Barnes with these essential rights.

94.     Because the law is clearly established in this area, and because Defendants had (and have) fair warning that denying Barnes the right to a public education, as well as a fair and open hearing prior to expelling him from VSU

27

was unconstitutional, Defendants are individually liable for violating Barnes's

rights protected by the Fourteenth Amendment

95.     The denial of constitutional rights is irreparable injury *per se*, and

Barnes is entitled to declaratory and injunctive relief and to compensatory

damages to be determined by an impartial jury.  In addition, Barnes is entitled to

punitive damages for Defendants' willful and malicious violation of his Due

Process rights.

COUNT 5

BREACH OF CONTRACT

(VSU AND BOARD OF REGENTS)

96.     Barnes realleges each fact set forth in paragraphs 1 through 95 of

this complaint and incorporates them herein by reference.

97.     The Board's and VSU's policies and provisions in the VSU student

handbook, as well as contracts for student housing, establish a binding

agreement between these Defendants and each VSU student.

98.     Incorporated into this agreement is Defendants' obligation to

follow the procedures they have established for student discipline and expulsion.

99.     Defendants failed to follow these binding procedures.

28

100.   The Georgia State Legislature has waived the sovereign immunity of the State and its departments and agencies for claims for breach of written contracts.  OCGA § 50-21-1 (a).

101.   Defendants' actions in failing to provide the procedures and rights guaranteed by their own policies have imposed substantial economic harm upon Barnes, who has lost the academic benefits of the classes he was unable to complete, has suffered reputational harm, has been forced to bear the financial burden of enrolling at another public university at great expense, and has been forced to relocate to Atlanta to continue his studies.

102.   Defendants' actions constitute breach of contract, and Barnes is entitled to compensatory damages to be determined by an impartial jury.

## COUNT 6

## AMERICANS WITH DISABILITIES ACT

## (ALL DEFENDANTS IN OFFICIAL CAPACITIES)

103.   Barnes realleges each fact set forth in paragraphs 1 through 102 of this complaint and incorporates them herein by reference.

104.   Because of challenges related to anxiety and depression, Barnes sought and received both counseling and accommodation from VSU during his time as a student there.   These challenges substantially limit Barnes's life

activities, including his educational activities and constitute qualified disabilities pursuant to the Americans With Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* ("ADA").

105.  Defendants' cynical and pretextual use of his status subjected Barnes to intentional discrimination on the basis of and by reason of his disability, in violation of Title II of the ADA.

106.  Barnes is entitled to declaratory and injunctive relief and compensatory damages to be determined by an impartial jury pursuant to 42 U.S.C. § 12133.

107.  Barnes is entitled, as well, to recover attorneys' fees associated with this action.  29 U.S.C. § 794(b); 42 U.S.C. § 12205.

## COUNT 7

## REHABILITATION ACT

## (ALL DEFENDANTS IN OFFICIAL CAPACITIES)

108.  Barnes realleges each fact set forth in paragraphs 1 through 107 of this complaint and incorporates them herein by reference.

109.  Defendants' actions subjected Barnes to intentional discrimination on the basis of and by reason of his disability, in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

30

110. Barnes is entitled to declaratory and injunctive relief and compensatory damages to be determined by an impartial jury.

111. Barnes is entitled, as well, to recover attorneys' associated with this action. 29 U.S.C. § 794(b).

**WHEREFORE,** Barnes prays:

(a) That the Court grant Barnes declaratory and injunctive relief, and award compensatory and punitive damages against the Defendants for violating his rights protected by the First and Fourteenth Amendments to free expression and due process; and that the Court grant Barnes declaratory and injunctive relief and compensatory damages against the Defendants for violating his rights protected by the ADA and the Rehabilitation Act, all in an amount to be determined by the enlightened conscience of an impartial jury;

(b) That the Court award Barnes his reasonable costs and attorneys' fees in bringing this action in an amount to be determined at trial;

(g) That Barnes be granted a trial by jury on all issues so triable; and

(h) That Barnes be granted such other and further relief as the Court deems just and proper.

31

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By  /s/ Robert Corn-Revere*
Robert Corn-Revere
Lisa Zycherman
Brigham J. Bowen
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C.  20006
Telephone:        (202) 973-4200
Facsimile:        (202) 973-4480

*Pro hac vice motion for all above counsel filed
contemporaneously with this complaint

COOK, YOUNGELSON & WIGGINS

By _____
Cary S. Wiggins
Ga. Bar No. 757657
260 Peachtree Street, NW, Suite 401
Atlanta, Georgia 30303
Telephone:        (404) 659-2880
Facsimile:        (404) 659-3272

Counsel for Plaintiff