

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 1 5 2009

JAMES N. HATTEN, Clerk
By [signature] Deputy Clerk

| | | |
|---|---|---|
| THOMAS HAYDEN BARNES, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | |
| | * | Case No. 1:08-cv-00077-CAP |
| RONALD M. ZACCARI, *et al.*, | * | |
| | * | **FILED UNDER SEAL** |
| Defendants. | * | |

## PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF DR. MATTHEW W. NORMAN

### INTRODUCTION

The VSU Defendants (Keppler, Mast, Zaccari, Board of Regents of the University System of Georgia, Morgan and Valdosta State University) make no serious attempt to justify their untimely designation of an expert witness after the close of discovery. Instead, under the rubric of an "opposition," they submit a laundry list of perceived grievances about how discovery was conducted, replete with Biblical references, but without citation of a single legal authority that supports their late designation of an expert. Defendants' claim that they must be excused for a blatant failure to follow the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Georgia because they could not have anticipated the need for a rebuttal expert until after the July 31, 2009 deposition of Dr. Kevin Winders is transparently false and should be summarily rejected.

1



CONFIDENTIAL

## ARGUMENT

### I. DEFENDANTS' DISREGARD OF THE RULES REGARDING THE DISCLOSURE OF EXPERTS REQUIRES THE EXCLUSION OF ANY TESTIMONY BY DR. MATTHEW NORMAN

#### A. Defendants Offer No Legal Justification For Their Untimely Disclosure

There is no dispute about the facts underlying Plaintiff's motion to exclude the expert report and testimony of Dr. Norman. Without moving to reopen the discovery period or for leave to make a late disclosure, Defendants attempted to supplement their initial disclosures simply by identifying Norman as an expert three and a half weeks after the close of discovery in violation of Fed. R. Civ. P. 26(a)(2)(C) and Local Rule 26.2(C). Nor is there any dispute about the governing legal standard: To excuse the failure to disclose an expert witness, two elements must be satisfied: (1) there must be substantial justification for the failure, and (2) the failure must be harmless. Memorandum Supporting Plaintiff's Motion at 7 (citing relevant legal authority) [Dkt. # 139]; Opposition To Plaintiff's Motion To Exclude the Expert Report and Testimony of Matthew W. Norman, M.D. ("Opp.") at 18 (quoting Plaintiff's memorandum and cited authority) [Dkt. # 144]. The party making the late disclosure bears the burden of showing both substantial justification and that the failure to comply was harmless. *See United States v. Batchelor-Robjohns*, 2005 WL 1761429 (S.D. Fla. June 3, 2005).

Defendants' opposition consists of a lengthy and unstructured discourse on their travails during the discovery process but no legal argument at all. Apart from citing some of the applicable rules, the Defendants mention only two cases, both of which were simply lifted from Plaintiff's memorandum, that stand for the

2

CONFIDENTIAL

unremarkable proposition that the district judge has discretion over the discovery process. *See* Opp. at 18, 20. What the Opposition lacks is any legal support for why the court should exercise its discretion to excuse Defendants' disregard of the rules *in this case*.

Defendants' creative attempt to interpret the rules in a way that favors their position is unavailing. They assert that Local Rule 26.2(C) "has no hard and fast deadline" and assert that the rule "implies an interpretative tone with discretionary room which the Court may allow otherwise." Opp. at 15. They then inexplicably cite that part of the rule that calls for *exclusion* of a late-designated witness as if it somehow supports their position. *See id.* (quoting Rule 26.2(C)) ("Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, *unless expressly authorized by the court order upon a showing that the failure to company* [sic] *was justified.* ") (emphasis added by Defendants).

Unfortunately for the Defendants, the use of italics to emphasize the court's ability to order an *exception* to the rule does not cancel the rule, which plainly states that parties failing to comply "shall not be permitted to offer the testimony of the party's expert." This Court has expressly rejected assertions like the ones made here, that the local rule is "more instructive than mandatory," and has held that the corresponding federal rule regarding the disclosure of expert witnesses "in conjunction with [the] Local Rule" is "clearly mandatory." *Gainor v. Douglas County*, 59 F. Supp. 2d 1259, 1297 (N.D. Ga. 1998). *See also Corey Airport Servs., Inc. v. City of Atlanta*, 2008 U.S. Dist. LEXIS 75508, at *45 (N.D. Ga. Sept. 30, 2008) ("If a party fails to comply with this provision of the local rules,

CONFIDENTIAL

then the party *shall not* be allowed to offer the testimony of the expert witness.") (emphasis added).

Defendants discuss no case law that applies the rule, evidently for good reason: it overwhelmingly supports exclusion of the late-disclosed witness. Any party failing to comply with the requirement "shall not be permitted to offer the testimony of the party's expert." *See Kipperman v. Onex Corp.*, 2009 U.S. Dist. LEXIS 71666, at *80 (N.D. Ga. Aug. 13, 2009); *Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1193-95 (N.D. Ga. 2005) (excluding testimony of plaintiff's expert witness because, *inter alia*, plaintiff's failure to identify expert witness in compliance with Local Rule 26.2(C) was not justified); *APA Excelsior III, L.P. v. Windley*, 329 F. Supp. 2d 1328, 1337-38 (N.D. Ga. 2004) (excluding expert witnesses not named during discovery); *Hammond v. Gordon County*, 316 F. Supp. 2d 1262, 1266 (N.D. Ga. 2002) (excluding expert witnesses not named until three weeks before the close of discovery). Indeed, this Court has described an assumption by counsel that Local Rule 26.2(C) is "more instructive than mandatory" as a "cavalier attitude" that "will not be tolerated." *Gainor*, 59 F. Supp. 2d at 1297.

Additionally, Defendants' argument does not address the reason for the rule, which is to require the disclosure of an expert early enough during discovery to allow for their deposition and an opportunity for the opposing party to identify their own expert on the subject matter "prior to the close of discovery." *See* Local Rule 26.1(C). Defendants also fail to explain (or even to cite) Rule 37(c)(1) of the Federal Rules of Civil Procedure, which also calls for the exclusion of an late-disclosed witness, unless the failure is substantially justified or harmless.

CONFIDENTIAL

Accordingly, Defendants offer no explanation for why, prior to filing their unannounced supplemental disclosure on August 18, 2009, they did not first ask this Court to extend discovery so that their tardy witness could be deposed.[1] Such a step is absolutely necessary, as explained by this court in *American General Life Insurance Co. v. Schoenthal Family, LLC,* 248 F.R.D. 298 (N.D. Ga. 2008), *aff'd,* 555 F.3d 1331 (11th Cir. 2009). There, Defendants named an expert on the last day of discovery and argued that their late designation was justified, primarily because they had been unable to depose Plaintiff's expert until three days before the expiration of the discovery period. *Id.* at 307-08. Defendants contended that because they were only able to depose Plaintiff's expert at the close of discovery, they did not have adequate time to depose Plaintiff's expert, decide if they wanted to designate their own expert, or have that expert deposed within the discovery period. *Id.* This Court rejected the late designation as a clear violation of the local rules and excluded the proposed expert. *Id.* at 308. *See also Hammond,* 316 F. Supp. 2d at 1266.

In addition, there is no merit to the VSU Defendants' claim that Dr. Norman should be permitted as a "rebuttal" witness. Rebuttal expert reports on the same subject matter identified by the Plaintiff under Rule 26(a)(2)(B) must be disclosed within 30 days after the other party's disclosure. *See* Fed. R. Civ. P. 26(a)(2)(C)(ii). Plaintiff disclosed Dr. Kevin Winders as an expert January 5,

---

[1] Defendants refer to an extension of the discovery period only obliquely and belatedly by offering to "agree to the allow the late deposition of Dr. Norman." Opp. at 18. Unfortunately, this magnanimous gesture lacks the necessary motion and fails to justify a further extension of the discovery period that already was extended once to accommodate counsel for the VSU Defendants.

5



2009. Under the Federal Rules regarding rebuttal experts, Defendants would have been required to disclose Dr. Norman no later than February 4, 2009.

## B. Defendants Offer No Factual Justification For Their Untimely Disclosure

Defendants offer no plausible explanation that their disregard of the rules was substantially justified. Quite frankly, for most of the opposition it is difficult even to identify an argument in support of the late disclosure of Dr. Norman as an expert. As best we can tell, the Defendants assert they were justified in ignoring Local Rule 26.2(C) because (1) "the substance of Dr. Winders expert testimony as was never disclosed until he was deposed on July 31, 2009," and Dr. Norman's testimony is necessary to rebut that of Dr. Winders, and (2) "Defendants have shown substantial justification with their explanation of their intentions and interpretations of the Local and Federal Rules; and by showing the demands of the discovery timetable with small firm representation of six (6) clients." Opp. at 18. Both assertions are utterly baseless.

Defendants' second claim is nothing more than a restatement of counsel's misinterpretation of the Local Rule, combined with a plea that the rigors of the case and the discovery process have been difficult for the firm to manage. But as the case law makes clear, Defendants' assertions regarding the "permissive" nature of the rule are plainly wrong. And even if Defendants' interpretation were plausible (*e.g.*, based on even a modicum of research), a party seeking such dispensation nevertheless would have to provide a good reason why the court should act to permit the late disclosure. Instead, Defendants offer a litany of charges regarding delays in receiving expert reports (on non-medical issues) and

6

CONFIDENTIAL

other perceived sleights during the discovery process that are both irrelevant to the issue at hand – the post-discovery designation of Dr. Norman as an expert – and wildly inaccurate. In any event, Defendant's counsel has given no reason why a "small firm" cannot understand and follow the rules.

Defendants' principal argument – that they could not have foreseen the need for an expert witness on medical issues until after Dr. Winders' deposition – strains credulity. From the beginning of this case, the VSU Defendants' principal defense has been that they were somehow justified in silencing Hayden Barnes and summarily kicking him off campus because he represented a "clear and present danger" to President Zaccari and others on campus. Dr. Winders submitted a letter to Dr. Zaccari on May 8, 2007 as part of the administrative appeal explaining that Mr. Barnes represented no threat to anyone, confirming the judgment of Leah McMillan, Mr. Barnes' on-campus counselor. [2]  Both letters simply were ignored by Dr. Zaccari. *See* Ex. B, Zaccari Dep. 249:14-255:13.

The issue for which the VSU Defendants belatedly seek to offer expert testimony has been central to this case from the very beginning. Indeed, it was a key contention in the parties' unsuccessful motion to dismiss. As this Court noted, "despite multiple documented assessments from McMillan and Mr. Barnes's own private psychiatrist, Dr. Kevin Winders, that Mr. Barnes had neither exhibited nor expressed tendencies or proclivities of violence, President Zaccari led a meeting on May 3, 2007 that yielded a decision to remove Mr. Barnes as a student from VSU." Order Denying Motion to Dismiss in Part at 4. [Dkt. # 37.]

---

[2] *See* letters dated May 2, 2007 and May 8, 2007 attached as Ex. A hereto.

7

CONFIDENTIAL

After the Court's order denying the motion to dismiss for most claims, and once discovery commenced, the Plaintiff disclosed his intention to call Dr. Winders both as a fact witness and as an expert witness.[3] Plaintiff disclosed that:

> Dr. Winders will testify regarding events that preceded the expulsion of Hayden Barnes from VSU as well as his efforts to assist in an administrative appeal of the expulsion. He will also provide expert testimony regarding the mental and emotional anguish suffered by Plaintiff as a result of Defendants' actions.

Plaintiff's Rule 26(a)(1) Initial Disclosures, Attachments A and B [Dkt. # 47]. At this time, Plaintiff's counsel already had reached out to counsel for the Defendants to try to work out the terms of a protective order.

The VSU Defendants' claim that they should be permitted to designate Dr. Norman as an expert after the close of discovery because they never received an expert report from Dr. Winders is based on a misunderstanding of the applicable rules. As counsel for the Plaintiff attempted to explain, Rule 26(a)(2)(B) requires expert reports only if the witness is "one retained or specially employed to provide expert testimony," and not from a treating physician. Fed. R. Civ. P. 26(a)(2)(B). The annotations to the 1993 Amendments to the Federal Rules of Civil Procedure make this distinction crystal clear: "The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or

---

[3] Plaintiff named both Dr. Winders and Greg Lukianoff as expert witnesses in the initial disclosures on January 5, 2009. [Dkt. # 47.] Plaintiff supplemented his initial disclosures on May 12, 2009 to name Professor Robert O'Neil as an expert. [Dkt. # 80.] Only the proposed testimony of Dr. Winders is material to the VSU Defendants' argument.

CONFIDENTIAL

specifically employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement of a written report." Fed. R. Civ. P. 26 advisory committee's note, 1993 Amendments.

A principal reason for this distinction is that treating physicians have notes or other documentation that illuminate the basis for their opinions, all of which were provided to counsel for VSU in due course.[4] The VSU Defendants complain that there was some delay in obtaining physicians' notes, but this false assertion does not justify the late designation of an expert. Defendants' counsel had medical records before the depositions both of Mr. Barnes and Dr. Winders, and any delay in Defendants' gaining access to Plaintiff's medical records resulted from their own actions. In numerous emails, Plaintiff's counsel offered to send Defense counsel a copy of a signed HIPAA release by Plaintiff granting access to his medical records provided Defendants signed a protective order, as ordered by the Court on May 7, 2009. (*See* Order Granting in Part and Denying in Part Motion

---

[4] Defendants claim that counsel for Plaintiff engaged in a five month battle to deny Defendants access to Plaintiff's medical records is patently false. After the court issued its order on the motion to dismiss, Plaintiff's counsel contacted counsel for Defendants regarding access to Plaintiff's medical records. For example, on February 9, 2009, Plaintiff's counsel Lisa Zycherman corresponded with Assistant Attorney General Cris Correia to arrange Defendant's access to Plaintiff's medical records and to work out the terms of a protective order. (*See* Ex. C.) Rather than sign the protective order, Attorney Correia filed a motion to compel production of Plaintiff's medical and mental records. (*See* Motion for Order to Allow Discovery of Plaintiff's Medical and Mental Health Records [Dkt. # 60].) Plaintiff objected, asking the court to limit the order to the mental health records at issue in this case. (*See* Response in Opposition re Order Motion [Dkt. # 62].) The court issued its response on May 7, 2009.

CONFIDENTIAL

for Order to allow discovery of Plaintiff's medical and mental health records [Dkt. # 77].) Plaintiff made numerous attempts to get Defendants to sign such a protective order.[5] Like most of the VSU Defendants' purported discovery grievances, any delay was the result of their own dilatory behavior.

Finally, there is no basis for the VSU Defendants' claim that Dr. Winders was not flexible with his availability to be deposed or that Plaintiff's counsel did not adequately make Dr. Winders available to be deposed. Opp. at 13. At a July 2, 2009 deposition, counsel for Plaintiff Erin Reid and Christopher Fedeli informed Defense counsel of the availability of Dr. Winders, along with several other witnesses. Counsel for Defendants asked the Plaintiff to put it in writing, and on July 3, 2009, Attorney Fedeli sent Counsel for all Defendants a list of available dates for deposing Dr. Winders.[6] Counsel for Defendants did not respond to Attorney Fedeli's email. On July 7, 2009, Attorney Reid followed up with two additional dates that Dr. Winders was available to be deposed. *Id.* Two days later,

---

[5] Following the court's order, on May 12, 2009, Plaintiff's Attorney Fedeli emailed Defendants' Attorneys Will, Smith and LaVallee copies of a draft protective order. This email followed-up on an April 20, 2009 email sent by Attorney Fedeli on the same subject. Defendant McMillan's attorney responded to Fedeli on May 14, 2009 with suggested modifications to the protective order, and signed off on the revised protective order on May 21, 2009. Defendant Gaskins' counsel signed off on the May 25, 2009. On June 5, 2009, Attorney Fedeli sent a reminder email to the group stating that the parties would receive a signed HIPAA release form from Barnes as soon as counsel for the VSU Defendants signed off on the protective order. Plaintiff's Attorney Reid again raised the issue of the protective order during the deposition of Laverne Gaskins on June 12, 2009 in Valdosta and asked Attorney Will if he planned on consenting. One month after Plaintiff's counsel circulated a draft protective order, Attorney Will finally agreed to the details of the order. (*See* Ex. C.) To claim that Plaintiff prevented or delayed Defendants from having access to Plaintiff's medical records is not supported by the facts.

[6] *See* emails attached as Ex. C.



on July 9, 2009, Attorney Reid followed up with a second email seeking to confirm that Defense counsel could depose Dr. Winders and Kelly Burke on July 20, 2009. *Id.* Counsel for the VSU Defendants responded on July 10, 2009, proposing a deposition schedule that would have Dr. Winders deposed on July 31, 2009, the last available date of discovery.

### C. Defendants' Proposed Expert is Unqualified

The VSU Defendants assert that it is "VITAL to Defendant's case that they be able to utilize the report and testimony of expert Dr. Norman. Dr. Norman's report and testimony are, *inter alia*, in direct debate of Dr. Winder's substantive disclosures." Opp. at 14. To support this proposition, they assert that "Plaintiff's Counsel believe that Winder's substantive disclosure warrants a rebuttal witness on Defendants' behalf." *Id.* This bizarre assertion is far from the truth. It is far more plausible to believe that the VSU Defendants only belatedly began to appreciate the deep flaws in their case as discovery was closing, and they only then scrambled to hire a witness in the following weeks. But Defendants' professed belief that Dr. Norman's testimony is "VITAL" does not excuse the late disclosure, nor does it make Dr. Norman competent to offer an opinion in this case.

As set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993), an expert's testimony is relevant if it will assist the trier of fact. Here, the proffered expert report makes clear that Dr. Norman's testimony will not satisfy the applicable standard. Dr. Norman has never examined or even met Hayden Barnes and states in his expert report that "[a]ll opinions formulated are based only on record view and not a direct examination of the Plaintiff, Mr. Thomas Hayden

CONFIDENTIAL

Barnes."[7] Given that Dr. Norman has never examined Barnes, it is hard to see how Dr. Norman can offer an expert opinion regarding the damage suffered by Mr. Barnes due to Defendants' actions.

Dr. Norman's testimony is also irrelevant because it is being offered to assess whether a "reasonable person" or a "reasonable clinician" could have found Mr. Barnes to be a "clear and present danger" in April and May of 2007. Dr. Norman is being asked to offer his opinion two years after Mr. Barnes was "administratively withdrawn" from Valdosta State University. Dr. Norman has no basis for his opinion, other than documents provided to him by counsel for the VSU Defendants. His testimony might have been relevant if he had been consulted by President Zaccari at the time. But, of course, there would have been no opportunity for such expert input since it is undisputed that Mr. Barnes was denied a hearing, and there was no opportunity to explore what a "reasonable person" might think. The only thing that mattered — the single dispositive factor — was that President Zaccari wanted Hayden Barnes off campus.[8] Dr. Norman's

---

[7] *See* Defendants Ronald M. Zaccari, Valdosta State University, Board of Regents of the University System of Georgia, Kurt Keppler, Russ Mast's *Supplemental* Initial Disclosures at 8 [Dkt. # 136].

[8] Indeed, those who participated at the time, including Defendants, Keppler, Mast, Morgan and Gaskins all testified that they did not perceive Mr. Barnes to be a threat. *See* Ex. D, Keppler Dep. 28:16-20; Ex. E, Mast Dep. 52:8-10; Ex. F, Morgan Dep. 51:11-22; Ex. G, Gaskins Dep. 135:21-136:4. Additionally, Defendant McMillan and Dr. Kevin Winders, the mental health professionals who were consulted at the time, likewise testified that Barnes was not a threat. *See* Ex. H, Winders. Dep. 71:22-72:4; Ex. I, McMillan Dep. 12:15-19.



proposed testimony has no bearing on the facts at dispute in this case and his testimony will not assist the trier of fact.[9]

### D.    This Court Should Exclude the Proposed Testimony

As articulated in Plaintiff's Initial Motion, the late designation of Dr. Norman as an expert is not harmless. (*See* Brief in Support of Motion to Exclude the Expert Report and Testimony of Dr. Matthew W. Norman, M.D. at 5 [Dkt. # 139].) The VSU Defendants' other miscellaneous complaints about the conduct of discovery (including allegations about the timing of Plaintiff's non-medical experts), are both false and irrelevant to the instant motion. Contrary to Defendants' claims, the Local and Federal Rules are silent as to the question of whether an expert witness report must be provided contemporaneously with the naming of experts. Reading the federal and local rules together, it is clear that the expert witness report must be provided during discovery, making Defendants' arguments on this point richly ironic.

Finally, there is no need for the court to grant Defendants' request for oral argument or for a status conference. It is clear that Defendants have failed to meet this standard. An oral argument is not necessary to decide this point.

---

[9] Plaintiff reserves the right to issue a full *Daubert* challenge to the relevancy of Dr. Norman's testimony and expert report if Defendants are allowed to use Dr. Norman as an expert in this case.

CONFIDENTIAL

## CONCLUSION

For the reasons set forth herein, and his initial brief, Plaintiff respectfully requests that the Court exclude Norman's testimony at trial, exclude his expert report (in support of summary judgment, as evidence or at trial) and award attorney fees for bringing this motion.

Dated September 14, 2009.

Respectfully submitted,

*/s/ Robert Corn-Revere*
Robert Corn-Revere
Christopher A. Fedeli
Erin N. Reid
Lisa Zycherman
Admitted *Pro Hac Vice*
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
202-973-4200; Email: bobcornrevere@dwt.com

*/s/ Cary Stephen Wiggins*
Cary Stephen Wiggins
Georgia Bar No. 757657
Irma Espino
Georgia Bar No. 558220
Wiggins Law Group
260 Peachtree Street, NW, Suite 401
Atlanta, GA 30303
404-659-2880; Email: cary@wigginslawgroup.com

Attorneys for Plaintiff

14



## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on September 14, 2009, I served the foregoing to all counsel of record via electronic means. I also certify, pursuant to Local Rule 7.1(D), that this document has been prepared in Times New Roman 14-point font.

*/s/ Robert Corn-Revere*

Robert Corn-Revere
Admitted *Pro Hac Vice*
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
202-973-4200
Email: bobcornrevere@dwt.com

Attorney for Plaintiff

# EXHIBIT A

CONFIDENTIAL

CONFIDENTIAL

# P C

## Psychiatric Consultants, P.C.

515 E. 63rd St. • Suite 1 • Savannah, GA 31405 • Telephone (912) 352-2921 • Fax (912) 352-1038

Arnold J. Tillinger, M.D.
Emmet R. Bishop, Jr., M.D.
Kevin Winders, M.D.
Nancy Eschette, Ph.D.
Elizabeth Kitchens, Ph.D.
Cecil Barnes, ACSW, LCSW
Maria Coughenour, LPC
Carol A. McGee, M.A.

May 2, 2007

Leah McMillan, Licensed Counselor
Valdosta State University
1500 North Patterson Street
Valdosta, GA  31698-0280
Fax 229-332-7169

**Re: Thomas "Hayden" Barnes**

Dear Mrs. McMillan:

I am writing this letter as a followup to our phone conversation on May 1, 2007. I evaluated Hayden on April 30, 2007. He states that he was surprised by the recommendation to take the summer quarter off. He states that he is doing fairly well but admits to some unresolved obsessiveness. He also admits that he becomes over-passionate about certain causes. However, he states that when other people point this out or when he feels that he is overinvolved on a project, he is able to back off. He agreed with increasing his Lexapro to 15 mg targeting anxiety and obsessiveness. I reviewed a three-page typed document that he is planning to share with you presenting his case. My only concern was that on the second page he documented periodic ups and downs in mood. He labeled these initially as downs, ups and normal. When we discussed this further, he stated, "Maybe I should have labeled this downs, normal, and a little down." In the ups, he mentioned less need for sleep; however, when I questioned him about this, he stated that he slept for six to eight hours during these periods of time, slept very soundly, and functioned very well for most of the next day. This is in contrast to when he was doing poorly when he feels he is very fatigued and tired during the day. He also mentioned racing thoughts; however, he described these as mostly worry and were not grandiose in nature. I questioned him more regarding grandiosity and it appears that he does not have any grandiosity and frequently has decreased self-esteem. It is clear that his mood cycles, however, I feel this is mostly due to anxiety and depression rather than a true Bipolar Disorder.

I questioned him significantly on any psychotic symptoms and he denies all of these. I also questioned him specifically on manic-type symptoms and, again, he denied these as well as hypomanic symptoms. He did admit to the mood cycling as stated before.

I feel the best approach is to increase his Lexapro targeting his most obvious symptoms, which would include anxiety, depression and obsessiveness. I think some of this obsessiveness is personality-related, however, the medications may still be helpful. If he does not show improvement on the Lexapro over the next two weeks, I asked him to give me a call and we would consider using a mood stabilizer on the possible chance that he has some type of bipolar variant.

There was nothing during the interview that led me to think that he was dangerous to himself or others. He also appeared to be able to care for himself. He specifically stated that he did not want to hurt anyone or himself.

Leah McMillan, Licensed Counselor
**Re: Thomas "Hayden" Barnes**
May 2, 2007
Page Two

CONFIDENTIAL

As a final note, I recommended that he return to your office after my evaluation and present his document as well as discuss his plans for the summer. I informed him that you may need further information and may want a second opinion. This second opinion could come from another psychiatrist or you might consider a personality inventory, such as the MMPI, to clarify his diagnosis.

If you have any questions or concerns, please contact me at 352-2921.

Sincerely,

Kevin J. Winders, M.D.
KJW/hbd

CONFIDENTIAL

# P C

## Psychiatric Consultants, P.C.

*515 E. 63rd St. • Suite 1 • Savannah, GA 31405 • Telephone (912) 352-2921 • Fax (912) 352-1038*

Arnold J. Tillinger, M.D.
Emmet R. Bishop, Jr., M.D.
Kevin Winders, M.D.
Nancy Eschette, Ph.D.
Elizabeth Kitchens, Ph.D.
Cecil Barnes, ACSW, LCSW
Maria Coughenour, LPC
Carol A. McGee, M.A.

To:    Office of the President
      Valdosta State University
      Fax: 229-333-5952

From:  Kevin Winders, MD

Re:    Thomas "Hayden" Barnes

Dear Sir,                                 May 8, 2007

      Hayden contacted me last night to inform me that he has been expelled from school. I was surprised to hear this, as I have been in contact with Leah McMillan, a counselor at your university, and she gave me no indication that expulsion was planned. In fact, I conducted an evaluation of Hayden on April 30, 2007, at her request and felt he was not a threat to harm himself or anyone else. As a precautionary step, I gave her options for a second opinion. Again, I am surprised that this action was taken with a good report from me and no further evaluation to contradict my findings. I understand that the "post Virginia Tech" period is difficult for all universities. I also understand that the university is not bound by my recommendations. However, Hayden had the insight to "drop" the anti parking garage campaign after the Virginia Tech tragedy, and I am not aware of any specific threats made by him.

      I am including my correspondences with Leah McMillan, so you have some background information. To make a full evaluation of Hayden, I would need to see your evidence that he is a threat. However, based on the information I have at this point, I think Hayden's main issue is being obsessive. It is impossible to predict the future, but I don't think he is violent or any more of a threat to harm someone than any other student.

      I support Hayden's effort to be re-enrolled in school to at least finish this semester.

                               Sincerely,

                               Kevin Winders, MD



CONFIDENTIAL

**VALDOSTA**
**S T A T E**
**UNIVERSITY**
*Building for Our Next Century*
1906 May 8, 2007

Board of Regents of the University System of Georgia
270 Washington St. S.W.
Atlanta, GA 30334

Office of the President
Valdosta State University
1500 N. Patterson St.
Valdosta, GA 31698

**Re:     Thomas "Hayden" Barnes, VSU Student ID No. 8702203740**

Dear President Zaccari & Board of Regents Members:

Please be advised I have been asked by Mr. Hayden Barnes to write a letter on his
behalf regarding his therapeutic treatment with the Valdosta State University Counseling
Center. Enclosed is the Consent to Release Mr. Barnes signed in order for our office to
disclose such information and documentation to you.

I began seeing Hayden as his Counselor in September 2005. Following the
completion of Fall semester 2005, Hayden transferred from VSU to attend Paramedic
School at the Rescue Training Facility of Savannah (uncertain correct name of said
school). He attended said program from January 2006 to September 2006, where he
completed his certificate and became certified. After completion of said program, Hayden
returned to VSU, Spring 2007 and I began seeing him again in February 2007. In Spring
semester 2007, I have seen Hayden a total of nine sessions; this total does not reflect
phone calls with Mr. Barnes and/or his Psychiatrist, Dr. Kevin J. Winders, concerning his
treatment.

It is my understanding that Mr. Barnes has been diagnosed previously by Dr.
Winders with Generalized Anxiety Disorder, Panic Disorder with Agoraphobia, and mild
ADHD symptoms; however, he did not meet full criteria for proper diagnosis of ADHD.
In the past few months, I began seeing other behaviors that concerned me and I wanted to
explore and observe further. I became concerned that Hayden could be decompensating
and made contact with Dr. Winders to process treatment concerns. It was about this same
time, that Hayden began to have issues with the administration at VSU.

Some of the behaviors I was concerned with, but not limited to, were: impulsive
behavior, obsessive behavior and thoughts, grandiose ideologies, narcissistic behavior
and thought pattern, "up and down" periods which could have been related to possible
manic and depressive periods, severe anxiety, mood shifts, and absolute thinking. I met

**Counseling Center**
*Division of Student Affairs*
**Location** Powell Hall–East • **Address** 1500 N. Patterson St. • Valdosta, GA 31698–0166
**Phone** 229.333.5940 • **Fax** 229.333.7169 • **Web** www.valdosta.edu/counseling
A Regional University of the University System of Georgia & an Equal Opportunity Institution



CONFIDENTIAL

H. Barnes 2

with Hayden and discussed my concerns. In addition, I spoke with Dr. Winders to discuss a possible change in diagnoses and medications. I suggested Hayden be reevaluated by Dr. Winders to address present concerns.

Hayden was reevaluated on May 1, 2007 by Dr. Winders and I have attached a copy of the letter that Dr. Winders sent me regarding this reevaluation. Dr. Winders has increased Hayden's medication to Lexapro, 15 mg, 1x daily, Gabitril, 4 mg, 1x daily, and Xanax as needed. It is my understanding that Hayden will continue treatment with Dr. Winders and if said behaviors are observed he may suggest another change in medications.

As far as your concern, I have seen the documentation and processed the behavior that has the President of VSU concerned for not only his own safety but the safety of others. I have discussed these issues directly with Mr. Barnes. As far as I am aware, Mr. Barnes has never acted out violently in his past or in the present. Mr. Barnes has contracted safety with me and discussed no suicidal or homicidal ideologies. Mr. Barnes has stated numerous times that he has not had nor does have any intentions to harm the President of VSU, others, or himself. He has been extremely apologetic that his behavior has frightened anyone. Hayden does admit to coping with stress and his political agendas inappropriately and will continuing working on reducing his anxiety and learn how to appropriately resolve conflict.

As you are aware, I cannot continue to see Hayden as his Counselor while he is no longer a student at VSU. However, if Hayden returns to VSU in the future, I will be more than willing to continuing seeing him in the VSU Counseling Center. In addition, I can refer Hayden to be monitored by our onsite consulting Psychiatrist to confirm that he is complying with said conditions and his mental state is stable.

It is my professional opinion after assessing Hayden that he is not a threat, indirectly or directly to anyone on the VSU Campus (i.e. President, staff, faculty, students, others, or self). Thank you for your time and assistance in this matter. Please contact my office if you have any questions or comments.

Respectfully Submitted,

Leah McMillan, L.M.F.T.
VSU Counseling Center

Cc:    Mr. Hayden Barnes

# EXHIBIT B

CONFIDENTIAL

Page 1

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,          CASE NUMBER
   Plaintiff,                1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
   Defendants.
_____/

DEPOSITION OF
DR. RONALD ZACCARI

JULY 29, 2009
9:07 A.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

## Page 246

1  been caused by the way this thing came out.
2      And 1902 is a Board of Regents policy which
3  supersedes any campus policy, and so I selected to use the
4  Board of Regents 1902 as the basis for the withdrawal.
5  Q   But Board Policy 1902 isn't an administrative
6  withdrawal policy, is it?
7  A   It is -- is the reason why I selected that as a
8  basis for the withdrawal.
9  Q   But there's nothing in Board Policy 1902 that
10  actually says "administrative withdrawal," is there?
11  A   No.
12  Q   You just chose to call it that.
13  A   Yes. I chose to call it that because Policy 1902
14  is -- (reviewing documents). If I read this from the policy
15  manual from the Board of Regents 1902, disruptive behavior
16  states the following: "Any student, faculty member,
17  administrator, employee can result in dismissal or
18  termination."
19      I did not dismiss. I did not terminate. I used
20  the opportunity for Mr. Barnes to step out for a period of
21  time under administrative withdrawal.
22  Q   Right. But Board Policy 1902 is a disciplinary
23  policy, isn't it, for gross irresponsibility?
24  MR. WILL:   Object to the form of the question.
25  THE WITNESS:   It's not grossly. It says that --

## Page 247

1  I'm putting this in the context that I believe that his
2  student behavior was out of the context of norm and
3  caused a great disruption to the administration of the
4  university, which says, "Any student who clearly
5  obstructs administrative activities in the university may
6  be discharged."
7      I felt that it was a disruptive behavior to the
8  administration of our campus.
9  BY MR. CORN-REVERE:
10  Q   Okay. Did you select Board Policy 1902 because the
11  other policies listed in Ms. Gaskins' memo to you weren't
12  appropriate to this situation?
13  A   I selected this because I thought it was the most
14  appropriate.
15  Q   But why did you exclude the others?
16  A   I think I've already covered that. The medical
17  withdrawal --
18  Q   Was too cumbersome?
19  A   It was not -- it was cumbersome, but it was going
20  to be a lengthy period of time before a decision could be
21  made.
22  Q   And you'd have to do things like provide evidence?
23  A   I would assume that that would be a part of it. A
24  physician would have to make the decisions on that based on
25  information.

## Page 248

1  Q   And is the same true of the mental health
2  withdrawal policy?
3  A   Yes.
4  Q   And is the same true of the policies with respect
5  to disciplinary procedures?
6  MR. WILL:   Object to the form.
7  BY MR. CORN-REVERE:
8  Q   I'm sorry. Disorderly conduct?
9  A   Yes.
10  MR. CORN-REVERE:   Let's mark as Zaccari Deposition
11  Exhibits 23 and 24, two letters dated May 8th, 2007.
12      (The documents were marked for identification as
13  Plaintiff's Exhibit Numbers 23 and 24.)
14  THE WITNESS:   (Reviewing documents.)
15  BY MR. CORN-REVERE:
16  Q   The first is a letter from Leah McMillan to the
17  Board of Regents --
18  MR. LaVALLEE:   Bob, can we wait until it gets
19  circulated?
20  MR. CORN-REVERE:   Sure.
21      (Pause)
22  MR. CORN-REVERE:   Everyone got it?
23      (Pause)
24  THE WITNESS:   (Reviewing document.)
25  BY MR. CORN-REVERE:

## Page 249

1  Q   Dr. Zaccari, have you had a chance to look at these
2  two exhibits?
3  A   Yes.
4  Q   Have you seen them before?
5  A   Yes.
6  Q   Please identify them for the record.
7  A   Exhibit 23 is a letter directed to the Board of
8  Regents, University System of Georgia, also is directed to
9  the Office of the President. It's dated May the 8th, 2007.
10  It's in reference to Mr. Barnes, and it is a letter
11  from Leah McMillan, VSU Counseling Center. Subject is
12  writing a letter that was requested by Mr. Barnes on his
13  behalf.
14  Q   Do you recall when you first saw these two letters?
15  A   One was written on May the 8th. The second one was
16  written on May the 8th from Dr. Winders.
17  Q   Do you know if you received them on May 8th, 2007?
18  A   I do not. Keeping in mind that the Board of
19  Regents meetings were being held in Atlanta on the 7th and
20  the 8th.
21  I'm not sure I was back in the office. I may have
22  been back later that afternoon, but they were signed on the
23  8th; and I'm not sure if they came to my attention the next
24  morning or late that afternoon of the 8th.
25  Q   Okay. So, on or about May 8th, perhaps May 9th,

CONFIDENTIA



# WHEELER
# REPORTING
*Court Reporting • Video • Litigation Support*
## 404.351.4577

Page 250

1    you saw these two letters?
2    A    Yes.
3    Q    Was it your understanding that these letters were
4    an attempt to satisfy the two conditions set forth in the
5    withdrawal notice to Mr. Barnes?
6    A    I was very surprised to get a copy of the letter
7    from Ms. McMillan.  I had no idea that there was a request.
8         There was no communication with the President's
9    office, knowing full well the concern that I had that such a
10   letter was being written by Ms. McMillan.
11        So, this was sort of a blind-sided event for me
12   when I saw it the next day after making the decision for
13   withdrawal on the 7th that this had come in.  There was no
14   communication about it.  My concerns are what would result
15   as a part of this.
16        So, my first reaction to Ms. McMillan's letter was
17   one of great surprise.
18   Q    Had you known that Ms. McMillan had been asked to
19   write a letter on Mr. Barnes' behalf, would you have
20   directed her as President of the university not to do so?
21   A    No.
22   Q    Did you understand these letters to reach the
23   conclusion that Mr. Barnes was not a threat to himself or to
24   you, personally?
25   A    I understood the endorsement that was in here by

Page 251

1    McMillan, yes.
2    Q    And by Dr. Winders or Winders?
3    A    My concern about -- is it Winders?
4    Q    It is actually Winders.
5    A    Dr. Winders' letter was a concern of trust at this
6    point.
7    Q    What do you mean by that?
8    A    What I mean by that is I had no idea that
9    Mr. Barnes was going to see Dr. Winders during this period
10   of time.
11   Q    Really?
12   A    That quickly.
13   Q    Oh, that quickly.
14   A    Yes.  And I was not sure -- as I had no awareness
15   of what transpired between the student and Dr. Winders --
16   what information was shared, the full chronology of events.
17        And so I wanted -- obviously, since the withdrawal
18   had already been signed and was underway, I wanted to
19   ascertain if full disclosure was discussed with Dr. Winders.
20   Q    So, you were surprised that Mr. Barnes was able to
21   meet the conditions of the withdrawal so quickly.
22   A    I was surprised by the letter from Leah McMillan
23   because it seemed to be in somewhat of a dichotomous
24   direction from what she and I had originally discussed about
25   some of the concerns with Mr. Barnes.

Page 252

1    Q    Well, I mean, it's a complete opposite conclusion
2    of what you believed, right?
3    A    I mean, she concludes in this letter to you that
4    Mr. Barnes is not a threat and you believed that he was.
5    A    Yes.
6    Q    And you thought -- I don't want to put words in
7    your mouth.  Let me just ask.
8         You said that you felt blind-sided by the fact that
9    Ms. McMillan had written a letter on Mr. Barnes' behalf.
10   A    Yes.
11   Q    And the reason for that was because you thought it
12   was very clear how you felt in the matter.
13   A    Oh, I felt it was understood that she, too, brought
14   out points that she was concerned about.
15        So, when this came out as somewhat different,
16   that's why I was surprised, not that it came in on the 8th
17   but after the withdrawal and after the decision was made.
18        Things were happening so quickly in that fine
19   period of time that the withdrawal was done and it was to
20   stand for, hopefully, the summer until we had an opportunity
21   to get more information and confirm that there's full
22   disclosure about everything that took place on the campus at
23   Valdosta State.
24   Q    Now if you had looked at these two letters and
25   concluded that they satisfied the conditions of the May 7th

Page 253

1    withdrawal, would that have permitted Mr. Barnes to enroll
2    in summer classes at Valdosta State?
3    A    Perhaps, yes.
4    Q    And you didn't want that, did you?
5    A    No.  I didn't say that.  I said I wanted to be sure
6    that this letter had full disclosure about everything.
7    Q    What do you mean by that?
8    A    I had no guarantee that Mr. Barnes had discussed
9    openly with Winders everything that took place between the
10   time that this business started on the 20th of April leading
11   up to the May 7th withdrawal.
12   Q    Didn't you earlier ask Leah McMillan to contact
13   Mr. Barnes' psychiatrist in this matter and find out what
14   was going on?
15        MR. LaVALLEE:  Objection to form.
16        MR. WILL:  I object to the form of the question.
17        THE WITNESS:  I asked -- I believe my testimony was
18   I asked Leah McMillan to do some follow-up about what was
19   going on with Mr. Barnes.
20   BY MR. CORN-REVERE:
21   Q    Okay.  Looking at Exhibit 24, Dr. Winders' letter,
22   the fourth line from the top says, "In fact, I conducted an
23   evaluation of Hayden on April 30, 2007, at her -- Leah
24   McMillan's -- 'request and felt he was not a threat to harm
25   himself or anyone else."

CONFIDENTIAL

## Page 254

1  The line before that, "I was surprised to hear" --
2  that he has been expelled -- "as I have been in contact with
3  Leah McMillan, a counselor at your university."
4  Q  Did you read this letter when it came in?
5  A  I did.  It was either on or about May 8th or 9th.
6  Q  Did you reach a decision that the conditions of the
7  withdrawal had not been met by these letters?
8  A  I did.
9  Q  Did you reach that on your own or did you consult
10 with anybody?
11 A  It was primarily my decision.
12 Q  Did you have any meetings to discuss that with
13 anybody?
14 A  No.
15 Q  Did you document your decision in any way?
16 A  It was already documented on the 7th.  You mean
17 following the reading of these two --
18 Q  (Nods head.)
19 A  No.
20 Q  Did you send Mr. Barnes a letter notifying him that
21 these two letters he had gotten were insufficient to satisfy
22 the conditions of the administrative withdrawal?
23 A  No.
24 Q  Did you communicate your decision to anyone else?
25 A  Board of Regents.  I think that -- I didn't send a

## Page 255

1  formal document that the administrative withdrawal would
2  stand, no.
3  Q  Did you put a note in the file memorializing your
4  decision to deny the appeal of the administrative
5  withdrawal?
6  A  No.  The letter was the final decision and that
7  stood, so there was no change.
8  Q  And no change from the May 7th, 2007, letter.
9  A  Yes.
10 Q  Did you just stick these in a drawer somewhere or a
11 file?  I mean, what did you do?  I mean, was there a
12 process?
13 A  There's a file in the office that remained with
14 these two in it.  These two letters.
15 Q  Now sometime after that, again, you wrote your
16 defense in the appeal to the Board of Regents.  And that,
17 again, is Exhibit Five.
18 MR. WILL:  I object to the characterization of the
19 doctor's letter as a defense letter.  It was written in
20 response to requested information from the Board of
21 Regents.
22 BY MR. CORN-REVERE:
23 Q  Okay.  In your letter that you sent to the Board of
24 Regents on June 21st, 2007, describing your reasons for the
25 administrative withdrawal, on page seven you state, "I am

## Page 256

CONFIDENTIAL

1  not an expert in the field of mental health, and because of
2  my concern for campus safety, I felt it necessary to defer
3  to the experts and incorporated their input as a condition
4  for Mr. Barnes' readmission to the university."
5  Is that an accurate statement of your position?
6  A  Yes.
7  Q  And these were the two conditions that relate to
8  this statement in your letter to the Board?
9  A  Yes.
10 Q  In what way did you defer to the experts in mental
11 health in deciding what to do with those two letters?
12 A  I felt more time was necessary to sort out the
13 complexity of the behavior patterns that I observed during
14 spring semester.
15 And this came in at a time when I was uncertain
16 about the dialogue and the information given to Dr. Winders
17 about what truthfully happened and the reasons behind what
18 happened.
19 Q  Okay.  So --
20 A  I was not convinced that a total understanding of
21 what has taken place or did take place was a basis for this.
22 Q  So, did you think it was necessary for the mental
23 health experts to defer to your judgment?
24 A  I felt my judgment as the person so closely
25 involved in it was not quite yet understood.

## Page 257

1  Q  So, in a choice between the mental health experts
2  and your judgment, you went with your judgment.
3  A  I went with the judgment that I felt was best at
4  this particular period of time based on the future and
5  safety of the campus.
6  MR. CORN-REVERE:  Let's mark as Zaccari Deposition
7  Exhibit Number 25 a memorandum of May 9th, 2007, from
8  Ronald Zaccari to a list of recipients.
9  (The document was marked for identification as
10 Plaintiff's Exhibit Number 25.)
11 THE WITNESS:  (Reviewing document.)
12 BY MR. CORN-REVERE:
13 Q  Dr. Zaccari, have you had a chance to look at this
14 exhibit?
15 A  Yes.
16 Q  Can you identify it for the record?
17 A  Memorandum from my office to university officials
18 stating that Mr. Barnes has been withdrawn, giving his
19 student I.D. number and stating that he's received
20 notification he's been withdrawn and has been given 48 hours
21 to vacate Converse Residence Hall.
22 Q  Is this your signature on the exhibit?
23 A  Yes.
24 Q  Did you write this memorandum?
25 A  I did.



**WHEELER REPORTING**

*Court Reporting • Video • Litigation Support*

**404.351.4577**

# EXHIBIT C

CONFIDENTIAL

**Reid, Erin**

CONFIDENTIAL

| | |
|---|---|
| **From:** | Cristina Correia [ccorreia@law.ga.gov] |
| **Sent:** | Monday, February 09, 2009 12:54 PM |
| **To:** | Zycherman, Lisa; mlavallee@dkllaw.com; Corn-Revere, Bob; cary@cywlaw.com |
| **Subject:** | RE: Barnes v. Zaccari - Jt Preliminary Report & Discovery Plan |
| **Attachments:** | ATTORNEY_GENERAL-#515722-v1-Barnes_-_HIPPA_Release.pdf |

Lisa,

Per our discussion earlier today, I am enclosing the HIPPA release I had originally sent Bob back in December. I understand you will get back to me no later than the end of this week with any objections to the release.

Regards,

Cris

Cristina Correia
Assistant Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
404-463-8850
ccorreia@law.ga.gov

---

**From:** Zycherman, Lisa [mailto:lisazycherman@dwt.com]
**Sent:** Monday, January 05, 2009 4:46 PM
**To:** Zycherman, Lisa; Cristina Correia; mlavallee@dkllaw.com; Corn-Revere, Bob; cary@cywlaw.com
**Subject:** RE: Barnes v. Zaccari - Jt Preliminary Report & Discovery Plan

One additional change I left off my list is the addition of a statement regarding the parties' plan to execute a HIPAA release as needed for discovery & related protective order.

**Lisa Zycherman** | Davis Wright Tremaine LLP

1919 Pennsylvania Avenue NW, Suite 200 | Washington, DC 20006
Tel: (202) 973-4280 | Fax: (202) 973-4499
Email: lisazycherman@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

 Please consider the environment before printing this email.

---

**From:** Zycherman, Lisa
**Sent:** Monday, January 05, 2009 4:45 PM
**To:** Cristina Correia (ccorreia@law.ga.gov); Matthew R. LaVallee (mlavallee@dkllaw.com); Corn-Revere, Bob; cary@cywlaw.com

9/14/2009

**Subject:**    Barnes v. Zaccari - Jt Preliminary Report & Discovery Plan

CONFIDENTIAL

Attached please find a new version of the joint report that accepts nearly all of Defendants' redlines. My changes, which reflect my conversation with Cris, are in redline. My recommended changes include: (1) inserting Plaintiff's position on jurisdiction; (2) restating the "specific problems" that "have created a hindrance to settlement" per my conversation with Cris; and (3) reformatting as needed & correcting one misspelled word. If this revised draft is ok with you, please let me know so we may file this evening.

 << File: Barnes v. Zaccari - Jt Preliminary Report & Discovery Plan.DOC >>
**Lisa Zycherman** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 200 | Washington, DC 20006
Tel: (202) 973-4280 | Fax: (202) 973-4499
Email: lisazycherman@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

 Please consider the environment before printing this email.

**Reid, Erin**

CONFIDENTIAL

**From:** Fedeli, Chris
**Sent:** Friday, July 03, 2009 3:04 PM
**To:** 'David Will'; 'Matthew LaVallee'; 'David Smith'
**Cc:** Corn-Revere, Bob; Reid, Erin
**Subject:** RE: Barnes v. Zaccari

Gentlemen,

Good seeing you yesterday in Atlanta.

As we discussed yesterday and following up on the below dates for Hayden's mother and Professor O'Neill, Dr. Winders is available on July 9, 17, and 31, and Greg Lukianoff is available on July 22, 24, and 28. Ms. Burke and Dr. Winders we can do in Savannah, Professor O'Neill in Washington DC, and Greg Lukianoff in Philadelphia. Please let us know your plans.

We will agree to July 14 for Mr. LaVallee's depositions of Doctors Grogten and Morgan.

We would like to depose defendants Zaccari, Keppler, and Mast during the week of July 27-31. We'd also like to depose Kim Towner and Richard lee that week.

Finally, I look forward to seeing you all next week on the 8th in Valdosta for the Doner and Farmer depositions.

I think that covers it. Have a great 4th of July (no depositions scheduled).

Chris

**Chris Fedeli** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 200 | Washington, DC 20006
Tel: (202) 973-4274 | Fax: (202) 973-4474
Email: chrisfedeli@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Fedeli, Chris
**Sent:** Monday, June 22, 2009 7:13 PM
**To:** 'David Will'
**Cc:** Matthew LaVallee; David Smith; Corn-Revere, Bob
**Subject:** RE: Barnes v. Zaccari

Hello David,

Hayden's mother is available anytime after July 9 with the following exceptions: July 21-23, 30, and 31. Professor O'Neil is available after July 6 with the exception of July 7 from 9-10 am, the morning of July 13, and July 20 from 1:30-3:30. We are still checking on Dr. Winders and Greg Lukianoff's availability. At least with respect to Professor O'Neill and Mr. Lukianoff, I believe we plan to do

9/14/2009

them here in Washington DC, at the Davis Wright Tremaine offices.

CONFIDENTIAL

We are not counsel to FIRE in this proceeding but to my knowledge we have already produced all the responsive documents FIRE is likely to have in response to Mr. LaVallee's requests for production to Plaintiff Barnes. I believe you received a copy of that production.

Regards,
Chris

**Chris Fedeli** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 200 | Washington, DC 20006
Tel: (202) 973-4274 | Fax: (202) 973-4474
Email: chrisfedell@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.


-----Original Message-----
From: David Will [mailto:dwill@royallaw.net]
Sent: Monday, June 22, 2009 5:38 PM
To: Fedeli, Chris
Cc: Matthew LaVallee; David Smith
Subject: Barnes v. Zaccari

Hi, Chris.

I would appreciate your checking and letting me know what dates would be good for the depositions of Greg Lukianoff, Professor O'Neil, Dr. Winder and Kelly Burke. I am assuming that we will take Greg's deposition in Philadelphia, Professor O'Neil's in Charlottesville, and Dr. Winder's and Kelly Burke's in Savannah, but if that is not the case, please let me know.

Do you represent FIRE? I would like to get some documents from them and wanted to know if I sure be going through you or if I can deal directly with the folks at FIRE.

Best regards.

David

9/14/2009

CONFIDENTIAL

**Reid, Erin**

| | |
|---|---|
| **From:** | Reid, Erin |
| **Sent:** | Tuesday, July 07, 2009 10:16 AM |
| **To:** | 'dwill@royallaw.net'; 'dsmith@brannenlaw.com'; 'Matthew LaVallee' |
| **Cc:** | Fedeli, Chris; Corn-Revere, Bob |
| **Subject:** | Depositions of Dr. Winders and Kelly Burke |

Gentlemen,

 To follow up on Chris's earlier email, Dr. Winders is available to be deposed July 20th in Savannah starting at 4pm.  Kelly Burke is also available that day.  Please confirm that this time and date will work for you.

Best,
Erin

**Erin Reid** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W. Suite 200 | Washington, DC 20006
Tel: (202) 973-4239| Fax: (202) 973-4499
Email: erinreid@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington

1

CONFIDENTIAL

## Reid, Erin

| | |
|---|---|
| **From:** | Reid, Erin |
| **Sent:** | Thursday, July 09, 2009 11:00 AM |
| **To:** | 'dwill@royallaw.net'; 'dsmith@brannenlaw.com'; 'Matthew LaVallee' |
| **Cc:** | Fedeli, Chris; Corn-Revere, Bob |
| **Subject:** | RE: Depositions of Dr. Winders and Kelly Burke |

Gentlemen,

I wanted to follow up with you regarding a potential date for the depositions of Dr. Winders and Kelly Burke. Dr. Winders and Ms. Burke are both available to be deposed July 20th in Savannah. Ms. Burke is available all day and Dr. Winders is available at 4pm. Please confirm at your earliest convenience that this time and date will work for you.

Best,

Erin

| | |
|---|---|
| **From:** | Reid, Erin |
| **Sent:** | Tuesday, July 07, 2009 10:16 AM |
| **To:** | 'dwill@royallaw.net'; 'dsmith@brannenlaw.com'; 'Matthew LaVallee' |
| **Cc:** | Fedeli, Chris; Corn-Revere, Bob |
| **Subject:** | Depositions of Dr. Winders and Kelly Burke |

Gentlemen,

To follow up on Chris's earlier email, Dr. Winders is available to be deposed July 20th in Savannah starting at 4pm. Kelly Burke is also available that day. Please confirm that this time and date will work for you.

Best,
Erin

**Erin Reid** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W. Suite 200 | Washington, DC 20006
Tel: (202) 973-4239| Fax: (202) 973-4499
Email: crinreid@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington

1

**Reid, Erin**

CONFIDENTIAL

| | |
|---|---|
| **From:** | Fedeli, Chris |
| **Sent:** | Friday, July 10, 2009 5:45 PM |
| **To:** | Reid, Erin |
| **Subject:** | Fw: Barnes v. Zaccari deposition schedule |

----- Original Message -----
From: Fedeli, Chris
To: Corn-Revere, Bob
Sent: Fri Jul 10 17:44:48 2009
Subject: Fw: Barnes v. Zaccari deposition schedule

----- Original Message -----
From: David Will <dwill@royallaw.net>
To: Fedeli, Chris; Matthew LaVallee <mlavallee@dkllaw.com>; David Smith
<dsmith@brannenlaw.com>; Holly Hance <hhance@royallaw.net>
Sent: Fri Jul 10 17:05:48 2009
Subject: Barnes v. Zaccari deposition schedule

Folks--I have attempted to coordinate the dates for the remaining depos with the
availability of the deponents and lawyers.  Here is my suggested schedule:  7/14 John
Grotgen/ Vic Morgan (Valdosta);  7/22 deposition of O'Neil and Lukianoff in Philadelphia;
7/27-7/29 depositions of Mast, Keppler, Zaccari, Tanner and Lee (Valdosta); 7/31 Dr.
Winders (Savannah); *Saturday *8/1 Kelly Burke (Savannah).

Please let me know if this fits your respective schedules.  If I have omitted anybody else
who needs to be deposed, please let me know that as well.

David

# EXHIBIT D

CONFIDENTIAL

DR. KURT J. KEPPLER 7/28/2009

Page 1

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

THOMAS HAYDEN BARNES,          CASE NUMBER
   Plaintiff,                 1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
   Defendants.
_____/

DEPOSITION OF
DR. KURT J. KEPPLER

JULY 28, 2009
9:04 A.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



**WHEELER**
**REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

Page 26

1  Q  Right. But you formed an opinion on your own
2  whether or not his concern was well-founded. Is that a
3  correct statement of what you just testified?
4  A  I've been dealing with students for 20-some years.
5  My understanding of students who may be eccentric or who may
6  have difference in opinions or may even be what you might
7  perceive as activists, it's part of my training. I'm used
8  to it. It doesn't bother me. I know how to deal with it,
9  I'm not president of the university, and I'm not in
10  that situation; so, how I would respond or how he would
11  respond, it's unfair for me to say.
12  Q  Well, actually, I think it's quite fair for you to
13  say. How would you respond in that situation?
14  MR. WILL: I believe that's an improper question.
15  That's a hypothetical question to a fact witness. I
16  object to the form of the question.
17  BY MR. CORN-REVERE:
18  Q  Okay. If you understand the question, you can
19  answer it.
20  A  I think what I said is clear. I have for many
21  years dealt with students who had various opinions that were
22  controversial, different, unusual, whatever.
23  And as part of my responsibility and training, my
24  role is non-judgmental. I don't care. I don't care what
25  you look like. I don't care what you say. I don't care how

Page 27

1  you respond. It's just college.
2  Q  So, it didn't raise a concern in your mind?
3  A  It raised a concern in my mind that he was
4  genuinely scared and frightened and, I think, sincerely
5  worried. Yeah, that raised a concern in my mind.
6  Q  But you didn't look into it further on your own to
7  determine whether or not it was well-founded. Is that
8  right?
9  A  Well, I had the information that everybody else
10  had. I saw the Facebook page. I knew about the -- what he
11  perceived as the compromise meeting that took place that he
12  thought went well; and then, I guess, after the comments
13  came out in the MySpace or Facebook page, he was
14  disappointed because they were totally different than what
15  he had said he thought came out of the meeting.
16  You know, is that -- again, I can't put myself in
17  the role of a president when there's 12,000 students that
18  I'm responsible for and I make the final judgment. As a
19  student affairs professional, I would have a different
20  opinion.
21  Q  You said you saw the same materials everyone else
22  did, right?
23  A  I don't know what materials everybody else saw.
24  Q  Okay. I understand. Other people may have seen
25  different things. But you did testify that you saw

Page 28

1  materials like the Facebook page.
2  A  I did see the Facebook page, yes.
3  Q  And you formed no impression on your own of whether
4  or not that constituted a threat?
5  A  I understand from reading that material when you
6  look at it from the perspective of the president and see the
7  word memorial and see the kinds of things that were written
8  after you had what you thought was a positive meeting where
9  you would think that there's not consistency here and this
10  is not what I took out of that previous meeting, I can
11  understand why you would be disappointed and upset. ...
12  I don't know what happened in that conversation.
13  I'm not privy to what happened in that conversation.
14  I can clearly tell you that I don't believe that
15  Dr. Zaccari was anything but genuine over his concern.
16  Q  Right. But that wasn't my question. My question
17  was: In looking at the materials yourself, did you perceive
18  a threat?
19  A  I did not. Physical threat, if that's what your
20  question was. Did I perceive a physical threat? I did not.
21  Q  I believe you testified at the beginning of the
22  series of questions that you didn't perceive it as a part of
23  your responsibility to determine whether or not there was a
24  threat. Is that a fair statement of what you said?
25  MR. WILL: I object to the form of the question

Page 29

1  because it is not.
2  BY MR. CORN-REVERE:
3  Q  Well, the witness can tell me if I am not correctly
4  stating --
5  A  I hope that is not what I said. My responsibility
6  is to be an advocate and supporter and provide services and
7  programs for students at the institution in those 14 units
8  that I believe I dictated to you previously.
9  Certainly, from time to time over the years, I am
10  asked advice from presidents or other vice presidents to
11  deal about, you know, student situations and things like
12  that.
13  And, so, I certainly think it is my responsibility
14  to be aware of what's a key issue and a concern on campus,
15  and I'm not the least bit afraid to share that
16  responsibility.
17  Q  Okay. But as the university official responsible
18  ultimately for student discipline matters, isn't it your
19  responsibility to determine whether or not a situation
20  represents a threat?
21  A  I can give an opinion. I am not an expert in being
22  able to judge a person's danger.
23  But I think it's certainly appropriate for me to be
24  asked opinions and to give my point of view as it might be
25  in the case of Dean Mast and Mr. Lee who have gone through



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

# EXHIBIT E

CONFIDENTIAL

FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

CONFIDENTIAL

THOMAS HAYDEN BARNES,          CASE NUMBER
    Plaintiff,                 1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
    Defendants.
_____/

DEPOSITION OF
RUSS MAST
JULY 28, 2009
3:10 P.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577

## Page 50

1    Dr. Zaccari?

2    A    This article? No, sir.

3    Q    Okay. Do you know if this article was discussed at

4 either the April 20th meeting or the May 3rd meeting

5 regarding Mr. Barnes?

6    A    I don't remember it being discussed at either one

7 of those two meetings, sir.

8    Q    But I believe you testified at those meetings there

9 was discussion of Mr. Barnes' Facebook postings.

10    A    Correct.

11    Q    Okay. Let's look at Exhibit Nine. Have you seen

12 this before?

13    A    I have.

14    Q    Okay. Can you identify it?

15    A    It is -- looks like a Facebook page from Hayden

16 Barnes' Facebook account.

17    Q    First of all, do you know how Dr. Zaccari came into

18 possession of a copy of this collage?

19    A    I do not. It was stated in the complaint that I

20 had given it, and I did not; and I have never had a Facebook

21 account to this day. So, I don't even know how to get on

22 there. My kids could tell you, but I cannot.

23    Q    Okay.

24    A    But this was shared at that meeting.

25    Q    Dr. Zaccari brought it to the meeting?

## Page 51

1    A    Yes, sir.

2    Q    What did he say about it?

3    A    That he felt threatened by the term there,

4 "memorial parking garage."

5    Q    Did Dr. Zaccari also express concern for the safety

6 of the student environmental group S.A.V.E.?

7    A    I don't remember anything about threats to the

8 S.A.V.E. students.

9    Q    Because the heading says, "S.A.V.E. - Zaccari

10 Memorial Parking Garage."

11    A    Right.

12    Q    So, conceivably this could be a blanket threat not

13 just to Dr. Zaccari but to the organization, as well, if you

14 interpret it that way.

15    A    That's up to the individual's interpretation.

16    Q    Yes. Was there any discussion at either the

17 April 20th meeting or the May 3rd meeting of whether or not

18 this was a reasonable concern of security?

19    A    I'm not sure I'm following you on that question.

20    Q    Did anyone either agree or disagree with

21 Dr. Zaccari's assumption that the use of the word "memorial"

22 represented some sort of threat?

23    A    I honestly don't remember.

24    Q    And I believe you characterized the May 3rd meeting

25 as one in which Dr. Zaccari, basically, announced his

## Page 52

CONFIDENTIAL

1 decision.

2    A    Right. I don't believe this document was given on

3 the May 3rd. It was on the other meeting.

4    Q    Was there discussion at the April 20th meeting

5 whether or not this represented some kind of threat?

6    A    There may have been. I don't remember. Not for

7 me.

8    Q    Did you form a conclusion, personally, about

9 whether or not this represented some kind of threat?

10    A    I don't see it as a threat. Memorial means many

11 things, so --

12    Q    Did you share your opinion with Dr. Zaccari?

13    A    No, I did not.

14    Q    Why not?

15    A    That would, in my opinion, would've been my Vice

16 President's responsibility.

17      MR. CORN-REVERE: Okay. And let's mark as Mast

18 Deposition Exhibit Number Ten another series of Facebook

19 pages.

20      (The document was marked for identification as

21 Plaintiff's Exhibit Number Ten.)

22      THE WITNESS: (Reviewing document.)

23 BY MR. CORN-REVERE:

24    Q    Have you had a chance to take a look at that

25 exhibit?

## Page 53

1    A    Yeah. I'm trying to understand what it is. I'm

2 not a big, as I say, Facebook person.

3    Q    Believe me, I'm with you on that one.

4    A    It looks like -- I guess what your call discussion

5 groups or whatever. And looks like an article after that.

6    Q    Okay. Have you ever seen this before?

7    A    No, I have not.

8    Q    Did anyone at either the April 20th meeting about

9 Hayden Barnes or the May 3rd meeting make reference to these

10 Facebook pages?

11    A    I don't remember. I remember the other Facebook.

12    Q    So, the discussion at those meetings that you

13 testified about earlier all would've been related to the

14 collage. Is that correct?

15    A    That's correct. I've never seen this before. This

16 document before.

17    Q    Okay.

18      MR. WILL: You good?

19      THE WITNESS: Yeah. I just need to get a drink of

20 water and use the bathroom.

21      (A recess was taken from 4:33 p.m. to 4:35 p.m.)

22 BY MR. CORN-REVERE:

23    Q    I want to follow up on one of the earlier questions

24 that I asked you about the meetings that took place.

25      I believe I asked you whether or not you had a



WHEELER REPORTING

Court Reporting • Video • Litigation Support

404.351.4577

# EXHIBIT F

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA

CONFIDENTIAL

THOMAS HAYDEN BARNES,          CASE NUMBER
   Plaintiff,               1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
   Defendants.
_____/

DEPOSITION OF
DR. VICTOR MORGAN

JULY 14, 2009
10:10 A.M.

VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES DEPARTMENT
CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



**WHEELER
REPORTING**
Court Reporting • Video • Litigation Support
*404.351.4577*

Page 50

1    MS. HANCE:  Object to form.
2    THE WITNESS:  From what I recall from the summary
3    of Virginia Tech, one of the things that was mentioned
4    was that there's greater latitude with federal and state
5    laws with sharing information than many counseling
6    centers and others may have originally believed.
7    And they may be even more so now as time has passed
8    where we realize it's important that people do share
9    information when it concerns the safety of others.
10    BY MS. REID:
11    Q    Okay.  Given that there is greater latitude
12    regarding the information that you can share, how much
13    information do you believe that you can share about a
14    student?
15    MS. HANCE:  Object to form.
16    THE WITNESS:  Again, I don't know how to answer
17    that question.  How much.
18    I think every situation should be dealt with as an
19    individual situation in the capacity in which you're
20    looking at what is involved and who is involved and who
21    is -- who it concerns.
22    So, I don't think you can just give a statement
23    that this is how much you can share,
24    BY MS. REID:
25    Q    Can you disclose that a student is receiving

Page 51

1    treatment at the Counseling Center?
2    MS. HANCE:  Object to form.
3    THE WITNESS:  Normally, that's not information that
4    we would give out to someone.
5    But, like I said, the person's position, if it's
6    law enforcement, if it's someone who is in an imminent
7    danger situation, we would do so in terms of a duty to
8    warn or in terms of information that might be needed to
9    evaluate a situation.
10    BY MS. REID:
11    Q    Did you believe that Hayden Barnes was an imminent
12    danger?
13    A    Did I, personally, believe that?
14    Q    Yes.
15    MS. HANCE:  Object to form.
16    THE WITNESS:  The only information I had about
17    Mr. Barnes was indirectly from discussions that I had
18    heard from the President's meeting and from Ms. McMillan.
19    In looking at everything that I had heard about
20    Mr. Barnes at that point, I agree with Ms. McMillan that
21    I heard nothing, saw nothing that made me believe that
22    Mr. Barnes was a threat to himself or anyone else.
23    BY MS. REID:
24    Q    Did you ever receive a phone call from Hayden
25    Barnes?

Page 52



1    A    I did.
2    Q    Can you -- what did Hayden call you about?
3    A    That was the only time I ever spoke to Hayden.  It
4    was about a five-minute phone call.
5    He called the Counseling Center.  He identified
6    himself and said that he was a client of Ms. McMillan's and
7    that he wanted to know if he could switch counselors.
8    And I told him that that was possible but that as
9    Director of the Counseling Center, what I would appreciate
10    him doing is telling me, if he could, why it is that he
11    wished to change counselors.
12    And he said, "Well, I just don't feel like
13    Ms. McMillan really knows me."
14    And I said, what do you mean by that?"
15    He said, "Well, I've been seeing her now for some
16    time and she's been asking me questions about if I'm
17    planning or thinking about hurting the President.  And when
18    she asks me those kinds of questions, it makes me think that
19    she doesn't really know me."
20    Q    When did this phone call take place?
21    A    You know, I really don't know when it happened.  I
22    do remember it happening, obviously, but I don't know -- I
23    don't have a date on it.
24    Q    Was it during the time period that these events
25    were occurring?  So, between April and May of --

Page 53

1    A    It would've been before he was withdrawn from
2    school, yeah.  So it would've been sometime in April, first
3    of May.
4    I don't know if you're going to ask anything
5    further about that, but that wasn't all that was said.
6    Q    Okay.  What else was said in that phone call?
7    A    I said, "As this situation might occur, what I
8    would normally ask you to do is that you address this with
9    your counselor first, and then if you feel after that you
10    still wish to change to see someone else, I'll work with you
11    on that."
12    I asked him what his relationship had been with
13    Ms. McMillan up to that date, and he said it had been very
14    good.
15    So, I said, "Well, Hayden since you have had a good
16    relationship up until recently and it's only because of
17    these questions that she's asking you, would you, please,
18    talk with her first about this and share with her what
19    you're telling me and see if you can continue to still work
20    with her?"
21    And he said, "I will and I appreciate it," and that
22    was the end of the conversation.
23    Q    During this conversation, was Hayden courteous on
24    the phone?
25    A    Yes, he was.

# EXHIBIT G

CONFIDENTIAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA


THOMAS HAYDEN BARNES,                    CASE NUMBER

     Plaintiff,                         1:08-CV-00077-CAP

vs.

RONALD M. ZACCARI, et al,

     Defendants.

_____/


DEPOSITION OF

LAVERNE GASKINS, ESQ.


JUNE 12, 2009

10:05 A.M.



VALDOSTA STATE UNIVERSITY CENTER
1500 NORTH PATTERSON STREET
SOUTH BUILDING, ROOM 1149
VALDOSTA, GEORGIA



SARAH E. WILLIAMS, FPR, CCR, RPR




**WHEELER REPORTING**
Court Reporting • Video • Litigation Support
**404.351.4577**

Page 134

1    Q    And if I understood your testimony, Ann Farmer's
2    recommendation to Dr. Zaccari was that if he had concerns
3    about security, he could get a retraining order.
4    A    Perhaps.
5    Q    Was that the recommendation she gave?
6    A    Yes, uh-huh.
7    Q    And so far as you know, Dr. Zaccari did not follow
8    that recommendation.
9    A    Not to my knowledge.
10   Q    And are you aware of any other communications
11   between Dr. Zaccari and the police department?
12   A    No. I'm not aware of any direct -- I don't have
13   direct knowledge of any communications.
14   Q    Okay. In discussing either Exhibits 21 or 22 at
15   the early May meetings in which Dr. Zaccari made them
16   available to the group, did you express any concerns about
17   the fact that these exhibits might be protected by the First
18   Amendment?
19   A    Yes.
20   Q    What did you say?
21   A    I said Hayden could challenge any action that you
22   take based on First Amendment grounds: Freedom of
23   expression. He could argue that he's entitled to have
24   something of this sort posted anywhere he chooses. This
25   includes Exhibit 21, as well.

Page 135

1    Q    Okay. But as I understand your earlier testimony,
2    the advice you got from the Board of Regents was do what you
3    need to do and worry about the lawsuit later.
4    A    I didn't receive that advice. That was advice that
5    was given to Dr. Zaccari.
6    Q    Right. But that was the advice he was given in
7    your phone call with Elizabeth Neely on May 1st, 2007. Is
8    that correct?
9    A    The time that I testified the conversation took
10   place, right.
11       MR. CORN-REVERE: We're up to 23. Okay. Let's
12   mark as Exhibit 23 a memo from Laverne Gaskins to
13   Dr. Zaccari.
14       (The document was marked for identification as
15   Plaintiff's Exhibit Number 23.)
16   BY MR. CORN-REVERE:
17   Q    Before we get to that exhibit, let me just ask one
18   follow-up question about the concerns that Dr. Zaccari had
19   expressed about Hayden Barnes based on what he had learned
20   from the Counseling Center.
21       Would it change or would it affect your opinion
22   about whether or not Hayden Barnes was dangerous if you knew
23   that President Zaccari had been told by Leah McMillan that
24   Mr. Barnes was no danger?
25   A    I never had an opinion that Hayden was dangerous,

Page 136

1    so it would not affect my opinion because I never had an
2    opinion that he was dangerous. I always had a strong
3    opinion that he was entitled to an opportunity to be heard
4    and he was entitled to due process.
5        If the individuals who were listening to the facts
6    as they were presented determined that he was a danger to
7    the campus, then that was a determination for that body to
8    make.
9    Q    Okay. But for those bodies that did meet -- and
10   I'm referring to the meetings of early May, either May 3rd
11   or May 7th, 2007, where the subject of Hayden Barnes came
12   up -- did anyone express agreement with Dr. Zaccari that
13   Mr. Barnes was dangerous in some way?
14   A    No.
15   Q    Did you have any follow-up conversations with any
16   of the participants at those meetings of whether or not
17   Mr. Barnes was a danger?
18   A    No.
19   Q    And in your phone conference with Elizabeth McNeely
20   (sic) on May 1st, 2007, did Ms. McNeely (sic) express any
21   agreement or disagreement with the proposition that
22   Mr. Barnes was in some way dangerous?
23   A    She seemed to support Dr. Zaccari's representation
24   that he was a danger to the campus and to himself.
25       I also vaguely recall shortly after his withdrawal

Page 137

1    from campus I was at the Board of Regents and I had lunch
2    with Betsy Neely and another attorney from another
3    institution. One or two attorneys. I just can't remember.
4        But I remember expressing some concerns about the
5    facts of the case and the fact that he didn't have a
6    hearing, and Betsy reemphasized the fact that he appeared to
7    be a danger to Zaccari and the campus community based on
8    representations made by Dr. Zaccari.
9    Q    Did she say what information she had for making
10   that determination other than Dr. Zaccari's claims?
11   A    No, she didn't.
12   Q    Do you know independently whether or not she had
13   any information?
14   A    No.
15   Q    Okay. But in that conversation over lunch with
16   Betsy McNeely (sic), was she --
17   A    By the way, it's Betsy Neely.
18   Q    Sorry. Sorry. In that conversation, she
19   discounted your concerns about due process based on the
20   perceived danger? Is that a fair characterization?
21   A    Yes.
22   Q    Okay. Let's look at Exhibit 23 and also, in
23   conjunction with that, Exhibit 3, your supplemental answer
24   to interrogatory three.
25   A    (Reviewing document.)



# EXHIBIT H

CONFIDENTIAL

CONFIDENTIAL

# Transcript of the Testimony of:

# Kevin Winders, M.D.

**Date:** July 31, 2009

**Case:** Thomas Hayden Barnes v. Ronald M. Zaccari, et al.
1:08-CV-0077-CAP

*Tom Crites & Associates International, Inc.*
*P.O. Box 9438*
*Savannah, Georgia 31412*
*Phone: 800-631-3480*
*Fax: 912-233-7777*
*critesreporting@aol.com*
*www.critesintl.com*

Case 7:12-cv-00089-HL   Document 153   Filed 09/15/09   Page 49 of 52

Kevin Winders, M.D.                                                    July 31, 2009
Thomas Hayden Barnes v. Ronald M. Zaccari, et al.

19 (Pages 70 to 73)

Page 70

```
1    WILL - WINDERS                70
2         Q        in the letter marked Exhibit 9, this is what
3    we delivered to Mr. Barnes that to let him know about
4    the decision by Valdosta State University to
5    administratively withdraw him from the school.
6         There were conditions upon which he could
7    return to the school. One of which was correspondence
8    subject to meeting academic requirements, but one of
9    which was correspondence from a non-university-appointed
10   psychiatrist indicating you're not a danger to yourself
11   or others, and documentation from a certified mental
12   health professional that indicated that during his
13   tenure at Valdosta State, he would be receiving ongoing
14   therapy.
15        Now, from a standpoint of the university
16   administration who wish to insure -- wish to satisfy
17   themselves that he was not a danger to himself or
18   others, particularly the university campus, is that a
19   reasonable request?
20        MR. WIGGINS:  I'm going to object.  Number
21   one, it seems to call for a legal conclusion, the
22   witness is not competent to answer that question.
23   Number two, it is beyond the scope of what he is
24   designated in this case as which is to testify about
25   Hayden's -- his treatment of Hayden and I don't think
```

Page 71

```
1    WILL - WINDERS                71
2    it is likely to lead to the discovery of any evidence
3    admissible to support a claim of defense in this
4    action.  With that stated, you're welcome to answer
5    it.
6         THE WITNESS:  Is the question do I think
7    it's reasonable for them to suspend him maybe is the
8    better word than expel, they can expel him based on
9    those criteria, I thought those criteria were already
10   met so I don't think it is reasonable.
11   BY MR. WILL:
12        Q        This was before your letter.  This is dated
13   before your letter.
14        A        Okay.
15        Q        So does that change your opinion?
16        MR. WIGGINS:  Same objection.
17        THE WITNESS:  My initial letter was May 2nd.
18   BY MR. WILL:
19        Q        So based on the May 2nd letter which was
20   Exhibit 7, you felt this was not appropriate?
21        A        Right.
22        Q        And, again, the letter you sent of May 8th,
23   you did say you had last conducted an evaluation of
24   Hayden on April 30th, correct?
25        A        Right.
```

Page 72

CONFIDENTIAL

```
1    WILL - WINDERS                72
2         Q        And at that time felt he was not a threat to
3    harm himself or anyone else; correct?
4         A        Correct.
5         Q        But then in the second paragraph, you say to
6    make a full evaluation of Hayden, I would need to see
7    your evidence he is a threat, however, based on the
8    information I have at this point, I think Hayden's main
9    issue is being obsessive.  It is impossible to predict
10   the future but I don't think he is violent or any more
11   of a threat to harm someone than any other student; is
12   that correct?
13        A        Correct.
14        Q        Okay.  Can you or could rule out to a
15   medical -- any degree of medical certainty that he was
16   not a threat to himself or others?
17        A        No.
18        Q        Has the American Psychiatric Association
19   taken a position on whether a psychiatrist can rule out
20   future violent behavior?
21        A        We can't.
22        Q        Okay.  Based on the assessment that you saw,
23   you did recognize in him that he had certain
24   characteristics which you felt here, the main issue
25   being obsessive?
```

Page 73

```
1    WILL - WINDERS                73
2         A        Correct.
3         Q        But he was under your care and perhaps the
4    care of others for unresolved mental health issues?
5         A        Yes.
6         Q        Okay.  And is it not true that a person who
7    has unresolved mental health issues and is undergoing
8    treatment is more likely to be violent than someone who
9    is not?
10        A        I don't think that's true.
11        Q        Okay.  Can you say to any degree of
12   certainty yes or no?
13        A        In his particular case, not with a hundred
14   percent certainty.
15        Q        Okay.  Once again, coming back to the faking
16   good, Hayden had a reason for wanting to stay in school?
17        A        Correct.
18        Q        And in the last evaluation that you saw of
19   him, is it possible to use my phrase "faking good" that
20   he is trying to express to you as his therapist that he
21   is under control so that he doesn't need to be
22   hospitalized and remain in school?
23        A        He can do that.
24        Q        When did you next see Hayden after the
25   incident -- after he was academically withdrawn from the
```

# EXHIBIT I

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
STATE OF GEORGIA



THOMAS HAYDEN BARNES,          CASE NUMBER
    Plaintiff,          1:08-CV-00077-CAP
vs.
RONALD M. ZACCARI, et al,
    Defendants.
_____/


DEPOSITION OF
LEAH MCMILLAN, LMFT

JULY 1, 2009
9:35 A.M.


VALDOSTA STATE UNIVERSITY
OAK STREET PARKING DECK
AUXILLARY SERVICES
DEPARTMENT CONFERENCE ROOM
VALDOSTA, GEORGIA

SARAH E. WILLIAMS, FPR, CCR, RPR



**Page 10**

1   Q   No, I understand. But just in breaking down your
2  understanding of that conversation, you said that the
3  incident was that Mr. Barnes was upset with the building of
4  a parking deck?
5   A   (Nods head.)
6   Q   In fact, this parking deck, right?
7   A   (Nods head.)
8   Q   Was there any other incident that you know of that
9  prompted that call?
10   A   No, sir.
11   Q   Okay. And from your understanding of that
12  conversation, President Zaccari felt threatened by this. Is
13  that to say that he was threatened by the fact that
14  Mr. Barnes was upset about the parking deck?
15   A   No, sir. That was never clear at that point. It
16  was stated in the context of, you know, he was upset about
17  the parking deck, but the more important issue was that the
18  President felt in danger.
19     So, it was told to me at the beginning in two
20  separate contexts.
21   Q   I see. But was there any discussion of why
22  President Zaccari said that he felt threatened?
23   A   At that point when Dr. Grotgen informed me and
24  asked me to contact Major Farmer, no.
25   Q   Okay. I believe you testified that Major Farmer --

**Page 11**

1  excuse me. I believe you testified that you had a
2  subsequent conversation with Major Farmer about this issue,
3  is that correct?
4   A   Yes, sir. Once Dr. Grotgen asked me to contact
5  Major Farmer, I contacted Major Farmer; and she stated that
6  she knew that Mr. Barnes was a client, Dr. Grotgen had
7  already given her that information. She also knew that I
8  was his therapist, and she processed that President Zaccari
9  felt threatened.
10     There were numerous instances -- again, if I had my
11  therapy notes, I could tell you verbatim what the
12  conversation was because I did write it down in my therapy
13  notes.
14     But, basically, she just needed any pertinent
15  information if I believed as his therapist that he was a
16  threat to himself or to anyone else.
17   Q   Okay. Just to make sure that I understand your
18  answer -- I'm not a therapist, so sometimes I don't
19  understand language that may be common in your profession.
20  When you said that Major Farmer "processed" that
21  Dr. Zaccari felt threatened, what do you mean by the term
22  "processed"?
23   A   I'm sorry. We use that quite a bit. Discussed,
24  articulated, explained the situation.
25   Q   Okay. And I believe you said that Major Farmer

**Page 12**

1  described numerous instances that led to Dr. Zaccari's
2  perception. Is that a correct statement?
3   A   Yes, sir. Again, I would need my therapy notes to
4  be able to tell you specifically what that conversation was.
5     But my understanding was that there had been some
6  instances with Mr. Barnes, and the President felt in danger.
7  She needed to know if I had any pertinent information to
8  give; any current information where I felt that he was a
9  threat to either himself or to the President or to VSU.
10   Q   And what did you tell Major Farmer?
11   A   I told Major Farmer -- I only gave her enough
12  information I felt was relevant for her to understand
13  the context of my professional opinion and also to help
14  Mr. Barnes.
15     I told her that I was concerned about some of the
16  behaviors that Mr. Barnes exhibited; however, I had worked
17  with him for a consistent period of time, and I did not feel
18  that he was a threat to himself or to anyone else. He had
19  never exhibited that specific type of behavior.
20   Q   Did Major Farmer say anything in response to your
21  opinion?
22   A   She said, "That's what I needed to know."
23   Q   Was there any follow-up conversation?
24   A   With Major Farmer?
25   Q   Yes.

**Page 13**

1   A   No, sir.
2   Q   Was that the only time you spoke with her about
3  Mr. Barnes?
4   A   Yes, sir. I think.. Again, I would have to have my
5  therapy notes to go through it and talk about the dialogue
6  but, to my recollection, yes, sir.
7   Q   Okay. Other than the conversation with John
8  Grotgen and your follow-up conversation with Major Barnes
9  (sic), was there any other communication with Major Farmer
10  about Hayden Barnes?
11     MR. LaVALLEE: Objection to the form.
12     THE WITNESS: No, sir, not that I can recall.
13  BY MR. CORN-REVERE:
14   Q   Were you in any meetings where Major Farmer was
15  present?
16   A   No, sir.
17   Q   Did anyone else from the Valdosta State University
18  Police Department ever contact you about Hayden Barnes?
19   A   No, sir.
20   Q   When Dr. Grotgen relayed this call to you that he
21  had gotten from Major Farmer, did he ask you about Hayden
22  Barnes?
23   A   Yes, sir. I think he -- we had a conversation. I
24  confirmed that Hayden was a client because of the
25  seriousness of the call. I confirmed that you were his

*CONFIDENTIAL*



WHEELER
REPORTING
Court Reporting • Video • Litigation Support
404.351.4577