# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 23 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

THOMAS HAYDEN BARNES,       *
                            *
Plaintiff,                  *
                            *
-vs-                        *
                            *   Case No. 1:08-cv-00077-CAP
RONALD M. ZACCARI, et al.,  *
                            *
Defendants.                 *
                            *

## RULE 56 STATEMENT OF UNDISPUTED FACTS SUPPORTING PLAINTIFF THOMAS HAYDEN BARNES' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(B)(1), Plaintiff Thomas Hayden Barnes, by and through undersigned counsel, hereby submits his Statement of Undisputed Facts supporting his Motion for Summary Judgment and the accompanying memorandum ("Motion for Summary Judgment"). For the reasons set forth in Barnes' Motion for Summary Judgment, Barnes is entitled to judgment in his favor, in light of the following undisputed facts:

1. Plaintiff T. HAYDEN BARNES ("Barnes") is a Georgia resident and former student at Valdosta State University. Barnes Dep. 113:20-22 (hereafter Ex. 1), Letter administratively withdrawing Barnes from Valdosta State (hereafter Ex. 2); Barnes appeal letter (hereafter Ex. 3).

2. Defendant RONALD M. ZACCARI ("Zaccari") is the former President of Valdosta State University, and resides in Valdosta, Georgia. Zaccari Dep. (hereafter Ex. 4) 8:25-9:5; Ex. 2; Zaccari 6/21/2007 letter to Neely (hereafter Ex. 5).

3. Defendant VALDOSTA STATE UNIVERSITY ("VSU") is a college-level institution of higher learning located in Valdosta, Georgia. VSU answer to interrogatories (hereafter Ex. 6).

4. Defendant BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA ("the Board") operates and supervises thirty-five university and college institutions throughout the State of Georgia and is headquartered in Atlanta, Georgia. BOR answer to interrogatories (hereafter Ex. 7).

5. Defendant LAVERNE GASKINS ("Gaskins") serves as in-house counsel to VSU, and resides in Valdosta, Georgia. Gaskins Dep. 8:6-9:7 (hereafter Ex. 8).

6. Defendant KURT KEPPLER ("Keppler") is Vice President for Student Affairs at VSU and resides in or around Valdosta, Georgia. Keppler Dep. 9:16-19 (hereafter Ex. 9).

7. Defendant RUSS MAST ("Mast") is Dean of Students at VSU and resides in or around Valdosta, Georgia. Mast Dep. 7:20-21 (hereafter Ex. 10).

8. Defendant LEAH McMILLAN ("McMillan") is a counselor at VSU's student counseling center and resides in or around Valdosta, Georgia. McMillan Dep. 5:6-9 (hereafter Ex. 11).

9. Plaintiff Thomas Hayden Barnes is a recent graduate of Kennessaw State University with a Bachelor of Science degree in anthropology. Burke Dep. 130:9-17 (hereafter Ex. 12).

10. In December of 2000, Barnes began seeing Dr. Kevin Winders, a psychiatrist, for physical problems associated with anxiety. Winders Dep. 12:23-13:10 (hereafter Ex. 13); Ex. 1 at 63:14-16; Ex. 12 at 32:20-33:4; August 2006 letter from Dr. Winders to VSU Access Office (hereafter Ex. 14).

11. Barnes is a licensed Paramedic in the State of Georgia. Ex. 1 at 58:21-59:11.

12. In January of 2002, Dr. Ronald Zaccari became President of VSU. Upon assuming the Presidency of the University, the Board of Regents mandated Zaccari to update the Ten Year Master Plan. Ex. 5 at 6. Zaccari has described the parking decks as "an integral part" of the Master Plan. *Id.*

13. In the Fall 2005, Barnes enrolled as a transfer student at VSU. He left VSU to attend paramedic school in Savannah in 2006. Ex. 1 at 55:15-23. *See also* Letter from Barnes to Dr. Winders requesting a letter of documentation from Dr. Winders to the VSU Access Office (hereafter Ex. 17).

14. In the fall of 2006, Barnes contacted the VSU Access Office regarding the procedures necessary to register as an on-campus disabled student suffering from a panic disorder with agoraphobia. Tanner Dep. 7:7-23 (hereafter Ex. 18); Ex. 14.

15. Dr. Kimberly Tanner, Director of the Access Office, worked with Barnes to help him submit documentation of his disability and to help him secure housing accommodations that VSU offered to students suffering from a disability. Ex. 18 at 9:16-20. *See also* email correspondence between Barnes and Tanner (hereafter Ex. 19).

16. Dr. Winders wrote a letter to the Access Office on Barnes' behalf describing Barnes' medical history. Pl. Ex. 13 at 43:16-44:6; Ex. 17; Ex. 14. The disorders identified by Dr. Winders were typical of the types of disorders that the Access Office dealt with. Ex. 18 at 7:16-18.

17. Barnes received ADA accommodations from the Access Office at Valdosta State. Ex. 18 at 9:16-10:11; *see also* Ex. 19.

18.     In January of 2007, Barnes re-enrolled as a student at Valdosta State University. Ex. 1 at 55:24-25.

19.     In February of 2007, Barnes resumed therapy sessions with Leah McMillan, therapist in the VSU Counseling Center. McMillan counseling notes (hereafter Ex. 20) at 5. Barnes first began seeing McMillan when he was a student at VSU in 2005. *Id.* at 1.

20.     On March 22, 2007, the VSU student newspaper, *The Spectator*, ran a story regarding President Zaccari's plans to construct a large parking deck on campus. *The Spectator* Article (hereafter Ex. 21); *see also* Ex. 1 at 153:6-154:1; Ex. 3 at 1.

21.     Barnes read the article in the student newspaper and became concerned that alternatives hadn't been explored thoroughly regarding the parking garage. Ex. 1 at 153:6-154:1.

22.     On or about March 22, 2007, Barnes posted a flyer at various places on the VSU campus protesting the parking garage. Barnes listed his "concerns for the possible environmental damage that construction of a parking garage may cause and suggested environmentally friendly alternatives." Copy of flyer (hereafter Ex. 22). *See also* Ex. 1 at 153:6-154:1; Ex. 3 at 1.

23. On March 23, 2007, Defendant Zaccari was informed by his "Administrative Assistant that flyers opposing the planned parking decks had been posted across campus and that Mr. Barnes was the author of the document." Ex. 5 at 1. Zaccari asked his administrative assistant to find out who had posted the flyers. Ex. 4 at 49:5-6. She investigated and reported back that Barnes was the author of the flyer. Ex. 5 at 1.

24. In addition to the flyer, Barnes circulated a letter to members of the VSU Student Government Association, the VSU Faculty Environmental Committee, the Board of Regents and *The Spectator* "outlining my concerns and suggesting environmentally friendly alternatives as well as constructive alternate uses for the $30 million which would be spent." He also posted the letter to his Facebook.com profile, a social networking website. Ex. 3 at 1; *see also* Ex. 1 at 154:9-15.

25. Barnes' statements on the issue of the parking garage focused on the detrimental aspects of the "30,000,000 Parking Garage": "[U]gly eye-sore, construction noise, dust, more pollution, less grass to enjoy and the same" and alternative uses for the money that would be spent "2,940 full scholarships to VSU; Textbooks for 8,797 VSU students for 4 years; PeachCare health coverage for 21,739 Georgia Children; Head Start/EOA for 2,845 Georgia children;

600,000 acres of Amazon rain forest protected; Housing for 215 Katrina Victims for 18 months." Ex. 22. *See also* Ex. 1 at 153:6-21.

26. On March 26, 2007, President Zaccari met with S.A.V.E., a student run environmental organization at VSU. Ex. 4 at 46:16-20. During the meeting President Zaccari "asked the leadership of the group if they knew about Mr. Barnes and his viewpoints." *Id.* at 2. *See also* Ex. 4 at 49:21-25.

27. On March 26, 2007, members of S.A.V.E. told Barnes that President Zaccari was upset about the flyers. Ex. 1 at 154:1-3. *See also* Ex. 4 at 47:4-9, 50:12-22.

28. After hearing about Zaccari's negative reaction, Barnes wrote a letter to President Zaccari to say he would remove the flyers and apologizing in the hope that the incident would not adversely affect the President's relationship with S.A.V.E. Barnes apology letter to Zaccari (hereafter Ex. 23); *see also* Ex. 1 at 154:1-6; Ex. 4 at 50:24-51:9.

29. After he received Barnes' letter, Zaccari notified the Chancellor of the Board of Regents of the University System of Georgia that "Mr. Barnes is withdrawing his opposition to VSU's parking garage." March 26 email from Thressea Boyd to Sethna Beheruz (hereafter Ex. 24).

30. On or about April 13, 2007, he created a political collage protesting the parking garage, which he posted on Facebook.com. Ex. 1 at 178:20-179:3; Ex. 3 at 2. *See also* Facebook collage (hereafter Ex. 25). The collage included photos of a multi-level parking structure, a bulldozer, a globe flattened by a tire tread, an asthma inhaler, a photo of Zaccari, and a picture of a public bus under a no-smoking style "not allowed" red circle and slash. It also included text such as "more smog," "bus system that might have been," "climate change statement for President Zaccari," and "S.A.V.E.-Zaccari Memorial Parking Garage." Ex. 25.

31. Barnes continued his research about the project, and he contacted the project manager about obtaining an environmental impact statement, which all projects with federal or state funding have to produce and make available. He was told that the parking deck proposal would be considered for a vote by the Board of Regents at its meeting the following day. Ex. 1 at 156:22-157:3. *See also* Ex. 3 at 2.

32. Prior to the April 2007 Board of Regents meeting, Barnes checked the Board of Regents' website and found phone numbers of members of the Board of Regents. He called several Board members to express his concerns about the project. Ex. 1 at 157:4-6; Ex. 3 at 2.

33. Barnes was told by one Board member that the proposal had not yet left the university level, and that he should express his concerns to VSU's President. Ex. 1 at 160:9-14. *See also* Ex. 3 at 2.

34. Barnes' communications with members of the Board of Regents was at all times respectful. Ex. 4 at 99:6-8.

35. On April 16, 2007, Linda Daniels, Vice Chair of Facilities for the Board of Regents, received an email from Barnes asking questions about the proposed parking decks to be built at VSU. Barnes April 16, 2007 email to Daniels (hereafter Ex. 26).

36. Fifteen minutes after receiving the email from Barnes, Daniels forwarded it to President Zaccari. *Id.* *See also* Ex. 16 at 38:4-39:5; Ex. 4 at 99:19-100:16. Daniels told President Zaccari that Barnes had "voiced his opinions" about the project to various officials and had asked them "to immediately disallow the parking decks." Ex. 5 at 2.

37. Daniels was concerned that Barnes might show up at the April 2007 Board meeting without understanding Board protocol, such as the fact that speakers must get on the board agenda in order to make a presentation. Ex. 16 at 32:4-8. Daniels testified she that wanted to forestall the possibility of any protest at the April 17, 2007 Board meeting at which the parking deck proposal was to be

considered because, in her view, it would be "awkward" and would consist of "a very tedious kind of uninformed objections about a parking deck" that "are all very clearly answered by the master plan." *Id.* at 31:23-33:5, 40:6-11.

38. Daniels told Zaccari the Board of Regents preferred that the possibility of a protest by Barnes be handled "at the campus level." Ex. 16 at 41:4-11.

39. Responding to the advice he received from a member of the Board of Regents, Barnes contacted President Zaccari's office on April 16, 2007 to schedule an appointment to discuss the parking deck project. He was instructed to appear at President Zaccari's office that day at 5:00 p.m. Ex. 3 at 2; Ex. 1 at 160:18-161:3. *See also* Ex. 5 at 2; Ex. 2 at 102:11-19.

40. Barnes arrived for his April 16, 2007 meeting with President Zaccari accompanied by a friend. When Barnes asked if his friend could accompany him to the meeting, Defendant Zaccari told him no; that "the discussion was going to be among three individuals: Dean Mast, Mr. Barnes and myself." Ex. 4 at 111:14-22; *see also* Ex. 1 at 161:5-18; Farmer Dep. 21:19-22 (hereafter Ex. 27).

41. During the meeting Zaccari said that Barnes had personally embarrassed him with his protest activities, and that he thought Barnes had "gone away" after his initial apology. Zaccari asked Barnes, "Who did [he] think [he]

was?," adding that Barnes had made life hard for him, and that he "could not forgive [him]". Ex. 3 at 2. *See also* Ex. 1 at 161:20-162:9, 178:9-16; Ex. 4 at 112:22-115:11; Ex. 27 at 21:23-22:7; Ex. 10 at 28:15-21.

42. During the meeting, Barnes behaved in a respectful manner towards Zaccari, listening quietly and engaging in a civil exchange of views. Ex. 10 at 27:19-28:7.

43. President Zaccari felt that Barnes was "not interested in any of the points that I was making." Ex. 4 at 116:8-9.

44. After the April 16, 2007 meeting, Barnes sent Zaccari a follow-up email, informing Zaccari that other colleges of similar sizes and profiles had established off-site, rather than on-site parking. Barnes email to Zaccari, April 16, 2007 (hereafter Ex. 28). *See also* Ex. 1 at 204:6-12; Ex. 4 at 118:1-127:19; Ex. 27 at 22:8-18, 23:8-18.

45. Following the meeting with Barnes on April 16, President Zaccari left Valdosta to attend the Board of Regents meeting at Georgia Southern in Statesboro, Georgia. Ex. 4 at 126:12-16.

46. Barnes did not attend the April 17-18, 2007 meeting of the Board of Regents. Ex. 16 at 45:1-13.

47. After receiving the call from Chancellor Daniels, President Zaccari asked Vice President Levy to review Barnes' academic record. Ex. 4 at 190:12-191:21.

48. On April 17 and April 20, the VSU registrar's office faxed multiple copies of Barnes' academic transcript to the President's office. Barnes' academic transcript (hereafter Ex. 29); Ex. 4 at 190:1-7. Zaccari reviewed Barnes' academic record and other elements of his background. Ex. 4 at 143:2-16.

49. On April 19, the VSU *Spectator* published a letter to the editor written by Barnes expressing his views about the parking garage. Ex. 21. *See also* Ex. 3 at 2; Ex. 4 at 205:15-22.

50. Prior to April 20, 2007, President Zaccari summoned Dr. Tanner to his office for a discussion about Mr. Barnes. Ex. 18 at 22:24-23:18.

51. President Zaccari informed Dr. Tanner that he was aware that Barnes was working with the Access Office and that Barnes was responsible for posting the fliers protesting the parking garage on campus. *Id.* at 24:8-13.

52. President Zaccari told Dr. Tanner that communications with Barnes were getting "increasingly difficult" and he wanted to know if Dr. Tanner "could provide any information about the student that might help facilitate communications" with Barnes. *Id.* at 24:10-19.

53. Dr. Tanner brought the Access Office file on Barnes to her meeting with Zaccari. She shared with Zaccari items from Barnes' file at the Access office, including the letter from Dr. Winders that discussed, in detail, Barnes' medical history including his current prognosis.. *Id.* at 24:12-25:23; Ex. 8 at 43:9-45:8; Ex. 14. *See also* Ex. 13 at 43:16-48:1.

54. President Zaccari returned from the Board of Regents meeting to Valdosta on April 19, 2007. Ex. 4 at 130:23-25. He read Barnes' letter to the editor of *The Spectator* upon his return to Valdosta. *Id.* at 205:15-21.

55. On April 20, 2007, Zaccari attended a small breakfast with VSU administration officials and some members of the faculty. At the breakfast, Zaccari discussed Barnes (without naming him) with attendees. *Id.* at 197:15-198:16.

56. After the meeting, one of the attendees, Dr. Michael Noll, a former professor of Barnes, suspected that Zaccari was talking about Barnes and asked whether that was the case. Zaccari confirmed his suspicions but instructed Noll to drop the subject, telling him that, "[t]his is not a faculty senate issue; that it would be handled from the administration side and the faculty. And I asked him not to discuss it." *Id.* at 198:14-16.

57. At some point on April 20, 2007, Zaccari saw Barnes' Facebook.com collage for the first time. It is not entirely clear how the collage made its way to Zaccari's office. Ex. 4 at 127:21-130:22.

58. Later on April 20, 2007, the day after Barnes' letter to the editor was published in *The Spectator*, Zaccari held his first meeting to "begin the investigation of Mr. Barnes." *Id.* at 207:4-11.

59. Zaccari met with various campus officials on April 20, 2007 in his conference room to discuss Hayden Barnes. In addition to Zaccari, Thressea Boyd, Major Ann Farmer, Dean of Students Russ Mast, Laverne Gaskins and Dr. Kim Tanner attended the meeting. Ex. 27 at 13:17-23; Ex. 18 at 27:3-9; Ex. 10 at 30:1-6.

60. At the April 20, 2007 meeting, President Zaccari distributed copies of Barnes' Facebook.com collage. Ex. 27 at 28:8-9; Farmer's notes (hereafter Ex. 30 at 1-5).

61. At the April 20, 2007 meeting, Zaccari told the group that he had looked into Hayden's employment and his grades, and he complained about Barnes' correspondence regarding the parking garage. Ex. 30 at 1-5; Ex. 27 at 14:12-16:7. *See also supra* ¶¶ 52-53; Ex. 4 at 106:18-109:5.

62.     Dr. Tanner brought the Access Office file on Barnes to the April 20, 2007 meeting. Ex. 18 at 25:20. Tanner told those in attendance that Barnes was registered with the Access Office and that he suffered from "depressive disorder, agoraphobia, . . . was on medications but had gone into the hospital . . . due to inability to function." Ex. 30 at 4; Ex. 27 at 26:6-11. Tanner also disclosed that Mr. Barnes was seeing a Dr. Kevin Winders who practiced with Psychological Consultants, P.C. in Savannah, Georgia. Ex. 30 at 4; Ex. 27 at 26:11-16.

63.     During the meeting, Maj. Farmer suggested to President Zaccari that, if he really felt threatened by Barnes' behavior, he could file a formal report and get a temporary restraining order. Ex. 27 at 30:4-31:17.

64.     President Zaccari never filed a formal police report against Barnes. Ex. 27 at 101:6-17.

65.     Following the April 20, 2007 meeting, Maj. Farmer "ran a check through our records person to see if he could pull up any reports with Hayden Barnes' name on them." Farmer found that there were "no kind of reports where there had been any trouble with Hayden Barnes." *Id.* at 34:21-35:7.

66.     VSU Police never interviewed Hayden Barnes. Doner Dep. 21:3-10 (hereafter Ex. 31).

67. On April 20, 2007, Maj. Farmer called the VSU Counseling Center to see if she could find out if Barnes was a patient at the Center and "whether or not Hayden may be a problem." Ex. 27 at 36:7-12.

68. The VSU Counseling Center intake form promises students "confidentiality." VSU Counseling Center intake form (hereafter Ex. 32). Under the policies of the VSU Counseling Center, all written and verbal information provided by students is confidential. *Id.*

69. The intake form is a contract between the Counseling Center and students at VSU. Ex. 11 at 74:8-75:15.

70. Confidential information provided by a student to a counselor cannot be disclosed unless mandated by law or the student signs a release. *Id.* at 75:18-76:17.

71. On the afternoon of April 20, 2007, Leah McMillan spoke with Maj. Ann Farmer about Barnes. Ex. 20 at 13; *see also* Ex. 11 at 10:23-24; Ex. 27 at 41:4-5. McMillan told Maj. Farmer that she started seeing Barnes as a counselor in February 2007. Ex. 27 at 41:13-14. McMillan also told Maj. Farmer that Barnes had a general anxiety disorder, a panic disorder. Ex. 30 at 6; *see also* Ex. 27 at 41:14-15. She also disclosed that she thought Barnes might be suffering from ADD. *Id.* at 41:24-25; Ex. 30 at 6. She also speculated that Barnes might be

suffering from a bipolar schizo-affective disorder. Ex. 30 at 6; Ex. 27 at 42:17-18. Although McMillan said that, in the past, Barnes had exhibited an irrational thought pattern, there was no evidence of him harming himself or anybody else. Ex. 27 at 41:18-23.

72. McMillan told Maj. Farmer that Barnes usually saw her once a week or once every two weeks, but had cancelled his last appointment. However, McMillan also said that Barnes always called to reschedule when he missed an appointment. Ex. 30 at 6; Ex. 27 at 42:9-13.

73. McMillan disclosed to Maj. Farmer that she was in touch with Barnes' psychiatrist, Dr. Winders, back in Savannah. Ex. 27 at 41:17-18. McMillan also told Maj. Farmer that Barnes' psychiatrist had not seen the increase in paranoia and irrational thought that she had. Ex. 30 at 6; Ex. 27 at 41:15-17.

74. McMillan told Maj. Farmer that there was no evidence that Barnes was a threat to himself or anyone else. Ex. 27 at 42:19-22.

75. On April 23, 2007, McMillan discussed Barnes' case with Director of the Counseling Center, Dr. Victor Morgan, Dr. Grotgen, and other counselors at the Counseling Center. Ex. 20 at 13; Ex. 11 at 101:23-24.

76. On or about April 23, 2007, Baines posted a series of items on his Facebook page, including clips of Bill Maher and The Daily Show television

programs-regarding a variety of political issues a New York Times article about processed foods; a note that: Hayden was cleaning out his room; and a link to a Salon.com article (written by Cary Tennis, Salon.com's advice, columnist, in response to the Virginia Tech shootings on April 16, 2007). The Salon.com article observed that the tragedy was "doubly depressing" because not only was the act terrible, but that, in the author's view, people would thereafter irrationally associate the heinous acts of the shooter with all people with mental illness. Facebook pages plus Salon.com article, "I'm mentally ill but I'm no mass murder" (hereafter Ex. 34).

77. On April 24, 2007, Zaccari summoned McMillan to his office to discuss Barnes' advocacy about the parking deck and to get more information about Barnes' treatment history. Ex. 11 at 17:12-18:9; Ex. 4 at 170:5-7. *See also* Ex. 20 at 13.

78. Zaccari told McMillan and he felt threatened by Barnes' continued advocacy against the parking garages and suggested that Barnes' communications about the project constituted indirect threats. Ex. 20 at 13; Ex. 11 at 106:8-12.

79. In the April 24, 2007 meeting with Zaccari, McMillan disclosed that Barnes was seeing a psychiatrist. Ex. 6. at 17:24-25. She also described current behaviors that Barnes was exhibiting that she had observed in her counseling

sessions. Ex. 11 at 17:22-23. McMillan told Zaccari that she "had been in contact with Dr. Winders regarding a possible re-evaluation of Mr. Barnes and a medication change." Ex. 11 at 17:24-18.6. *See also* Ex. 4 at 170:18-19.

80.  During the April 24, 2007 meeting, McMillan also told Zaccari that she had "never at anytime observed any behaviors that warranted me being concerned that Mr. Barnes was a threat to himself or anyone else." Ex. 11 at 17:24-18:6. She said that Barnes had behaved in a safe way in the past and had expressed "no suicidal or homicidal ideas." Ex. 11 at 110:13-15; Ex. 20 at 14.

81.  McMillan told Zaccari at April 24, 2007 meeting that she would speak to Barnes about his "behavior and plans for the summer." Ex. 20 at 14. She also disclosed that Barnes' "next appointment was April the 26th, 2007, at 11:00 a.m." *Id.*

82.  After April 24, 2007 meeting with Zaccari, McMillan contacted Dr. Kevin Winders, Barnes' private psychiatrist, and requested that he reevaluate Barnes in light of Zaccari's asserted concerns. *Id. See also* Ex. 11 at 39:14-24; Ex. 13 at 51:19-52:10; Winders April 25, 2007 letter to McMillan (hereafter Ex. 35).

83.  On April 25th, 2007, Dr. Winders sent a letter to McMillan addressing some of her concerns. Dr. Winders reviewed Barnes medical file for