**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

THOMAS HAYDEN BARNES,      \*

                                 \*

Plaintiff,                 \*

                                 \*

v.                            \*     CASE NO. 7:12-cv-00089-HL

                                 \*

RONALD M. ZACCARI, *et al.*,    \*

                                 \*

Defendants.              \*


**OPPOSITION TO DEFENDANT'S MOTION
FOR A FINDING OF QUALIFIED IMMUNITY**

Plaintiff Thomas Hayden Barnes ("Barnes") hereby opposes Defendant Ronald M. Zaccari's ("Zaccari's") post-trial Motion for a Finding of Qualified Immunity (Dkt. #370), submitted pursuant to Fed. R. Civ. P. Rule 50(b).

At the conclusion of the trial on February 1, 2013, the Court set forth the parameters for any post-trial motion for judgment as a matter of law.  Any such motion must be supported by "specific citations to the testimony of the individual witnesses" and must present legal reasons why judgment notwithstanding the verdict should be entered.  (Ex. D, Tr. Vol. 5, 6:22-7:4.)[1]  The Defendant filed his Motion for a Finding of Qualified Immunity on February 21, 2013.  (Dkt. #370.)  However, the Motion contained no specific references to trial testimony, nor did it present any legal arguments that have not already been considered and rejected by this Court.[2]  Far from providing grounds for judgment notwithstanding the verdict, the evidence presented at

---

[1] Exhibits A, B, C, and D hereto contain all references to Volumes 1, 2, 3, and 5 of the trial transcript, respectively.  There are no references to Volume 4 of the trial transcript.

[2] Once a case proceeds to trial, the full record developed in court supersedes the record existing at the time of summary judgment, and any qualified immunity defense must be evaluated in light of the character and quality of the evidence received in court.  *Ortiz v. Jordan*, 131 S. Ct. 884, 888-89 (2011).

1

trial firmly anchored the jury's findings, and even illustrated why some previously dismissed claims should be reinstated.[3]   Accordingly, the Defendant's motion should be denied.

## I.     The Evidence at Trial

### A.      There Was No Emergency

The threshold requirement for Defendant's post-trial motion is trial evidence that an emergency existed that precluded Zaccari from providing Barnes the basic due process protections of notice and a hearing before he was expelled from VSU.  (Ex. C, Tr. Vol. 3, 222:21-25 ("[W]hether or not an emergency existed . . . [is] the only peg on which Dr. Zaccari can hang a qualified immunity defense."); *see also* Ex. D, Tr. Vol. 5, 5:5-12.))  Accordingly, Zaccari asserts that Barnes's continuing presence at VSU constituted an "emergency" as set forth in *Goss v. Lopez*, 419 U.S. 565 (1975).  Zaccari Mot. 7.  *See Goss*, 419 U.S. at 582 ("Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.").  Because qualified immunity is an affirmative defense, the Defendant has the burden of proof as to the existence of an emergency.  *Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980); *Ellis v. La Veccia*, 567 F. Supp. 2d 601, 609 (S.D.N.Y. 2008).

Zaccari makes no serious attempt to satisfy his evidentiary burden.  The Defendant's motion does not cite to the trial record at all, except in a very general way, and instead relies on a selective rehash of a couple of deposition transcripts.  *Compare* Zaccari Mot. 3-5 (citing Gaskins and Neely deposition transcripts) *with* Ex. B, Tr. Vol. 2, 125:5 (admonishing counsel that "depositions are not the same as trial testimony").  In this case, neither the trial testimony nor the

---

[3] Among other things, the trial testimony established that Barnes was expelled in retaliation for his speech.  Although the First Amendment issue is not currently before the Court, this record will be binding on any future proceedings on remand.

exhibits provided the slightest support for Zaccari's defense.  Quite to the contrary, the testimony demonstrated that Zaccari's emergency claim is a transparent fabrication.  There was never any danger to persons or property and the only "disruption" of the academic process was the result of Zaccari's unnatural interest in silencing a student critic.

The Defendant frankly admitted on cross examination there was no emergency.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 81:6-7 ("Q.  Where is the emergency?  A. I didn't say there was an emergency.").)  Rather, Zaccari's own testimony revealed that he closely followed Barnes's public advocacy regarding the proposed construction project from the time he first became aware of it, several weeks before he began to assert "security concerns."  (Ex. B, Zaccari Test., Tr. Vol. 2, 177:13-23; Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 41:12-42:18.)  He was upset with the content of fliers Barnes posted on campus because he believed the student misunderstood a project that he believed was very important to the university,[4] and he directed his administrative assistant, Thressea Boyd, to find out who was responsible for the fliers.  (Ex. B, Zaccari Test.,

---

[4] Zaccari testified at great length – some might say obsessively – about the importance of the parking deck proposal in the context of general development plans for VSU.  (Ex. B, Zaccari Test., Tr. Vol. 2, 179:2-181:13; 187:15-190:5).  At the same time, Zaccari explained that he was "very, very concerned" that Barnes "simply didn't understand" the need for the parking deck or all the work that went into it.  (*See*, *e.g.*, Ex. B, Zaccari Test., Tr. Vol. 2, 189:20-190:5.  *See also id.* 189:14-17 (Barnes "was totally incorrect"); 223:10-15 ("We worked hard.  Mr. Barnes came in in 2007 and had [a] reaction to a lot of hard work."); Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 47:15-21 (Zaccari was concerned that Barnes's advocacy was inaccurate and naïve.)).  *See also* Ex. C, Boyd Test., Tr. Vol. 3, 111:20-22 ("There was just general discussion, you know, about what was being said on the flier, the inaccuracies of the flier.").  In fact, on April 16, 2007, the day of the Virginia Tech shootings, a day that Zaccari claims "changed everything" as "the 9/11 for universities," the president met with Barnes for more than an hour to have what he characterized as a "stern" conversation about why the student was so wrong about the proposed project.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 48:14-51:6.)  The subject of Virginia Tech did not even come up.  Afterward, when Barnes was evidently unpersuaded, Zaccari characterized the student's attitude as "mocking" and in disagreement with "the administrative policies of the University of Georgia System."  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 53:23-54:24.)  By this time, and long before any security concerns were articulated, Zaccari had already been investigating Barnes for his political views.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 55:3-18.)

Tr. Vol. 2, 177:13-23; 229:2-15; Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 41:12-42:18.)   After identifying Barnes as the culprit, Zaccari complained to the student group S.A.V.E. about him, thus prompting Barnes to withdraw the fliers and write a letter of apology.  (Ex. B, Zaccari Test., Tr. Vol. 2, 178:1-23; 181:17-24; Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 41:12-42:18; 43:4-44:6.)   Zaccari immediately reported the withdrawal of the fliers to the Board of Regents ("BOR").   (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 44:7-14; Ex. C, Boyd Test., Tr. Vol. 3, 113:5-25.)

Zaccari initially tried to claim that Barnes's communications with state officials and the possibility of a protest at the BOR meeting constituted some kind of emergency.  (Ex. B, Zaccari Test., Tr. Vol. 2, 186:11-20; Ex. C, Zaccari Cross-Exam., Tr. Vol. 2, 228:3-20; 236:17-25.) However, Linda Daniels, who called Zaccari on April 16, 2007 to ask about Barnes, confirmed that her only concern in placing the call was to ensure that Roberts Rules of Order would be followed and that the meeting would go smoothly.[5]   Zaccari was forced to admit on cross-examination that neither Barnes's contact with state officials, nor the call he received from Linda Daniels, caused any concerns about campus security.  (Ex. B, Zaccari Cross-Exam., Tr. Vol. 2, 228:3-20; 238:10-239:15; Ex. C, Tr. Vol. 3, 47:7-48:6.)   It did, however, prompt Zaccari to arrange the April 16, 2007 meeting with Barnes, just as the president was preparing to leave for the BOR meeting.[6]

---

[5]   (Ex. C, Daniels Direct Exam., Tr. Vol. 3, 181:5-184:18.)  As Ms. Daniels explained, "I was just trying to be conscientious to make sure . . . we had done what we could to make sure that [Barnes] knew that if he wanted to be in front of the Board of Regents that there is a protocol for that."  (*Id.* 184:14-18).  Daniels' trial testimony simply confirmed her account of the matter at deposition.  (Dkt. #180, Daniels Dep. Tr. 36:13-41:11.)   Counsel is mindful of the Court's admonition regarding the use of deposition transcripts and cites such material only where it helps illustrate that trial testimony was entirely consistent with the record as established in depositions.

[6]   (Ex. B, Zaccari Test., Tr. Vol. 2, 186:18-187:12; Ex. A, Barnes Test., Tr. Vol. 1, 54:7-55:25.)  As Barnes described the encounter, Zaccari said that he thought Barnes had "gone

Despite defense counsel's attempt to paint the April 16 meeting in the most inflammatory terms,[7] Zaccari ultimately admitted that nothing about his contact with Barnes caused the slightest concern about a possible "emergency."  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 51:7-17 ("Q.  Now, up to this point you had no security concerns at all, did you?  A. That's correct."); 52:14-21 ("There was nothing in my opinion to be concerned about on the 16th, 17th, and 18th.").   By Zaccari's own admission, however, he had long harbored – and acted on – his concerns about Barnes's political views.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 30:8-12 ("I can't understand, after all these years, why we have a protest just before we go to approval.  That is why I started to look into Mr. Barnes and his background academically . . . and I began to find out a little more about him."); 42:1-43:6 (Zaccari was displeased with Barnes's fliers and he took action to find out who was responsible); 54:7-55:18 (even without any perceived threat, Zaccari investigated Barnes's political views); 56:10-57:8 (after reading Barnes's letter to the *Spectator*, Zaccari gathered information on Barnes from the VSU Access Office).)

Although he resisted admitting it until he was confronted with deposition testimony, Zaccari ultimately acknowledged that he had no security concerns at all before April 20, 2007, when he was given a copy of Barnes's Facebook cartoon by his administrative assistant,

---

away" and that his advocacy about the parking decks had "embarrassed" him.  (Ex. A, Barnes Test., Tr. Vol. 1, 55:8-12.)  This account was confirmed, in relevant part, by Dean Russ Mast, who also attended.  (Ex. C, Mast Test., Tr. Vol. 3, 196:20-197:3.)  Even Zaccari confirmed that he was displeased that Barnes had resumed his protest and that his tone in the meeting was "stern" as he attempted to set the student straight.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 48:25-51:9.)

[7]  Contrary to the record developed at trial, Zaccari's strategy throughout this case has been to exploit common misconceptions about mental health counseling and to suggest that Zaccari was worried he was dealing with a potential psycho killer.  Defense counsel's opening statement contained many such references, including this choice example:  "[O]n April 16th, 2007, we have an unmistakable and unforgiveable tragedy at Virginia Tech.  A mentally ill student kills 32 people on that campus.  On that same afternoon a mentally ill student goes into Dr. Zaccari's office to meet."  (Ex. A, Opening Statement of David Will, Tr. Vol. 1, 24:4-8.)

Thressea Boyd.[8]  Yet by this time, Zaccari had already dispatched Boyd to find out about Barnes's involvement with the fliers, reported to the BOR when he believed Barnes had ceased his activities, met with Barnes to persuade the student he was wrong, castigated Barnes for "embarrassing him," and looked into the possibility of expelling the student for inadequate academic performance once he was convinced Barnes had an "adversarial relationship with the president's office, that he wanted to continue his protest."  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 73:20-22.  *See also id*. 54:20-24.)  Before April 20, Zaccari also contacted the Access Office seeking assistance on how to deal with "the student who had been doing the posters" (Ex. C, Tanner Cross-Exam., Tr. Vol. 3, 106:16-107:12), and the Director was all too willing to share Barnes's confidential file.  (Ex. B, Zaccari Test., Tr. Vol. 2, 204:17-205:7; Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 58:7-10; Ex. C, Tanner Cross-Exam., Tr. Vol. 3, 106:19-109:1.)  Also before April 20, Boyd had supplied Zaccari with a NEW YORK TIMES article that discussed how to withdraw students with mental health issues.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 58:24-59:25.)

Ultimately, Zaccari's emergency defense boils down to his claim that he feared for his life after his administrative assistant supplied him with a copy of Barnes's Facebook print-out and he put it together with information he had been able to glean about Barnes's use of the VSU Counseling Center.  (Ex. B, Zaccari Test., Tr. Vol. 2, 190:6-191:20; 198:1-204:5.)  This claim has been implausible from the beginning,[9] and Zaccari was unable to persuade even his own

---

[8]  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 52:14-21; 58:7-10; 63:3-19.)  The record demonstrates that Zaccari had no genuine security concerns even after April 20.  *See infra* at 7-11.  But that date marks the time when Zaccari began to assert such claims.

[9]  *See, e.g.*, *Barnes v. Zaccari*, Order (Dkt. #37) (N.D. Ga. 2008), slip op. at 15 ("For purposes of the motion to dismiss, the court determines that the inclusion of the word 'memorial' by its mere utterance in a photo collage that was posted on an internet website simply cannot be

generally pliable subordinates that such a concern was reasonable.  Zaccari's counsel has pursued a strategy of plucking out random words from the Barnes's Facebook postings or from emails and arguing that they can have "only one meaning," but the evidence does not support this tale even if Zaccari's testimony could be believed.[10]

A far more plausible explanation of the evidence is that Zaccari was angered and embarrassed by Barnes's protest, and his concern escalated when the student didn't "go away" as the president expected.  As a consequence, Zaccari sought out information about Barnes looking for an excuse to expel him, and ultimately seized upon the mental health "emergency" story once he found out Barnes used the Counseling Center and Boyd supplied him with an article about how to deal with mentally ill students.  Later, when his administrative assistant also supplied the Facebook printouts, Zaccari believed he had the ammunition he needed to remove the student he believed was "mocking" him.  He then called a series of meetings for the purpose of engineering the expulsion.  The problem was, he could not sell the idea there was any danger, and could not

---

rationally construed as likely to incite immediate violence, even in the wake of the Virginia Tech tragedy that the defendants allude to in their motion.").

[10] On matters both large and small, Zaccari suffered from a pronounced inability at trial to keep his story straight.  He claimed he had to invoke an exception to usual due process protections because there was an "emergency," yet his actions were inconsistent with any actual belief in imminent danger.  *See infra* at 7-11.  Additionally, he testified that he "had no awareness of Mr. Barnes" when Linda Daniels called him on April 16, and for that reason he began to look into the student's background.  (Ex. B, Zaccari Test., Tr. Vol. 2, 184:22-186:9.)  But by this time, he had already directed his staff to determine Barnes's authorship of fliers, complained to S.A.V.E. about him, and reported the student's apology to the BOR.  He initially claimed that the Daniels call was prompted by security concerns, but later contradicted himself – as did Linda Daniels in her testimony.  *See supra* at 4.  And – for the first time at trial – Zaccari claimed that Elizabeth Neely "directed" him to withdraw Barnes, (Ex. B, Zaccari Test., Tr. Vol. 2, 206:10-14; 215:1-8), a characterization of events Neely flatly rejected.  (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 158:18-20 ("I was not Dr. Zaccari's administrative superior in any way.  I was not in his chain of command, so it would have been totally inappropriate for me [to] direct him to do anything."); 167:3-5 ("I never directed Dr. Zaccari to do anything.").)  This was just one example of the many ways Neely failed to support Zaccari's claims.  *See infra* at 13-16.

get support for using VSU's established procedures for dealing with either emergency situations or disciplinary problems.

After Zaccari settled on the emergency ploy, he initiated a series of meetings that dragged on for more than two weeks before Barnes finally was expelled.  The process was drawn out because the meetings did not produce the consensus Zaccari wanted (and that he later falsely represented to the BOR that he had).  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 73:14-75:5); *see also* Plaintiff's Ex. 15 at 4, ¶ 13 (used for impeachment).)  Although Barnes's counselor, Leah McMillan, inappropriately disclosed some confidential information about her relationship with Barnes (which Zaccari still tries to exploit), she consistently and repeatedly told Zaccari that Barnes was no danger to himself or others.[11]  Indeed, Victor Morgan, the Director of the VSU Counseling Center, likewise told Zaccari that the word "memorial" on Barnes's Facebook cartoon did not constitute a threat, and that the Counseling Center would not provide the factual support to remove Barnes from school under VSU's Mental Health Withdrawal policy.[12]

Similarly, VSU Counsel LaVerne Gaskins advised Zaccari that Barnes's rights under the First and Fourteenth Amendment were implicated, as well as his rights under the Americans With Disabilities Act, and that, whatever procedure Zaccari chose to invoke, the student's due process rights should be respected.  (Ex. B, Gaskins Test., Tr. Vol. 2, 74:1-75:2 ("[M]y advice has consistently been to the president that Hayden Barnes was entitled to due process."); 89:4-23 ("I raised issues about my concerns with due process.  I had some concerns about First

---

[11] (Ex. B, McMillan Test., Tr. Vol. 2, 127:24-128:4.  *See also* Joint Ex. 3 (Ltr. from McMillan to Zaccari, May 8, 2007); Joint Ex. 4 (Ltr. from Dr. Kevin Winders to Zaccari, May 8, 2007).)

[12] (Dkt. #172, Morgan Dep. Tr., 21:3-23:11.)  Dr. Morgan was offered as a rebuttal witness at trial to confirm these points, but his testimony was not permitted.  (Ex. C, Tr. Vol. 3, 187:2-188:17.)

Amendment rights. I also expressed some concerns about the Americans with Disabilities Act.")).  Gaskins not only advised Zaccari that Barnes was entitled to due process in each of their meetings, she went to the unusual step of sending him copies of the relevant policies and drafting a memo "to make certain [Zaccari] understood that the student was entitled to due process," stressing that "before he made a decision I wanted him to be fully aware of what Hayden was entitled to."  (Ex. B, Gaskins Test., Tr. Vol. 2, 100:16-101:12.  *See also* 96:7-16 ("I reemphasize again the advice that I consistently provided to the president during this time."); 98:8-10.) [13]

When Zaccari got no satisfaction from these meetings, either with respect to the purported reasons for the expulsion or the process for accomplishing it, he reached out to Elizabeth Neely to find a way to achieve his purpose without having to follow established procedures.  As will be explained in the next section, Zaccari's conversations with Neely provided no support for his ultimate claim that he was merely following Neely's direction or legal advice.  *See infra* at 13-16.  But for purposes of the present discussion about campus safety, it is equally clear that Neely made no independent evaluation as to whether or not an emergency actually existed.  (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 168:1-13.  *See also* Dkt. #188, Neely

---

[13] Zaccari's motion quotes various snippets of testimony from Gaskins's deposition (but not her trial testimony) and misleadingly characterizes it as suggesting an emergency may have existed and expressing uncertainty about whether there was any violation of due process. Zaccari Mot. 3-5.  But Gaskins made clear both at her deposition and at trial that she did not believe an emergency existed, (Dkt. #183, Gaskins Dep. Tr. 135:25-136:4), and, except for Zaccari, no one else expressed the opinion that Barnes was a threat in any of the meetings she attended.  (Dkt. #183, Gaskins Dep. Tr. 136:9-14.  *See also id*. 46:5-22; 47:18-48:3; 59:4-10.) Moreover, Gaskins was unequivocal in her belief that Barnes's due process rights were violated. (*E.g*., *id.* 97:1-6 ("There are no circumstances the hearing procedure should be disregarded. Ultimately, a student is entitled to a hearing."); 103:13-15 ("And I agree that Dr. Zaccari made a decision without due process to Barnes to expel Barnes from Valdosta State.").)  But no matter how much Zaccari may selectively quote Gaskins' deposition, her trial testimony was quite clear on these points.  (*See, e.g*., Ex. B, Gaskins Test., Tr. Vol. 2, 67:7-9 ("Q. Did you ever form a belief that Mr. Barnes presented a threat to VSU?  A. I never believed he was dangerous."); 74:11-12 ("[M]y advice has consistently been to the president that Hayden Barnes was entitled to due process.").)

Dep. Tr. 38:18-20 ("Q. Did you take any steps to investigate the perceived threat independently? A. Not that I recall.").)   Accordingly, her testimony at trial sheds no light on this threshold question.

But other testimony made clear that if there was any "disruption" of campus activities, it resulted <u>only</u> from Zaccari's compulsive desire to silence Barnes and not from any question of campus safety.  Zaccari called meeting after meeting looking for a way to expel Barnes without having to present evidence of any kind.   However, Zaccari's real concern was unwittingly brought to light by the testimony of Thressea Boyd, his administrative assistant who had investigated Barnes's flyers, reported the student's apology to the BOR, informed Zaccari of Barnes's use of the Counseling Center, and who delivered the print-out of the Facebook cartoon. After she called Virginia Tech "our 911" that "changed the way higher education looks at security on any campus," (Ex. C, Boyd Test., Tr. Vol. 3, 130:16-19), Boyd was asked to describe how Barnes's activities "disrupted the normal functioning of the office of the president."   She responded:

> I think it was more of the flow of the e-mails.  Originally [Barnes] said he was going to take down the page, and then that changed, and so we had to – you know, there was – I believe I sent an email to Dr. Sethna that the situation was over, and then it came back up again.

(Ex. C, Boyd Cross-Exam., Tr. Vol. 3, 132:20-133:2; *see also* 134:9-13 ("Q. And so when you say the office was disrupted, it meant that you simply misunderstood what [Barnes's] apology meant, right?  A. Well, an apology that says you're going to stop something is an apology that says you're going to stop something.  And then when it doesn't stop, it starts back.").)

In short, the only "disruption" that occurred was the sense of alarm within Zaccari's office that a student might express an opinion that differed from that of the university president, and that he did not shut up when told to do so.  (*See*, *e.g.*, Ex. C, Boyd Test., Tr. Vol. 3, 111:20-

22 ("There was just general discussion, you know, about what was being said on the flier, the inaccuracies of the flier."); Ex. B, Zaccari Test., Tr. Vol. 2, 189:20-190:5 ("I was very, very concerned that [Barnes] "simply didn't understand, and, in fact, mentioned to several of the Board of Regents' members that the university had not considered any alternatives to this parking facility when we had spent well over two years looking at all of those options . . . ."); Ex. A, Barnes Test., Tr. Vol. 1, 55:8-12 (Zaccari "told me that I had embarrassed him, that he couldn't forgive me, that he thought after my letter – I guess my letter about the fliers – that I had just gone away.")).  This is not even close to the kind of "continuing danger to persons or property" or "ongoing threat of disrupting the academic process" contemplated in *Goss.*  419 U.S. at 582.

Ultimately, however, Zaccari's actions speak louder than his words, and the record confirms he had no actual concern about safety, notwithstanding his assertions to the contrary. Zaccari's claim is that, beginning April 20, 2007, he was targeted by a death threat by a "mentally ill" student, and that he was worried about a "copycat" killing in the wake of Virginia Tech.  Yet his response – to hold a series of meetings over a period of two weeks – is a remarkably lackadaisical response for a person who claims to have been afraid for his life.  And Zaccari's story, that he was concerned not just for his own safety but for the campus as a whole, is inconsistent with his actions.  He testified that he thought Barnes's Facebook cartoon also targeted the student organization S.A.V.E., yet he declined to warn the group of any potential danger.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 71:14-72:2.)

Once the expulsion was accomplished and Barnes was locked out of his dorm room, Zaccari sent a memo to other administration officials giving the student another 48 hours to leave campus – something Zaccari described as "giving the student an opportunity to vacate the

university."  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 85:17-86:2.)  Such actions cannot be reconciled with Zaccari's "emergency" defense.  (*See*, *e.g.*, Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 81:19-23 ("Q. Okay.  So you were concerned that he might be unbalanced, that he might be violent so you locked him out of his dorm, cut him off from his counselor, and he was cut adrift. That's your response to an emergency?   A. Yes.").)   The fact that Zaccari chose not to immediately remove Barnes from campus on April 20 or seek a restraining order confirms that there was no genuine safety concern.  (*See* Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 85:17-86:23.) As Zaccari himself put it best, "I didn't say there was an emergency."[14]

The jury's decision not to award punitive damages does not suggest otherwise.  The Defendant erroneously conflates the denial of punitive damages with a finding that Zaccari "did not act with callous disregard or indifference to Mr. Barnes' constitutional rights."  *See* Zaccari Mot. 8.   But there was no such finding.   Although callous indifference or malice were prerequisites to the award of punitive damages, the decision not to award damages says nothing at all about what the jury may or may not have believed about the existence of an emergency. The jurors were instructed that they did not have to explain their verdict and the decision not to award punitive damages could have resulted from any number of considerations.   Perhaps the jury felt as a sense of rough justice that the compensatory damages provided enough relief from Zaccari's constitutional violations, or that Zaccari's public humiliation at being identified as a law breaker was punishment enough.  Or maybe the jurors simply regarded Zaccari as a pathetic

---

[14] (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 81:7.)  The Defendant's claim that he was just trying to allow Barnes to finish his exams and to respect his rights is illogical and does not withstand scrutiny.  If an actual emergency existed – that is, if there had been a real danger – then Zaccari should have acted immediately (assuming, of course, he had evidence to support such action).  But if Barnes could be allowed to linger on campus for almost three weeks after Zaccari discovered the Facebook cartoon, there is no reason he could not have attended the spring and summer sessions.

figure that warranted tempering justice with mercy.  Whatever the reason, Zaccari cannot convert the verdict into an affirmative finding that he acted without malice or callous disregard of student rights. [15]

### B.    Zaccari Did Not Follow Legal Advice

The Court has already rejected Zaccari's qualified immunity defense twice, and, in the process, described his claim that he was just following legal advice as "disingenuous." *Barnes v. Zaccari*, 757 F. Supp. 2d 1313, 1334-35 (N.D. Ga. 2010), *aff'd*, 669 F.3d 1295 (11th Cir. 2012); *Barnes v. Zaccari*, Order (Dkt. #37) (N.D. Ga. 2008), slip op. at 24-25.  The record at trial confirms that Zaccari's actions in expelling Barnes were not the result of any legal advice, and that the procedures he implemented were an obvious denial of due process.  The Defendant's generalized references to "testimony" of Elizabeth Neely and citation to her deposition transcript do not establish that Zaccari was acting on the advice of counsel when he concocted the "administrative withdrawal" procedure.

**First**, Zaccari attempted to claim for the first time at trial that he was acting not just in response to Neely's advice, but that he was acting at her <u>direction</u>.  (Ex. A, Opening Statement of David Will, Tr. Vol. 1, 25:20 ("He did what she said had to be done . . . ."); Ex. B, Zaccari Test., Tr. Vol. 2, 206:10-14 ("Q: Who made that decision?  A. Vice Chancellor Elizabeth Neely."); 207:23 ("I followed her directive."); 224:11-12 ("[T]he decision that I was directed to make by the senior attorney at the Board of Regents office.").)  Although he acknowledged that LaVerne Gaskins had raised due process and other concerns in her role as VSU Counsel, he tried to claim

---

[15] In any event, the legal standards governing qualified immunity and punitive damages are distinct.  To be subject to qualified immunity, Zaccari must demonstrate that a reasonable public official would not have understood he was violating Barnes's constitutional rights under these circumstances.  Denial of qualified immunity does not require a showing that Zaccari acted with malice or callous indifference.

that "LaVerne was overruled by the senior attorney," Betsy Neely.  (Ex. B, Zaccari Test., Tr. Vol. 2, 215:1-8.)   Zaccari asserted further that Neely dictated specific inclusions in the withdrawal notice, such as its reliance on BOR disciplinary Policy 1902 as the relevant provision, as well as the conditions for Barnes's return to VSU.  (Ex. B, Zaccari Test., Tr. Vol. 2, 208:5-12 ("[S]he referenced Board of Regents policy 1902, which I was not familiar with . . . ."); 219:15-20; Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 76:20-24.))

Unfortunately for Zaccari, Neely's testimony (which he does not cite in his motion) expressly undermined all of his specific assertions about the nature of her "advice."  She denied directing Zaccari to make any decision about the withdrawal, and in fact testified it would have been improper for her to do so.  (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 156:6-13 ("I did not direct him that he had to do anything."); 158:8-20 ("[I]t would have been totally inappropriate for me to direct him to do anything.")).  She was not providing formal legal advice, but saw her role as providing a "sounding board."[16]  Contrary to Zaccari's asserted defense, she did not mention using BOR Policy 1902, which she identified as a policy designed to deal with student demonstrations from the 1960s, and she noted that Barnes's situation was not "disciplinary," so Policy 1902 would not have been appropriate.[17]  Nor did she suggest the two conditions for

---

[16] (Ex. C, Neely Test., Tr. Vol. 3, 141:10-13 ("I saw my role as reviewing the options, maybe giving my thinking on it . . . ."); Ex. C, Neely Cross-Exam., Tr. Vol. 3, 157:15-25 (operated as a "sounding board"); 163:10-15.)  This was consistent with Neely's deposition testimony.  (Dkt. #188, Neely Dep. Tr. 8:21-9:11 (confirming that she did not provide formal legal advice to Zaccari but viewed her role as "management consulting with a legal twist").)

[17] (Ex. C, Neely Test., Tr. Vol. 3, 143:19-144:14 (identifying BOR Policy 1902 as dealing with student demonstrations; does not recall discussing it with Zaccari); 141:19-24 (noting that this was not a disciplinary case); Ex. C, Neely Cross-Exam., Tr. Vol. 3, 160:19-21 (no recollection of discussing BOR Policy 1902 with Zaccari); 159:13-14 (not a disciplinary case).)  Again, this is consistent with Neely's deposition testimony.  (Dkt. #188, Neely Dep. Tr. 42:21-43:9 (no recollection of discussion of BOR Policy 1902 with Zaccari).)

14

Barnes's readmission as Zaccari claimed.[18]  She also denied "overruling" Gaskins, or even having the authority to do so.  (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 162:12-15; 158:8-14 ("We did not have supervisory authority in our office over counsel at the institutions.").)

**Second**, if Zaccari had actually believed there was an emergency involving campus security and a mentally ill student, the only policy that arguably would have been relevant was VSU's Mental Health Withdrawal Policy.  (Pl.'s Ex. 11.)  For that reason, Gaskins specifically listed that policy in her memorandum to Zaccari that explained the due process requirements, and she made sure to deliver a copy of the policy to Zaccari to make sure he was aware of it.  (Ex. B, Gaskins Test., Tr. Vol. 2, 83:3-16; 100:16-101:12; Pl.'s Ex. 4.)  However, Zaccari could not get support from the Counseling Center for a Mental Health Withdrawal, and so he never mentioned it as an option in his direct testimony, nor did he discuss the possibility of a Mental Health Withdrawal with Neely.[19]

However, the one specific policy suggestion that Neely sent to Zaccari – which was identified in the document she sent as an "administrative withdrawal" – was a draft 1983 Medical Withdrawal policy that provided the same informal pre-expulsion hearing rights as VSU's Mental Health Withdrawal procedure.  (*See* Pl.'s Ex. 13; Ex. C, Neely Cross-Exam., Tr. Vol. 3, 162:21-164:8; Ex. B, Gaskins Test., Tr. Vol. 2, 92:15-94:1.)  But Zaccari ignored this suggestion, and it was he who dictated the use of BOR Policy 1902 in its place, as well as the

---

[18] (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 167:3-5 ("Q. Did you direct Dr. Zaccari to impose these conditions on Hayden Barnes' withdrawal?  A. No, I never directed Dr. Zaccari to do anything.").)

[19] (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 161:11-15.)  This omission utterly undermines Zaccari's claim for why he could not provide a hearing <u>before</u> the expulsion.  He claimed it was necessary to avoid a judicial hearing because such a proceeding would have revealed confidential information about Barnes and alarmed the student body.  (Ex. B, Zaccari Test., Tr. Vol. 2, 213:14-24.)  But such concerns were inapplicable to the informal and confidential proceedings that would have been provided pursuant to a Mental Health Withdrawal.

two conditions set forth in the withdrawal notice for Barnes's readmission.  (Ex. B, Gaskins Test., Tr. Vol. 2, 98:11-99:13; 102:8-21.)  Thus, Zaccari followed no one's advice for the key provisions of the withdrawal notice that Barnes received.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 76:25-78:21.)

**<u>Third</u>**, far from following legal advice or taking actions to ensure that post-expulsion remedies would protect Barnes's rights, Zaccari went out of his way to thwart due process protections.  After dictating the onerous conditions for readmission, Zaccari summarily decided the two letters Barnes provided within twenty-four hours of his expulsion did not satisfy him.  (Ex. B, Zaccari Test., Tr. Vol. 2, 217:20-219:13.)  But worse still, he concealed the existence of the letters from the Board of Regents as it began to review his decision.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 82:19-83:9.)  Moreover, the review process was tainted from the beginning – and Zaccari knew it – because of Neely's consultation in the underlying decision.  Although Neely claimed that she did not participate "directly" in the review of Zaccari's decision, all of the review filings were addressed to her personally as the supervisor of the office of legal affairs.  (Ex. C, Zaccari Cross-Exam., Tr. Vol. 3, 84:9-85:6.)  By the same logic that led her to advise Zaccari that "it is not a good practice for the president to be bringing a complaint against any student" because in that circumstance "there is no due process at the campus level," Neely's participation in the underlying decision necessarily biased the appeal.[20]

---

[20] (Joint Ex. 6).  Neely testified that it would taint the process if Zaccari's subordinates were involved in any review of the expulsion because they "might be accused of being biased or being afraid to render an opinion that would go against something that he thought."  (Ex. C, Neely Cross Exam., Tr. Vol. 3, 171:6-13; 149:24-150:10.)  But the same problem applies to Neely's office.  Zaccari's defense is predicated on Neely being directly involved in the decision, either by direction or by providing advice.  Thus, even if Neely did not handle the appeal directly, those who worked for her did.  Under such circumstances, both the initial decision and the review procedure lacked due process.  (Ex. C, Neely Cross Exam., Tr. Vol. 3, 171:15-172:8.)

**II.    The Court Should Reaffirm its Prior Rulings on Qualified Immunity**

No evidence was presented at trial that should cause this Court to disturb its earlier rulings denying qualified immunity.  Quite to the contrary, the testimony confirmed that Barnes was expelled in retaliation for his protest against the parking deck, which angered and embarrassed Zaccari.  Although there is not currently a First Amendment claim in the case, it is obvious that no public official acting for such a purpose could be considered "reasonable."[21]  But whether or not the record established retaliation, it is clear that there was no emergency that required the immediate removal of Barnes from the VSU campus, and so the factual predicate required for Zaccari's qualified immunity defense was not established.  Accordingly, it does not matter whether Zaccari purportedly was following legal advice.  Neither the facts nor the law support his claim for qualified immunity.[22]

Zaccari cites *Poulakis v. Rogers*, 341 F. App'x 523 (11th Cir. 2009), but that case does more to undermine his claim for qualified immunity than to support it.  *See* Zaccari Mot. 6.  In *Poulakis*, the Eleventh Circuit stressed that where the law is clear, "the officer's consultation with an attorney will not aid him in our qualified immunity analysis, because an attorney's advice cannot transform the officer's patently unlawful activity into objectively reasonable conduct."  *Id.* at 532.  That is, "a wave of the prosecutor's wand cannot magically transform an

---

*See, e.g.*, *Davis v. Monroe County Bd. of Educ.*, 120 F.3d 1390, 1402-04 (11th Cir. 1997) ("A fair hearing in a fair tribunal is a basic requirement of due process.").

[21] *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279-82 (11th Cir. 2004) (finding that viewpoint discrimination is "[o]ne of the most egregious types of First Amendment violations" and rejecting defendant's qualified immunity claim that she was simply trying to prevent "disruption of class"); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("[T]here is no justification for harassing people for exercising their constitutional rights.").

[22] Not only was there no emergency, but Zaccari neither sought, nor did he follow, legal advice from Neely.  The withdrawal notice he concocted was entirely the product of his own design.

unreasonable probable cause determination into a reasonable one." *Id.* at 533. Although a genuine effort to obtain legal guidance can be a factor in a qualified immunity analysis, "reliance on the advice of counsel alone will not satisfy an official's burden of acting reasonably." *Watertown Equip. Co. v. Norwest Bank Watertown, N.A.*, 830 F.2d 1487, 1495 (8th Cir. 1987).

Moreover, the holding in *Poulakis* was limited to the second prong of the qualified immunity analysis – "whether the unconstitutionality of the officers' actions was clearly established at the time of the incident." 341 F. App'x at 525. But that question was the subject of Zaccari's interlocutory appeal to the Eleventh Circuit, and the appellate court's answer is the law of the case. As the Eleventh Circuit made clear, "no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment." *Barnes v. Zaccari*, 669 F.3d at 1305. The Court confirmed that the right to a pre-deprivation hearing has been the law for more than 50 years, and it denied Zaccari's claim for qualified immunity.

Most notably, Zaccari did not seek Neely's advice as to *whether* an emergency existed, and he failed to provide her with the underlying facts necessary to help in making such a determination. For example, he did not disclose to Neely that he was angry at Barnes's speech about the proposed parking deck, or that he had already tried unsuccessfully to remove Barnes based on his academic record. (Ex. C, Neely Cross-Exam., Tr. Vol. 3, 159:4-8; 168:8-13.) Rather, he directed Gaskins to explore with Neely what procedure should be followed when the university president is the one who files a complaint. (Ex. B, Gaskins Test., Tr. Vol. 2, 85:8-86:2.) Although Zaccari later claimed to have security concerns, he did not provide any details to Neely, nor did she make any independent inquiry into the situation. But the Eleventh Circuit

made clear in *Poulakis* that the defense of "seeking legal advice" requires that the official "fairly explained the circumstances and material facts." 451 F. App'x at 534. That clearly did not occur in this case. Accordingly, Neely's testimony cannot be a proxy for what a "reasonable" college administrator would have done in this case.[23]

Zaccari's citation to *Castle v. Appalachian Technical College*, 627 F.3d 1366 (11th Cir. 2010), is not to the contrary. *See* Zaccari Mot. 9. In *Castle*, the Court rejected the student's constitutional claim because two officials investigated allegations she had bullied and shouted at other students and confirmed without exception that the claims were true. It found the officials "reasonably believed that they would have suspended Castle in the absence of her protected speech [involving a complaint about an instructor] because of her other conduct." *Id*. at 1199. In this case, there was no "other conduct." Barnes' speech concerning the parking deck was the sole reason cited for the expulsion. As the testimony at trial showed, the only "disruption" in this case was the overwrought reaction to Barnes's speech by those in Zaccari's office. *See supra* at 3-4.

Finally, Zaccari's claim that he was denied the ability to raise his qualified immunity defense was patently false. The Court specifically asked counsel to confirm that "[b]oth the plaintiff and the defendant then are satisfied for the Court to consider the motion for judgment as a matter of law based on qualified immunity based on the evidence and the proffers that have been made to this point in this case." Both did so. (Ex. D, Tr. Vol. 5, 4:11-6:1.) The

---

[23] In this regard, the trial testimony of Vice President for Student Affairs Kurt Keppler provides an important counterpoint: "If I would have had any decision in this case I would have jumped on his back and said, please, don't do this." (Ex. C, Keppler Test., Tr. Vol. 3, 208:4-6.) Unlike Neely, Keppler attended the meetings in which Zaccari tried to claim an emergency existed.

Defendant's claim that the jury should have been charged on the meaning of "emergency" under

*Goss v. Lopez* added nothing to the matters the jury was properly asked to consider.[24]

**Conclusion**

Accordingly, Plaintiff respectfully requests that the Court deny the Defendant's Motion

for a Finding of Qualified Immunity.

Dated: March 4, 2013

Respectfully submitted,

_____/s/Robert Corn-Revere_____
Robert Corn-Revere
Lisa Beth Zycherman
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC  20006-3401
bobcornrevere@dwt.com
lisazycherman@dwt.com
(202) 973-4200

Cary Wiggins
Georgia Bar #757657
Wiggins Law Group
260 Peachtree Street, N.W.
Suite 401
Atlanta, GA  30303
cary@cywlaw.com
(404) 659-2880

*Counsel for Plaintiff*

---

[24] Likewise, the Court properly denied Defendant's late-filed special interrogatories.  The interrogatories were largely irrelevant to the immunity question and improperly sought answers on questions of law.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2013, I electronically filed the foregoing Opposition to Defendants' Motion for a Finding of Qualified Immunity and all exhibits attached thereto with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

       /s/Robert Corn-Revere       
Robert Corn-Revere
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC  20006-3401
bobcornrevere@dwt.com
