**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **THOMAS HAYDEN BARNES,** | |
| Plaintiff, | |
| v. | Case No. 7:12-cv-89 (HL) |
| **RONALD M. ZACCARI, *et al.,*** | |
| Defendants. | |

**ORDER**

Before the Court is Defendant Ronald M. Zaccari's Motion for Judgment as a Matter of Law (Doc. 373) and Motion for Qualified Immunity (Doc. 370), as well as Plaintiff Thomas Hayden Barnes's Motion to Strike (Doc. 388). For the reasons stated below, the Motions for Judgment as a Matter of Law and Qualified Immunity are denied. The Motion to Strike is granted.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

a.  **Factual Background**[1]

The history of this case begins in the spring of 2007, over six years ago. At that time, Plaintiff Thomas Hayden Barnes, who was somewhat of an activist, instigated a campaign at Valdosta State University ("VSU") to raise awareness

---

[1] A complete recitation of the extensive facts of this case is unnecessary given the procedural posture of this litigation. The factual background was extensively laid out in the Northern District's Order on Plaintiff's and Defendants' Cross Motions for Summary Judgment. (*See* Doc. 244; *published at* 757 F. Supp. 2d 1313 (N.D. Ga. 2010)).

about the possible construction of a parking garage on campus. Barnes was concerned about the potential environmental impact and the financial implications associated with the construction of the parking garage. As part of his protest, Barnes put up flyers, communicated with fellow students and VSU officials via email, contacted members of the Board of Regents, and posted information about the parking garage on his personal Facebook page.

Barnes's protest caught the attention of then-President Ronald M. Zaccari, who was a strong advocate for the construction of the garage. Zaccari took several steps in response to Barnes's protest. He began by investigating Barnes's record at VSU, including his counseling history and academic record. Barnes's counseling history revealed that he met with a counselor on a regular basis and received special accommodations from VSU through the Access Office based on disability. After doing an initial investigation, Zaccari met personally with Barnes to discuss his protest. Zaccari also met with other school administrators to discuss Barnes. Those administrators with whom he met included Major Ann Farmer, the head of VSU campus police; Leah McMillan, Barnes's counselor at VSU's Counseling Center; Kurt Keppler, Vice President of Student Affairs; Russ Mast, the Dean of Students; and Victor Morgan, the Director of the VSU Counseling Center. The record reflects that Zaccari also consulted with Elizabeth Neely, Vice Chancellor for Legal Affairs at the Board of Regents of the University System of Georgia ("BOR"), and Laverne Gaskins, in-

2

house counsel for VSU, to seek legal advice about the options that were available to him for dealing with Barnes.

After a series of meetings with the above-listed group, Zaccari eventually made the decision to "administratively withdraw" Barnes from VSU under Board of Regent's Policy 1902.[2] Zaccari's decision was met with some dissent. Gaskins informed Zaccari that a student accused of violating Board Policy 1902 was entitled to due process. Keppler and McMillan discussed with Zaccari that no one at the VSU Counseling Center thought that Barnes posed a threat to campus. Despite these comments, Zaccari proceeded to administratively withdraw Barnes, effective May 7, 2007. A letter informing Barnes of his administrative withdrawal was slipped under the door of his dorm room. It stated that he had been withdrawn and notified him that he was deemed a "clear and present danger to the school." There were two conditions for readmission in the letter, with which Barnes contends he complied, but he was not allowed readmission to VSU in spring 2007.

Zaccari claims that all of the actions that he took were based on his belief that Barnes posed a serious threat to the VSU campus. The timing of Barnes's

---

[2] BOR Policy 1902 provides "Any student, faculty member, administrator, or employee, acting individually or in concert with others, who clearly obstructs or disrupts, or attempts to obstruct or disrupt the teaching, research, administrative, disciplinary, or public service activity, or any other activity authorized to be discharged or held on any campus of the University System is considered by the Board to have committed an act of gross irresponsibility and shall be subject to disciplinary procedures, possibly resulting in dismissal or termination of employment." (Doc. 179, Ex. 44.)

3

protest coincided with the April 16, 2007 Virginia Tech massacre when a student diagnosed with mental illness killed thirty-two people and wounded seventeen others in two separate attacks. The shooting took place on the same day that Zaccari first met with Barnes to discuss his parking deck protest. Zaccari claims that the Virginia Tech shooting put VSU on high alert, and Zaccari contends that Barnes's actions alarmed him so greatly that that he felt Barnes's withdrawal was necessary.

    b.  **Procedural Background**

In 2008, Barnes filed this lawsuit in the Northern District of Georgia, originally naming eight defendants[3]. The lawsuit alleged seven counts against Defendants including claims that Defendants violated Barnes's First Amendment right to free speech in both their individual and official capacities under § 1983, that Defendants violated Barnes's procedural and substantive due process under § 1983 in both their individual and official capacities, that VSU and the BOR breached a contract between the parties, and that all Defendants in their official capacities violated the Americans with Disabilities Act and the Rehabilitation Act. (Complaint, Doc. 1.) Defendants filed motions to dismiss, which were granted in part and denied in part by the Northern District. (Doc. 37.) The Northern District granted the motion to dismiss the claims under § 1983 against all Defendants in their individual capacities. The other claims survived.

---

[3] The original defendants included Zaccari, Valdosta State University, the Board of Regents, Laverne Gaskins, Kurt Keppler, Russ Mast, Leah McMillan, and Victor Morgan.

4

In December 2009, all of the parties filed motions for summary judgment, with the exception of Victor Morgan, who was voluntarily dismissed by Barnes a few days prior to the filing of summary judgment motions (Doc. 161). In September 2010, the Northern District issued an order on the parties' cross motions for summary judgment. Leah McMillan, Laverne Gaskins, Kurt Keppler, and Russ Mast were all granted summary judgment (Doc. 244) and the claims against them were dismissed. Valdosta State University was also dismissed as a defendant. Additionally, summary judgment was granted to all Defendants on the claims under the Americans with Disabilities Act and the Rehabilitation Act. The Northern District also granted summary judgment in favor of Barnes on two of his claims: (1) a breach of contract claim against the Board of Regents, and (2) a claim for a procedural due process violation against Zaccari. At the end of the order, the Northern District wrote "[h]aving resolved all pending claims in this lawsuit as a matter of law, the only remaining issue in this case is damages." (Doc. 244, p. 57.)

Zaccari and the Board of Regents filed an interlocutory appeal to the Eleventh Circuit on the issue of Zaccari's defense of qualified immunity and the breach of contract issue (Doc. 249). Barnes filed a cross appeal on the Northern District's decision to grant summary judgment to Zaccari on Barnes's First Amendment claim and on the substantive due process claim. Barnes also appealed the dismissal of his claims under the Americans with Disabilities Act

and the Rehabilitation Act, and appealed the decision to deny injunctive relief (Doc. 255).

In February 2012, the Eleventh Circuit addressed only the qualified immunity issue and the breach of contract, noting that because final judgment had not yet been entered, the other claims were not ripe for review. As to qualified immunity, the appellate court agreed that Zaccari was not entitled to qualified immunity and that he was responsible for breaching Barnes's procedural due process rights by administratively withdrawing him from VSU (Doc. 267). However, as to the breach of contract claim, the Eleventh Circuit reversed the Northern District, finding the contract claim to be without merit. The case was remanded with instructions to dismiss the claim against the BOR and proceed to trial on the issue of damages as to the procedural due process violation. Soon after the remand, the case was transferred to this Court for the resolution of the damages issue.

In January 2013, the case proceeded to a trial by jury on the issue of damages. The Court, against Zaccari's objections, chose to trifurcate the trial in an attempt to avoid confusion and prejudice. (Doc. 339.) Because liability had already been decided, Phase One of the trial focused solely on the issue of the amount of damages that should be awarded to Barnes. At the end of Phase One, jury instructions were read and a verdict form given to the jury for deliberation. Next, after the jury returned a verdict in Phase One, Phase Two was to be focused on punitive damages, assuming the jury found in Phase One that

6

punitive damages were warranted. Finally, Phase Three of the trial was intended to resolve any outstanding evidentiary disputes relevant for purposes of qualified immunity. At the end of Phase Three, any special interrogatories pertinent to qualified immunity would be sent back with the jury for resolution.

After a week-long trial, the jury returned a verdict in Phase One awarding $50,000 to Barnes. The jury did not find punitive damages were warranted. (Doc. 354.) Thus, Phase Two was not necessary. The Court conferred with counsel for Zaccari and Barnes outside the presence of the jury, and the parties declined to move into Phase Three of the trial. (Doc. 383, p. 5.) With Phase Three waived by the parties, the trial concluded.

Now, in the aftermath of the trial, the Court is faced with the resolution of the post-trial motions filed by the parties. The pending motions are discussed below.

## II.   **MOTION FOR JUDGMENT AS A MATTER OF LAW** (Doc. 378)

In his original Motion, Defendant Zaccari argues that judgment as a matter of law is appropriate for two reasons: (1) Barnes did not prove that his damages resulted from the denial of procedural due process, and (2) the damages award was based on speculation and conjecture. The Court finds that neither argument has merit.

Zaccari first argues that Barnes was unable to prove at trial that his damages were the result of a procedural due process violation. Zaccari maintains that this failure to properly prove the cause of his claimed injuries means that

Barnes is entitled to only nominal damages. For support, Zaccari relies on Carey v. Piphus, 435 U.S. 247 (1977). In Carey, the Supreme Court of the United States held that mental and emotional distress caused by the denial of procedural due process under § 1983 were compensable injuries. As to the amount of damages owed to a plaintiff alleging this type of claim, the Court determined that a procedural due process violation did not warrant presumed damages, as with a claim like defamation *per se*. 435 U.S. at 264. However, the Court concluded that procedural due process rights did deserve a certain level of protection. In the event that there was no actual proof of injury, nominal damages were deemed to be appropriate. Id. at 266. The Court stated

> [b]ecause the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

Id. In sum, under Carey, a procedural due process violation is actionable for compensatory damages, but to receive a compensatory award the damages must be proven, not presumed. If a procedural due process violation is proven but there is no evidence of damages, nominal damages are appropriate.

Zaccari contends that Carey applies to the present case and only nominal damages should be awarded because Barnes failed to present sufficient evidence at trial to show that compensatory damages are justified. The Court disagrees. Barnes produced evidence at trial that as a result of his administrative

8

withdrawal from VSU without proper procedural due process, he suffered the following financial impact: increased tuition (Transcript, Direct Examination of Barnes, Doc. 379, p. 83); increased rent (Id.); increased living expenses between Valdosta and Atlanta (Transcript, Direct Examination of Barnes, Doc. 379, p. 89); and lower salary (Transcript, Direct Examination of Barnes, Doc. 379, p. 89-90). These specific details offered through Barnes's direct testimony satisfy the Carey standard requiring plaintiffs to prove their damages. These damages all resulted from Zaccari's decision to administratively withdraw Barnes from VSU without proper due process. Barnes has presented sufficient evidence to demonstrate that his damages did result from the denial of due process.

Next, Zaccari argues that the damages awarded by the jury are the result of conjecture or speculation, which Zaccari claims is improper. The Court finds this argument to be without merit. The evidence about damages presented by Barnes at trial was very precise. The transcript reveals that Barnes carefully calculated his claimed damages and he testified in detail about the amount that he believed he was due as a result of Zaccari's procedural due process violation. (Transcript, Direct Examination of Barnes, Doc. 379, pp. 82-91.) Barnes was explicit about the increased expenses he was forced to pay as a result of his administrative withdrawal, and he gave a specific amount that he was claiming in damages:

> Q: Okay. And I believe you testified that the cumulative total that you estimated in lost income and higher expenses was around $50,000; is that correct?

9

A: Yes, sir.

(Transcript, Direct Examination of Barnes, Doc. 379, p. 91.) Barnes's estimate of $50,000 is the exact amount awarded by the jury. Thus, the Court finds the amount of damages is not the result of speculation. The evidence presented at trial is sufficient to demonstrate that the jury's verdict was not based on speculation or conjecture.

In addition to the two reasons set forth by Zaccari in his original Motion for Judgment as a Matter of Law, he set forth an additional reason that he believes judgment in his favor is warranted in a supplement to his Motion filed June 21, 2013. In that supplement, Zaccari notifies the Court that the Georgia Court of Appeals resolved the case of Barnes v. Zaccari that was pending in state court. *See* Board of Regents of University System of Georgia v. Barnes, --- S.E. 2d ---, 2013 WL 2321975 (Ga. App. May 29, 2013). In the appellate court's decision, the Georgia Court of Appeals ruled that neither the VSU Student Handbook nor a counseling center consent form created a binding contract between Barnes and the Board of Regents. Id. at *3. The court reasoned that because neither of the documents were signed by a representative of VSU or the Board of Regents, "they do not constitute signed, contemporaneous agreements between the parties which demonstrate their intent to enter into a binding contract." Id. As a result of this finding, the court went on to hold that without a binding contract, there was no waiver of sovereign immunity and the Board of Regents was not a proper party to Barnes's breach of contract claims. Id.

Zaccari argues that the <u>Barnes</u> decision is relevant to the present case because the holding of the state appellate case proves that Barnes does not have a property right based on the VSU Student Handbook, and therefore, he cannot assert a deprivation of due process. The Court finds Zaccari's argument to be misguided. Barnes's right to due process does not arise from a contract. Instead, it stems from the principle that "due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." <u>Dixon v. Alabama State Bd. of Ed.</u>, 294 F.2d 150, 158 (11th Cir. 1961). This principle is well-established in Eleventh Circuit jurisprudence, as explained by the Northern District in its order addressing the parties' cross-motions for summary judgment. (*See* Doc. 244, p. 29-30.) Therefore, the lack of a contractual property right has no bearing on Barnes's rights to proper due process before facing disciplinary action.

For the reasons above, the Court finds that Zaccari's Motion for Judgment as a Matter of Law is without merit. The motion is denied.

## III.   **MOTION FOR QUALIFIED IMMUNITY** and **MOTION TO STRIKE**

### a.  **Motion to Strike** (Doc. 388)

At the outset, the Court addresses Barnes's Motion to Strike, which is relevant to the Motion for Qualified Immunity. In his Motion, Barnes asks the Court to strike Zaccari's reply brief filed on the issue of qualified immunity (Doc. 388). Barnes argues that the Court's instructions about post-trial briefs explicitly informed counsel that any motion on qualified immunity was due twenty days

after the conclusion of trial and response briefs were due ten days after the motion. The Court did not authorize any reply briefs, and therefore, Barnes argues that Zaccari's reply brief is improper. The Court agrees and finds the reply brief to be opposite the Court's specific instructions given at the end of trial. (*See* Transcript, Doc. 383, p. 7.) Thus, Barnes's Motion to Strike is granted and Zaccari's reply brief will not be considered by the Court in its review of the Motion for Qualified Immunity.

b. **Motion for Qualified Immunity** (Doc. 370)

Qualified immunity protects government officials from liability for conduct that does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1157 (11th Cir. 2010). To receive qualified immunity, the official claiming the defense must demonstrate that that he or she was acting within the scope of his or her discretionary authority when the alleged wrongful acts occurred. Id. at 1158. If the court concludes that the official was acting within his or her discretionary function, then the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to qualified immunity. Id. (quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004)). To carry this burden, the plaintiff must show that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. Id.

In limited circumstances, a defendant who violates a constitutional right is excused and can receive qualified immunity despite his constitutional violation. One of these situations, recognized by the Supreme Court in Goss v. Lopez, 419 U.S. 565, 582-83, 95 S. Ct. 729 (1975), is when there is an emergency on a school campus. In Goss, the Supreme Court held that compliance with procedural due process rights in an emergency situation on a school campus "cannot be insisted upon." Id. at 584. "Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." Id. In other words, when there is an emergency situation on campus, a school administrator can be entitled to qualified immunity even if a student's constitutional rights are knowingly violated by the administrator's response to the emergency.

In his Motion for Qualified Immunity, Zaccari claims that, even though the Northern District determined that he violated Barnes's due process rights, he is still entitled to qualified immunity because he was responding to an emergency situation. His motion represents the fourth time in this litigation that Zaccari has raised the qualified immunity defense.[4] A qualified immunity defense is typically considered early in a case, at either the motion to dismiss or summary judgment stage. However, the issue of qualified immunity can be properly reasserted post-

---

[4] The first time Zaccari claimed qualified immunity was in his Motion to Dismiss (Doc. 16). The second assertion of the defense was in his Motion for Summary Judgment (Doc. 177) and the third was in the interlocutory appeal of the qualified immunity issue to the Eleventh Circuit following the decision of the Northern District on summary judgment (Doc. 267).

trial if a defendant is unable to successfully raise the defense earlier in the case. Johnson v. Breeden, 280 F.3d 1308, 1317 (11th Cir. 2002).[5] The qualified immunity defense may be raised post-judgment because of the entitlement of a defendant to have any evidentiary disputes upon which the qualified immunity defense turns decided by a jury. Id. at 1318. Once any unresolved factual issues are decided by a jury, the court is charged with applying the jury's determination to the law and entering a post-trial decision on the defense. Id.

Prior to trial in this case, the Court isolated the only factual issue remaining unresolved that had any potential impact on qualified immunity: whether as a matter of fact Zaccari reasonably believed he was acting under a circumstance of emergency when he moved to administratively withdraw Barnes from Valdosta State University.[6] At the end of Phase One of this trial, the Court gave the parties

---

[5] The Eleventh Circuit specifically addressed the issue when this case was before the appellate court on interlocutory appeal. The court, after denying Zaccari qualified immunity, stated:

> [h]owever, Zaccari's qualified immunity defense does not drop out of the case. At trial, the district court can use a special verdict or written interrogatories to determine any disputed facts and the reasonable inferences drawn from those facts. Once these issues are decided, Zaccari may reassert his qualified immunity defense in a motion for judgment as a matter of law.

Barnes v. Zaccari, 669 F.3d 1295, 1308 (11th Cir. 2012).

[6] The Court recognizes that Defendant Zaccari moved for qualified immunity on four grounds, one of which was his emergency defense. The other three grounds were: (1) relying on the legal advice of Elizabeth Neely, (2) the jury's decision not to award punitive damages, and (3) the totality of the circumstances. (Doc. 370.) The Court made itself clear at the end of the trial that the only issue remaining

the opportunity to present this factual issue to the jury for resolution. However, the parties mutually agreed to waive their right to move into Phase Three of the trial, which included arguing the facts of the emergency issue and sending the question to the jury through the use of a special interrogatory. Mr. David Will, one of Zaccari's attorneys, stated "I don't think it's necessary for the jury to answer that question." (Transcript, Doc. 383, p. 5.) Mr. Robert Corn-Revere, one of Barnes's attorneys, similarly informed the Court that Barnes was content to leave the question of emergency to the Court and not send it to the jury. Id. at 5-6.

By waiving Phase Three of the trial, the parties agreed to assign the Court the role of fact-finder for purposes of determining whether Zaccari reasonably believed there was an emergency situation at VSU during spring 2007. In fulfilling this role, the Court has undertaken a full review of the trial exhibits and trial transcript and has made the following findings of fact.

### i. **Qualified Immunity: Findings of Fact**

The timeline in this case is essential to a factual understanding of whether Zaccari reasonably believed there was an emergency on campus. A combination of events led to Zaccari's awareness and ensuing investigation of Barnes in spring 2007. Sometime in March, Zaccari became aware of certain flyers posted around campus protesting the construction of a parking garage. (Plaintiff's Exhibit 1, Doc. 358-1, p. 1.) Zaccari made inquiries with a campus group, Students

---

pertinent to qualified immunity was emergency, and therefore, the Court finds it unnecessary to examine the merits of these three additional grounds.

Against Violating the Environment ("SAVE"), as to who posted these flyers and he learned that Barnes was responsible. (Transcript, Cross Examination of Zaccari, Doc. 380, p. 229.)

On March 26, 2007, Zaccari was contacted by Dr. Behruez Sethna, a member of the Board of Regents, about Barnes's protest of the parking garage. (Transcript, Cross Examination of Zaccari, Doc. 381, p. 31; *see also* Joint Exhibit 1, Doc. 359-1, p. 1.) Dr. Sethna was aware of Barnes's protest because of an email Barnes sent to VSU teachers and administrators in protest of the construction of the parking garage. (Joint Exhibit 1, Doc. 359-1, p. 1-6.) Zaccari determined that he should look into Barnes's activities as a result of the inquiry from Dr. Sethna and his own observations about Barnes's protest. (Transcript, Cross Examination of Zaccari, Doc. 381, p. 29.)

However, on the same day that Zaccari was contacted by Dr. Sethna, Zaccari received a letter from Barnes stating that he had withdrawn his opposition to VSU's parking garage. (Transcript, Cross Examination of Zaccari, Doc. 381, p. 30; *see also* Joint Exhibit 1, Doc. 359-1, p. 2.) Zaccari sent word to Dr. Sethna through an email written by his administrative assistant, Thressa Boyd, that Barnes had withdrawn his protest. Id. According to Boyd, at this point Zaccari "thought everything was fine." (Transcript, Cross Examination of Zaccari, Doc. 381, p. 30.)

On April 13, 2007, Barnes, still frustrated with the planned construction of the parking garage on campus, posted a satirical collage on Facebook. (Plaintiff's

16

Exhibit 1, Doc. 358-1, p. 3.) The collage included a picture of Zaccari's face and a picture of a parking garage, among other images, and at the top of the collage it read "S.A.V.E. – Zaccari Memorial Parking Garage." Id. Zaccari became aware of the Facebook posting on April 20, 2007 when someone at an administrative meeting gave him a copy of the collage.

However, on April 16, 2007, before Zaccari found out about the Facebook post, several significant events occurred. First, the Virginia Tech shooting took place. Second, Linda Daniels, a member of the Board of Regents, forwarded an email to Zaccari that was addressed to her and sent by Barnes. The email articulated Barnes's reasons for protesting the construction of the parking garage and sought support from the Board of Regents in opposing the project. (Joint Exhibit 10, Doc. 359-1, p. 7.) Third, Zaccari and Barnes met together, along with Russ Mast, the Dean of Student Affairs, in Zaccari's office to discuss Barnes's protest. (Transcript, Examination of Mast, Doc. 381, p. 197.) Mast described both parties at that time as "respectful." Id. Fourth, Barnes sent an email to Zaccari following their meeting. (Joint Exhibit 11, Doc. 359-1, p. 9.) In the email, Barnes stated that he "resort[s] to adversarial tactics only when necessary, when I see something going forward that fundamentally shakes my moral core and there seems to be little, if any time (and I already lack the credibility) to inflict change." Id. The email went on to state his motivation behind putting up flyers on campus and included a quote from an environmental writer, Derrick Jensen.

At this point, Zaccari describes his mindset as being "very, very concerned that [Barnes] simply didn't understand…" (Transcript, Direct Examination of Zaccari, Doc. 381, p. 189-90.) Zaccari noted that Barnes "mentioned to several of the Board of Regents' members that the university had not considered any alternative to this parking facility when we had spent well over two years looking at all of those options and considered that they were not as viable as building this new multipurpose facility." Id. Zaccari's testimony reflects a sense of concern with Barnes's continuing protest, especially when the apology letter Barnes sent in March led Zaccari to believe the protest was over. (Transcript, Direct Examination of Boyd, Doc. 381, p. 112.)

On April 20, 2007, Zaccari held a meeting with Thressa Boyd, Ann Farmer of the VSU Police, Russ Mast, Laverne Gaskins, and Kimberly Tanner of the VSU Access Office. At the meeting, Zaccari received a printed copy of Barnes's Facebook post. After reviewing the post, Zaccari grew increasingly concerned about Barnes's activities. He testified that "[t]hose independent references started to look as a greater concern…" (Transcript, Direct Examination of Zaccari, Doc. 380, p. 203.) He further testified that he was concerned about Barnes and began "to focus on the concerns of the operations of Valdosta State University." Id. Based on the record, Zaccari appeared to hold a genuine concern for the operation of VSU in light of the combination of Barnes's emails to him and to the Board of Regents, along with Barnes's Facebook posting, and the

18

environment on college campuses in the wake of Virginia Tech. Id.  He stated that at that time he was

> trying to sort out the student's behavior, a possible diagnosis that possibly what we're going to do to make sure that over 10,000 university students, 600 faculty members, and over 1300 employees were going to be able to continue university operations without any disruption, and it concerned me a great deal because we were approaching the final examination period at the university.

Id. at 203-04.

On April 20, 2007, Zaccari held another meeting with university administrators about Barnes. (Transcript, Cross Examination of Zaccari, Doc. 381, p. 72.) On April 26, Zaccari met with Laverne Gaskins to discuss possible options for withdrawing Barnes from VSU. Id. On May 3, a third meeting was held with university administrators to discuss Barnes and determine the best possible way to proceed. Id. On May 4, Gaskins testified that she sent Zaccari a draft of a withdrawal letter addressed to Barnes. (Transcript, Cross Examination of Gaskins, Doc. 380, p. 96.)

On May 7, 2007, a formal withdrawal letter was placed under the door of Barnes's dorm room. It was addressed to Barnes and was signed by Zaccari. The letter informed Barnes that

> [a]s a result of recent activities directed towards me by you, including but not limited to the attached threatening document, you are considered to be a clear and present danger to the campus. Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from Valdosta State University effective May 7, 2007.

(Plaintiff's Exhibit 4, Doc. 358-1, p. 2.) Attached to the letter was a printed copy of the collage that appeared on Barnes's Facebook page. On May 9, Zaccari sent a memorandum to several faculty members informing them of Barnes's administrative withdrawal. (Plaintiff's Exhibit 26, Doc. 358-7, p. 6.) Zaccari informed administrators that Barnes would be given 48 hours to vacate his residence hall, meaning that he would be gone from campus no later than 5 p.m. on May 11, 2007. Id.

This timeline is important because it demonstrates that Zaccari first became aware of Barnes in late March, that he became increasingly alarmed by Barnes's protest and activities in mid-April, that he notified Barnes of the administrative withdrawal on May 7, and that he gave Barnes until May 11 to permanently leave the campus of VSU. Days, even weeks, elapsed between the time Zaccari knew about and became alarmed by Barnes and when he took action to remove him from campus.

The term "emergency" carries with it the connotation of a sudden, unexpected event. While there is no black letter law setting out the amount of days that does and does not constitute an emergency, an event that takes place over a span of weeks cannot be categorized as an emergency. In this case, Zaccari's interaction with Barnes began in late March and lasted until May 11. This span of time is sufficient to demonstrate the lack of emergency circumstances. Further, the fact that Zaccari allowed Barnes a full 48 hours to vacate his dorm room and leave campus supports a finding that there was no

20

emergency. Gaskins, who underwent an extended drafting process with Zaccari to come up with the withdrawal letter given to Barnes, agreed that the time period did not support a finding of an emergency.

> Q: Okay. Now, in your job do you deal with matters of campus security from time to time?
>
> A: From time to time, yes.
>
> Q: Okay. In your experience, where there is some kind of emergency is it common to give the student or source of that emergency several days to leave campus?
>
> A: I can't say it's common.
>
> Q: Are you aware of any time it's ever happened?
>
> A: I don't recall, no.

(Transcript, Cross Examination of Gaskins, Doc. 380, p. 107.)

A finding that the timeline does not support an emergency does not mean that Zaccari was not genuinely concerned about his personal safety during this time. To the contrary, the evidence supports a finding that Zaccari was extremely worried about his personal safety in light of the Virginia Tech shooting and Barnes's protest. Gaskins testified that Zaccari was "genuinely frightened." (Transcript, Direct Examination of Gaskins, Doc. 380, p. 110.) Neely testified that Zaccari called her after the Virginia Tech shooting to tell her about Barnes and his Facebook post, explicitly mentioning his use of the term "Zaccari Memorial Parking Garage." (Transcript, Direct Examination of Neely, Doc. 381, p. 139-40.) She noted that "the thing that struck me, I think, the most about it was that he

had hired his own police escorts to escort him on campus because he was really afraid of being attacked." Id. Keppler also testified at trial that the Facebook post made Zaccari concerned for his personal safety. (Transcript, Direct Examination of Keppler, Doc. 381, p. 205.) Zaccari himself admitted that he was scared and concerned for his personal safety. (Transcript, Direct Examination of Zaccari, Doc. 380, p. 205.) However, while the record clearly establishes that Zaccari was afraid for his personal safety, the record does not show is that there was any kind of imminent danger that threatened VSU that would qualify as an emergency.

Even if there was some scintilla of evidence that supported Zaccari's argument that there was an emergency, Zaccari's own statements at trial serve as the damning piece of evidence to eviscerate his defense. Zaccari testified twice on the stand that there was no emergency at VSU during the spring of 2007. The first statement regarding emergency took place on direct examination. Zaccari was testifying regarding his efforts to deal with Barnes and the following exchange occurred:

> Q: Did you consider this to be a priority item or an emergency?
>
> A: I felt it was getting very close to a – it was a priority. I would say a concern about the operation of closing the semester. My concern was, if we held that judicial meeting and I expressed the opinions that really need to make sense in terms of that hearing, that immediately the word would go across campus that the president had a concern, and I believe that – the way things happen on a university campus move very, very quickly – that it could have ...
>
> Q: [ ]

22

> A: I'm suggesting that I did not want to open that door to possible confusion….

(Transcript, Direct Examination of Zaccari, Doc. 380, p. 213-14.) The second reference to an emergency took place during Zaccari's cross examination. The exchange is below:

> Q: You just listed meetings that spanned from April 20th, 2007 to May 7th, 2007, all the time you're convinced this young man is a threat, and you're content to have him on campus even though you believe he's a threat. Is that your testimony?
>
> A: Yes.
>
> Q: Where is the emergency?
>
> A: I didn't say there was an emergency. I said to support the end of the semester and the work that he had put in, that we were going to allow him to finish his exams.
>
> Q: Even though he was a clear and present danger, as you wrote?
>
> A: I think that's a – that was a call that I had – I felt that we had to support – we had to allow him to finish.

(Transcript, Cross Examination of Zaccari, Doc. 381, p. 80-81.)

Based on a review of the transcript and trial exhibits, this Court is convinced that there is sufficient evidence on the record to conclude that, as a matter of fact, Zaccari could not, and did not, reasonably believe there was an emergency on the campus of VSU during spring 2007.

### ii. **Qualified Immunity: Conclusions of Law**

Zaccari argues in his Motion for Qualified Immunity that he is entitled to immunity because there was an emergency at VSU in the spring of 2007 that would allow him to receive the benefit of qualified immunity even though he knowingly violated a student's procedural due process rights. However, as explained above, Zaccari has not been able to demonstrate a factual basis for his claim that there was an emergency situation. Thus, Zaccari has no defense to Barnes's assertion that Zaccari violated his procedural due process rights and the right was clearly established at the time of the alleged violation. As a matter of law, this Court concludes that Zaccari is not entitled to qualified immunity. His motion is denied.

### IV. **MOTIONS FOR ATTORNEY'S FEES**

Under 42 U.S.C. § 1988, a court may award reasonable attorney's fees to a prevailing party as part of the cost of litigating under § 1983. 42 U.S.C. § 1988(b). Section 1988 does not distinguish between prevailing plaintiffs and prevailing defendants. However, the Supreme Court of the United States has developed two distinct standards for these groups. Prevailing plaintiffs, who act as private attorney generals and vindicate those policies that Congress considers of the highest priority, are entitled to attorney's fees absent special circumstances which would render an award unjust. Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 416-17 (1978). On the other hand, prevailing defendants are subject to a more rigorous standard. A prevailing defendant may only recover

attorney's fees when the defendant establishes that the plaintiff's claims were frivolous, unreasonable, or without foundation. Id. at 422; *see also* Hughes v. Rowe, 448 U.S. 5, 14 (1980) (noting that to receive attorney's fees, the plaintiff's case must have been "meritless in the sense that it [was] groundless or without foundation.") Attorney's fees are also warranted in those cases where a plaintiff continues to litigate a case after it clearly became meritless. Id. at 15.

In making the determination about whether a case is frivolous, the proper inquiry for district courts focuses on whether a case is so lacking in arguable merit as to be groundless or without foundation. Sullivan v. Sch. Bd. of Pinellas Cnty., 773 F.2d 1182, 1189 (11th Cir. 1985). "[W]here a plaintiff introduces no evidence in support of his claims, a finding of frivolity is appropriate." Id. There are several factors set out by the Eleventh Circuit to help district courts determine whether an action is frivolous: "(1) whether the plaintiff established a [*prima facie*] case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial." Cohen v. World Omni Fin. Corp., 457 Fed. App'x. 822, 828 (11th Cir. 2012) (citing Sullivan, 773 F.2d at 1190). The Eleventh Circuit also provided additional guidance by setting forth another factor for consideration in a § 1988 case: the attention given to the claim. "[A] claim is not frivolous when it is 'meritorious enough to receive careful attention and review.'" Cohen, 457 Fed. App'x. at 828 (quoting Busby v. City of Orlando, 931 F.2d 764, 787 (11th Cir. 1991)). It is against this legal backdrop that the parties' motions for fees are evaluated.

25

a. **Leah McMillan** (Doc. 364)

i. **Merits of Motion**

In this case, Defendant Leah McMillan contends that the above-listed factors weigh in her favor, justifying her recovery of attorney's fees. She points to language in the Northern District's order on the cross motions for summary judgment to support her claim for attorney's fees:

> The Court is not persuaded by the various phrases from cases cited by Barnes in support of his argument that McMillan is liable because those quotations are taken out of context and fail to sufficiently address how McMillan, as counselor at a state university, caused Barnes to be withdrawn. Because the undisputed facts show that Zaccari made the withdrawal decision on his own, the link between McMillan's actions in April-May 2007 and Barnes's alleged harm regarding his substantive and procedural due process rights is too remote to fairly permit the imposition of civil liability against McMillan.

(Doc. 244, p. 33.) McMillan argues that this finding, along with others in the Northern District's summary judgment order, demonstrate that Barnes's case against her was frivolous and she is entitled to attorney's fees.

In response, Barnes contends that McMillan is not entitled to attorney's fees. Barnes agrees that the three factors from Cohen, 457 Fed. App'x. at 828, are applicable in this case to determine frivolity, but Barnes contends that McMillan misapplied the factors, which actually weigh in his favor.

After review, the Court finds that the factors weigh in favor of McMillan. First, Barnes was unable to establish a *prima facie* case against McMillan for First Amendment retaliation or due process. As to the First Amendment claim,

the Northern District concluded in its order on McMillan's motion for summary judgment that "Barnes has failed to present sufficient evidence to support his conclusory allegation that McMillan conspired with someone else to have Barnes withdrawn from VSU in retaliation for his speech." (Doc. 244, p. 25-26.) This demonstrates that Barnes was unable to establish the *prima facie* case for his First Amendment claim under the Northern District's interpretation of the claim.[7] Barnes also could not establish a *prima facie* case against McMillan for a violation of either substantive or procedural due process. The Northern District found that "Barnes has failed to meet the causation requirement with regard to his claim that McMillan deprived him of his substantive and procedural due process rights." (Doc. 244, p. 32.) Thus, Barnes was not able to establish a *prima facie* case as to any of his claims against McMillan. Second, McMillan never offered to settle. Third, the claims against McMillan did not proceed to trial.

The additional factor articulated by the Eleventh Circuit that calls attention to the level of scrutiny and review the case has received also weighs in favor of McMillan. There is no doubt that this case has been the subject of much judicial attention in the well over five years that it has been pending in federal court. However, the Northern District's decision to dismiss McMillan in her official capacity at the motion to dismiss stage and in her individual capacity at the

---

[7] The Court recognizes that Barnes objects to the Northern District's interpretation of his First Amendment claim; however, the Northern District's interpretation of the claim is controlling for purposes of the present fee motions.

summary judgment stage does not rise to a level of extended discussion and review that defeats McMillan's argument of frivolity.

In the order on the cross-motions for summary judgment, the Northern District concluded that "McMillan consistently and repetitively voiced her objection to Zaccari's opinion that Barnes or the Facebook collage was a threat. She argued that Barnes should be permitted to remain a student, and then she lobbied for Barnes's readmission after Zaccari served notice of withdrawal." (Doc. 244, p. 27.) The Northern District recognized that McMillan was not a proper subject to this litigation because it was "undisputed that Zaccari independently decided to administratively withdraw Barnes without any kind of hearing and that McMillan voiced opposition to the withdrawal of Barnes on multiple occasions." (Doc. 244, p. 32-33.) The Northern District's conclusions and this Court's independent review of the record supports a finding of frivolity as to the claims against McMillan. Thus, she is entitled to attorney's fees.

## ii. **Amount of Fees**

The Eleventh Circuit utilizes the lodestar approach to calculate a reasonable award of attorney's fees. Loos v. Club Paris, LLC, 731 F. Supp. 2d 1324, 1329 (M.D. Fla. 2010). The lodestar formula consists of multiplying the number of reasonable hours expended on the litigation by the reasonable hourly rate. Id. (citing Burlington v. Dague, 505 U.S. 557, 559-60, 112 S. Ct. 2638 (1992)).

28

To determine the reasonable hourly rate, the Court must ascertain "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Id. (quoting Norman v. Housing Auth. of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988)). The party that seeks attorney's fees bears the responsibility of producing evidence that will demonstrate that the requested rate is in line with prevailing market rates. Id. "The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is the place where the case is filed." Scelta v. Delicatessen Support Servs., Inc., 203 F. Supp. 2d 1328, 1332 (M.D. Fla. 2002) (quoting Am. Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 437 (11th Cir. 1999)).

The second step in the lodestar approach is to assess the reasonable number of hours expended. Loos, 731 F. Supp. 2d at 1330. The hours claimed by the party seeking fees must be properly documented. Id. Generalized statements of the hours worked are not sufficient for purposes of fee awards; instead, a party must submit proof of the hours dedicated to the litigation. Id.

In addition to attorney's fees, a prevailing party is entitled to be reimbursed for reasonable expenses of litigation. The Eleventh Circuit has held that "[r]easonable attorneys' fees ... must include reasonable expenses … as equally vital components of the cost of litigation." Dowdell v. City of Apopka, 698 F.2d 1181, 1190 (11th Cir. 1983). Thus, all reasonable expenses incurred through the litigation process, with the exception of routine office overhead, are recoverable.

In this case, McMillan, whom the Court has found to be the prevailing party in the case brought against her by Barnes, seeks a total of $129,217.50 in fees and $4,492.62 in expenses. McMillan's lead counsel, Mr. Matthew R. LaVallee, submitted an affidavit along with his motion for fees in which he claims that the billing rates for his firm in this civil litigation are $125.00 per hour for attorneys and $50.00 for paralegals. (Affidavit of LaVallee, Doc. 364-2, p. 2.) The court finds these rates to be reasonable in Atlanta, which is the relevant market for purposes of determining attorney's fees since it is where the case was filed.

As to the number of hours claimed by Mr. LaVallee and his co-counsel, a total of 1,020.90 hours, the Court finds the hours billed by the attorneys on the case are reasonable. Barnes's counsel raised some objection to the total number of hours, claiming that the redactions shown on the billing sheets were not reflected in the total number of hours claimed. However, after performing independent calculations, the Court finds the number of hours claimed by Mr. LaVallee accurately takes into account the redactions on the billing sheets. Barnes's counsel also raised some objection to the amount of hours claimed by Mr. LaVallee based on Barnes's contention that any time McMillan's counsel spent "sharing the work of other Defendants' counsel should be eliminated." (Doc. 385, p. 22.) The Court finds this objection to be meritless. The eight Defendants in this case were represented by three different law firms, and it is fair and appropriate that these firms would wish to coordinate their efforts defending the case. No reduction is necessary for the sharing of any work. Thus,

the total of 1,020.90 hours claimed by the attorneys in this case is deemed to be reasonable.

However, the hours billed by the paralegals on this case should be reduced. "A court may award fees for the work of paralegals, but only to the extent they [they] perform work traditionally done by an attorney." SE Property Holdings, LLC v. 145, LLC, 10-00521-KD-B, 2012 WL 6681784 at *5 (S.D. Ala. Dec. 21, 2012) (quoting Scelta, 203 F. Supp. 2d at 1334 (internal quotations omitted)). Where this is not the case, paralegal work is viewed as falling within the category of unrecoverable overhead expenses. Scelta, 203 F. Supp. 2d at 1334. Based on a review of the billing records, the Court finds that some of the work billed by the paralegals working with Mr. LaVallee was clerical in nature, including printing and organizing documents (Doc. 364-3, p. 35), organizing exhibits (Doc. 364-3, pp. 60-61), and organizing transcripts (Doc. 364-3, p. 64). Thus, the overall amount of hours billed by paralegals in this case must be reduced from the claimed 32.10 hours to 25.80 hours.

In sum, the Court finds that $125.00 per hour rate charged by Mr. LaVallee and his co-counsel is reasonable and the 1,020.90 hours claimed is reasonable for work performed by the attorneys on the case. Multiplying the hours times the rate amounts to $127,612.50. Additionally, a $50.00 per hour rate is reasonable for paralegals and the appropriate number of hours billed in this case by paralegals is 25.80. Multiplied together, this amounts to $1,290.00. In total, McMillan's counsel in entitled to $128,902.50 in fees.

As to the expenses, the Court finds the expenses claimed by McMillan's counsel to be, for the most part, reasonable. However, the Court denies the request to reimburse McMillan's counsel for $136.05 in legal research fees. Computer research is generally considered part of attorney's fees rather than costs. Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago, 38 F.3d 1429, 1440 (7th Cir. 1994). As McMillan had to establish entitlement to attorney's fees, she must also demonstrate that she is entitled to computer research costs. The records submitted to the Court do not provide sufficient information to determine the reasonableness of these research charges, and thus, the request to claim these charges as nontaxable expenses is denied. The Court will deduct $136.05 from McMillan's claim for $4,492.62 in expenses, meaning her total amount of nontaxable, recoverable expenses is $4,356.57.

McMillan's total costs and expenses in this case are $133,259.07.

### iii. **Sanctions**

McMillan also moves the Court for the imposition of sanctions under 28 U.S.C. § 1927 against Barnes's attorneys for "unreasonably and vexatiously multiplying proceedings." Section 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." The Eleventh Circuit has given three requirements that must be met before the

imposition of sanctions is appropriate under § 1927: (1) the attorney must engage in "unreasonable and vexatious" conduct; (2) that "unreasonable and vexatious" conduct must be conduct that multiples the proceedings; and (3) the amount of the sanction must directly relate to the excess proceedings. Amlong & Amlong, P.A. v. Denny's Inc., 500 F.3d 1230, 1239 (11th Cir. 2006). An attorney multiplies proceedings "unreasonably and vexatiously" within the meaning of the statute only when the attorney's conduct is "so egregious that it is 'tantamount to bad faith.'" Id. (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)).

In this case, the Court does not find the conduct of Barnes's attorneys to equate to bad faith. All parties involved in this case have aggressively and passionately pursued their claims and defenses, and the Court does not find Barnes's attorneys' conduct to be so far outside the realm of proper conduct that it warrants sanctions. Thus, McMillan's motion as it relates to sanctions is denied.

### b. **Defendant Laverne Gaskins** (Doc. 366)

#### i. **Merits of Motion**

Like McMillan, Defendant Laverne Gaskins argues that she was an improper defendant and the case against her was frivolous, justifying attorney's fees under § 1988. Gaskins was dismissed in her official capacity early in the case, and she was dismissed in her individual capacity on summary judgment with the Northern District finding the following:

> With regard to Gaskins, neither the undisputed facts nor any other evidence supports the conclusory allegation that she made an agreement with anyone to violate Barnes's constitutional rights.

33

> To the contrary, the undisputed facts and evidence in this case show that Gaskins opposed the withdrawal of Barnes, and, whenever given the opportunity, she alerted anyone who would listen of the legal ramifications of taking such action.

(Doc. 244, p. 36.) The Northern District also noted that Gaskins attached a memorandum to the proposed withdrawal notice that she drafted at Zaccari's request, warning him of the potential implications of his actions. The memo read "Please find below the proposed letter. You should note that due process dictates that the student be apprised of what particular policy has been violated, an opportunity to be heard and also informed of the appeal process ..." (Doc. 244, p. 36.)

In response, Barnes contends that the case against Gaskins was not frivolous because her work drafting the withdrawal notice and consulting with administrative members at VSU about Barnes's withdrawal is sufficient to establish some merit to the case against her. Barnes contends that Gaskins was aware of Zaccari's plan to unilaterally withdraw Barnes and she did nothing to stop him, and in fact, helped Zaccari to defend his actions to the Board of Regents.

The Court reviews Gaskins' motion by applying the same factors used to analyze Defendant McMillan's assertion of frivolity. First, the Court looks to see whether Barnes established a *prima facie* case against Gaskins. He did not. The Northern District found that Barnes was unable to establish a claim for First

Amendment retaliation[8] or due process[9] against Gaskins. Second, Gaskins asserts that she never offered to settle the case. Barnes makes some mention of a settlement attempt, but Gaskins contends that she did not take place in the settlement negotiations. Even if Gaskins did participate in these negotiations, the settlement offer consisted of a $5,000.00 offer made by the University to settle all claims as to all Defendants. This can hardly be considered a serious settlement negotiation, considering that Barnes asserted damages for millions of dollars. As to the third factor, the case against Gaskins did not proceed to trial. Finally, similar to the analysis of McMillan's case, the Court finds that while the case as a whole did receive careful review and attention, the attention was not placed specifically on Gaskins' involvement in the case.

The Northern District determined, and this Court agrees, that the evidence in this case demonstrated that Gaskins consistently and emphatically warned Zaccari about the potential ramifications of his actions if he chose to withdraw Barnes. Thus, the case against Gaskins for First Amendment and due process violations was frivolous and Gaskins is entitled to attorney's fees.

---

[8] The court noted that "all of the evidence produced in this case supports a finding that Gaskins did not reach an agreement with anyone to retaliate against Barnes for exercising his constitutional rights." (Doc. 244, p. 37.)

[9] As to due process, the Northern District found that "any causal connection between Gaskins' actions and the violation of Barnes's constitutional rights was severed by the free, independent, and volitional acts of Zaccari. Accordingly, the court grants Gaskins motion for summary judgment as to [the due process claims]." (Doc. 244, p. 38) (internal quotations omitted).

ii. **Amount of Fees**

Using the lodestar approach described *supra*, the Court first looks to whether the rates charged by Gaskins's counsel are reasonable. Gaskins was represented by two attorneys – Mr. David R. Smith, who charges $200.00 per hour, and Ms. Beverly O'Hearn, who charges $175.00 per hour. A paralegal also worked on the case at a rate of $95.00 per hour. The Court finds that these rates are reasonable in the relevant market of Atlanta.

Next, the Court looks to the hours claimed by Gaskins's counsel. Counsel claims 470.20 attorney hours (420.60 performed by Mr. Smith and 49.60 performed by Ms. O'Hearn) and 2.00 paralegal hours. Plaintiff's only objection as to the amount of hours is that it should be reduced based on the collaboration between counsel for all of the Defendants. As stated above, the Court finds this objection to be without merit. Thus, Gaskins's counsel is entitled to recover for all of the hours claimed.

The Court's calculations of the attorney's fees for Gaskins are as follows: 420.60 hours worked by Mr. Smith multiplied by $200.00 hourly rate amounts to $84,120.00; 49.60 hours worked by Ms. O'Hearn multiplied by $175.00 hourly rate amounts to $8,680.00; 2.00 hours worked by a paralegal at a rate of $95.00 per hour amounts to $190.00. Adding these three sums together, Gaskins is entitled to $92,990.00 in fees.

As to expenses, the Court finds that all of the expenses claimed by Gaskins's counsel are reasonable with the exception of the Westlaw charges,

which are addressed *supra.* These charges amount to $90.84, and this amount shall be deducted from Gaskins's counsel's claim of $5,223.87. Based on these calculations, a total of $5,133.03 shall be awarded in nontaxable expenses.

Gaskins's total costs and expenses in this case are $98,123.03.

c. **Defendants VSU, BOR, Keppler, Mast, Morgan, Zaccari** (Doc. 368)

Defendants Valdosta State University, the Board of Regents, Kurt Keppler, Russ Mast, Victor Morgan, and Ronald Zaccari all filed a joint motion for fees. The motion as it relates to the merits of each Defendant's claim for fees is analyzed below. Following the analysis on the merits is an analysis of the appropriate amount of fees owed to each Defendant.

i. **Merits of Motion: Valdosta State University**

In their motion for fees, Defendants claim that Valdosta State University ("VSU") was an improper party to this lawsuit and the case was frivolous as to VSU from the beginning, warranting the imposition of attorney's fees. The three factors from Cohen weigh in favor of VSU. First, there was no *prima facie* case established against VSU. The Northern District dismissed VSU as a Defendant at the summary judgment stage because VSU was not a proper party under Georgia law. Specifically, Georgia law, which controls the capacity to be sued according to Federal Rule of Civil Procedure 17, dictates that "[t]he government, control, and management of the University System of Georgia and all of the institutions in said system shall be vested in the Board of Regents of the University System of Georgia." GA. CONST. Art. 8, § 4 ¶ I(b). Because the Board

of Regents, not the individual institution, is the proper party to name as a defendant in a lawsuit, Barnes was unable to establish a *prima facie* case against VSU. Second, there was no serious settlement offer from VSU. Third, the case did not proceed to trial as to VSU. The fourth factor also weighs in favor of Defendants. While the case did receive careful attention, the attention was never directed towards the involvement of VSU as a Defendant.

Barnes argues that Defendant VSU should have raised the defense that it was not a proper party earlier in the lawsuit. Barnes contends that by not raising the defense in the motion to dismiss, the case against VSU cannot be considered completely frivolous. The Court finds this argument without merit. The decision of VSU not to raise a defense does not change the fact that Barnes and his counsel failed to fully investigate whether VSU was a proper party to sue before dragging it into this litigation.

Based on an application of the Cohen factors, the Court finds that VSU's motion for attorney's fees should be granted. Barnes and his counsel should have done their homework prior to naming VSU as a defendant. The case as to VSU was frivolous from the outset.

### ii. **Merits of Motion: Board of Regents**

The Board of Regents ("BOR") claims attorney's fees based on the assertion that the BOR was an improper party because it cannot be sued in federal court without a waiver of Eleventh Amendment immunity, as held by the Eleventh Circuit in the interlocutory appeal of this case in February 2012. Barnes

v. Zaccari, 669 F.3d 1295, 1309 (11th Cir. 2012) (holding that the BOR's claim for Eleventh Amendment immunity was valid because Georgia did not waive its immunity, and thus, there was no jurisdiction to decide Barnes's breach of contract claim). Barnes does not appear to address the BOR's request for attorney's fees in his response brief.

After review, the Court finds that the case as to the Board of Regents was not frivolous. Defendants' motion for summary judgment was initially denied by the Northern District as to the breach of contract claim against the BOR, which meant that the Northern District saw some merit to the claim. (Doc. 244, p. 49.) The Eleventh Circuit later reversed the Northern District's decision and determined that Eleventh Amendment immunity should shield the BOR from suit. However, as shown by the Eleventh Circuit's overruling of the Northern District's initial decision, the issue of the applicability of Eleventh Amendment immunity was not always crystal clear.

The Court acknowledges that the BOR succeeded in defending against Barnes's claims for violations of the Americans with Disabilities Act and the Rehabilitation Act. In the order on cross-motions for summary judgment, the Northern District found that the claims under these Acts "fail as a matter of law, and the court grants the BOR's motion for summary judgment as to Counts 6 [Americans with Disabilities Act] and 7 [Rehabilitation Act]." (Doc. 244, p. 54.) However, the partial win for the BOR on these claims does not change the Court's determination that the case against the BOR was not entirely without

merit, and therefore, no attorney's fees are warranted. The case against the BOR was not frivolous and the motion for fees as to the BOR is denied.

### iii. **Merits of Motion: Keppler**

Defendant Kurt Keppler, the Vice President of Student Affairs in 2007, also moved for attorney's fees, claiming that the case against him was frivolous. Using the three Cohen factors to determine frivolity, the Court finds that the case against him was without merit. First, Barnes was unable to establish a *prima facie* case against Keppler for either a First Amendment or due process violation. As to the First Amendment claim, the Northern District found that "there is an absence of evidence to support Barnes's conclusory allegation that Keppler agreed with anyone to retaliate against Barnes." (Doc. 244, p. 41-42.) Thus, the First Amendment claim failed at the summary judgment stage. As to the due process claim, the Northern District determined that the case against Keppler, which was primarily based on omissions and lack of action, should be dismissed on summary judgment because "any omissions or lack of action on the part of … Keppler that Barnes contends caused his rights to be violated were severed by the intervening free, independent, and volitional acts of Zaccari when he chose to ignore the advice and warnings of those around him and decided to withdraw Barnes without notice or a hearing." (Doc. 244, p. 43-33) (internal quotations and citations omitted). As to the second factor, Keppler never made any serious attempt to settle the case. As to the third factor, the case against Keppler did not proceed to trial. As with the Defendants mentioned above, the factor analyzing

whether the case was the subject of careful attention and review also weighs in favor of granting attorney's fees to Keppler because he was never the subject of any extensive review or discussion in this case.

In his deposition, which was read at the trial on damages held in Valdosta, Georgia, Keppler disagreed with Zaccari's opinion that Barnes posed a threat and voiced opposition to the withdrawal. Keppler stated "Did I have anything to do with the final decision in this case? Obviously not. If I would have had any decision in this case, I would have jumped on [Zaccari's] back and said, please, don't do this." (Transcript, Doc. 381, p. 208.) The Court finds that the evidence against Keppler was never sufficient to justify pursuing him as a Defendant, and the case against him was frivolous. Thus, attorney's fees are justified as to Keppler.

### iv. **Merits of Motion: Mast**

The claims against Russ Mast, the Dean of Students at VSU in 2007, are very similar to the claims against Keppler, as they are primarily based on Mast's alleged lack of action and his omissions as opposed to any affirmative action. Mast attended several meetings in April and May 2007 to discuss Barnes, but Mast agreed with Keppler that Zaccari's response was an overreaction.

Applying the factors to determine frivolity, the Court finds that the case against Mast was frivolous. First, Barnes was unable to establish a *prima facie* case against Mast for First Amendment or due process violations. As to the First Amendment claim, the Northern District granted summary judgment in favor of

41

Mast, finding that there was no evidence on the record to support the conclusion that Mast reached an agreement with anyone to retaliate against Barnes. (Doc. 244, p. 41.) As to the due process claim, the Northern District reached the same conclusion as it did with Keppler, namely, that Mast's actions, or lack thereof, could not be the cause of the violation of Barnes's rights, because those actions were causally severed by the acts of Zaccari. (Doc. 244, p. 44.) Thus, there was no *prima facie* case as to either claim. The record also shows that Barnes may not have had a good faith belief in Mast's involvement in the decision to administratively withdraw him. Barnes commented in his deposition on the facts that led to his claims against Mast, stating

> [o]ther than his attendance at the meetings, other than my assumption -  you could say speculation - that he was aware of President Zaccari's action, my speculation that - well, my knowledge - my fact that he is over the judicial process at Valdosta State University, and my speculation that he could have done something to prevent what happened, is the basis. Those are my facts.

(Barnes Depo., Doc. 179, p. 197-98.) The second factor also weighs in favor of a finding of frivolity because Mast did not make any serious settlement offer. The third factor also points to frivolity because the case against Mast did not go to trial. Finally, the factor relating to the attention and review on this case weighs in favor of frivolity because the evidence showed that the case against Mast personally did not warrant any extended review. Thus, the motion for fees as it relates to Mast is granted.

### v.  **Merits of Motion: Morgan**

Victor Morgan, the director of VSU's student counseling center in 2007, also requests attorney's fees on the grounds that the lawsuit against him was frivolous. Morgan contends that there was never sufficient evidence to allege any claim against him. Morgan was dismissed voluntarily by Barnes five days before dispositive motions were due. (Doc. 161.) Defendants claim that keeping Morgan in the case until dispositive motions were due was frivolous and in bad faith. In response, Barnes contends that keeping Morgan in the case until this time was not frivolous. Barnes argues that he dismissed Morgan as soon as he knew undoubtedly that Morgan was not responsible for the violation of his First Amendment and due process rights.

After review, the Court finds the claims against Morgan were frivolous. Barnes could easily have dismissed Morgan earlier in the litigation. Morgan's deposition was taken on July 14, 2009. In his deposition, Morgan stated that he told Zaccari "we cannot remove Hayden from school based on a mental health withdrawal. In my opinion, he's complying with everything we're asking him to do." (Deposition of Victor Morgan, Doc. 231-31, p. 22.) He went on to say that he told Zaccari that Barnes was not a danger on campus. "I think our conclusion was that at that point we didn't see any reason to inform the President that we did feel that he was a danger. In fact, just the opposite." (Morgan Dep., Doc. 231-31, p. 24.) Based on these statements, it was clear that Morgan had no responsibility in his individual or official capacity for the withdrawal of Barnes.

43

However, Barnes chose to wait until December 18, 2009, six months after the deposition, to dismiss Morgan. This amount of time is too long to dismiss a clearly frivolous claim against a party.

The Court finds that the case against Morgan was frivolous and Morgan should have been dismissed immediately upon realizing that he was not responsible for any violation of Barnes's rights. The motion for fees as it relates to Morgan is granted.

### vi.  Merit of Motion: Zaccari

The case against Zaccari was not frivolous, as proven by the judgment against him on Barnes's procedural due process claim. Looking to the three Cohen factors, Barnes was able to establish a *prima facie* case against Zaccari for due process and Barnes was awarded summary judgment on this claim. The case proceeded to trial, where Barnes was awarded a compensatory award of $50,000 by a jury. This is sufficient to show that the claims against him were not frivolous. The Court acknowledges that summary judgment was granted in Zaccari's favor on the First Amendment and substantive due process claims filed against him. However, the legal finding that Zaccari was responsible for a constitutional violation of Barnes's procedural due process rights is sufficient to convince this Court that attorney's fees are not appropriate for Zaccari. The case against him was not "frivolous, unreasonable, or without foundation," and therefore, attorney's fees are not warranted based on his limited success in

defending the First Amendment and substantive due process claims against him. Zaccari's motion for fees is denied.

### vii.  **Amount of Fees: VSU, Mast, Keppler, Morgan**

Defense attorney Mr. David Will, along with his co-counsel, Ms. Holly Hance, represented the VSU Defendants, including VSU, Mast, Keppler, Morgan, the Board of Regents, and Zaccari. The Court again turns to the lodestar approach to determine the appropriate amount of fees to be awarded to defense counsel. First, the Court looks to the rates claimed by Mr. Will and Ms. Hance. Mr. Will, who has been practicing law for thirty-three years, states that he charges $250.00 per hour. Ms. Hance, who has been practicing law for seven years, charges $175.00 per hour. The Court finds these rates to be reasonable in the Atlanta market. The paralegal rate claimed by defense counsel is $75.00 per hour, which the Court also finds to be reasonable.

Next, the Court looks to the amount of hours claimed by defense counsel. The billing records from defense counsel are voluminous, and the Court is not required to examine each individual billing entry to determine reasonableness. Loranger v. Stierheim, 10 F.3d 776, 783 (11th Cir. 1994) (determining that in cases where records are voluminous "an hour-by-hour review is simply impractical and a waste of judicial resources"). Instead, in cases with extensive billing records, courts are authorized to employ across-the-board percentage cuts either in the number of hours claimed or the final lodestar figure if there is a need to reduce the amount of hours claimed by attorneys. Id. Eliminating an hour-by-

hour review does not relieve the court of the responsibility of explaining the rationale behind its decision. Id.

Looking to VSU Defendants' counsel's claims for fees, the Court finds several problems with the total number of hours claimed by defense counsel that must be remedied with across-the-board cuts. First, the total amount of hours claimed by Mr. Will and Ms. Hance do not reflect this Court's determination that Zaccari and the Board of Regents are not entitled to attorney's fees.[10] Thus, the Court finds it appropriate to reduce the number of hours by 33%. This 33% figure is appropriate because Zaccari and the Board of Regents, the two non-frivolous Defendants, represent two out of six of the VSU Defendants represented by Mr. Will and Ms. Hance. The claims against Zaccari and the BOR were not completely meritless and fees are not warranted for either of those Defendants.[11]

---

[10] The Court recognizes that the billing records included with the Motion for Fees do not include time spent working on the case after March 2012, the date the Eleventh Circuit upheld a finding of Zaccari's liability for a violation of Barnes's procedural due process rights. Defense counsel notes in the motion that they are not seeking fees past March 2012 because they are not seeking fees on the claim that proceeded to trial. However, after review, the Court finds it appropriate to further limit the award of attorney's fees based on the determination that none of the claims asserted against the Board of Regents and Zaccari were frivolous.

[11] The use of a mathematical formula is disfavored for purposes of reducing a fee award on the grounds of limited success. See Hensley v. Eckerhart, 461 U.S. 424, 435 n. 11, 103 S. Ct. 1933 (1983). However, the 33% reduction applied here is distinguishable from these disfavored formulas. The reduction is not an attempt to reduce the total amount of the award on the basis of limited success. Instead, the 33% reduction is based on the Court's determination that attorney's fees are not appropriate for Zaccari or the Board of Regents. Thus, the use of a mathematical formula is appropriate.

The Court finds that an additional 5% reduction in the total number of hours claimed by defense counsel is appropriate based on "block billing." "Block billing" occurs when an attorney lists all of the day's tasks on a case in a single entry and does not separate the tasks and the time spent working on those individual tasks as separate entries on billing records. Ceres Envtl. Servs, Inc. v. Colonel McCrary Trucking LLC, 476 Fed. App'x. 198, 203 (11th Cir. 2012). Examples of block billing include an entry by Mr. Will on May 28, 2009 that claims 7.7 hours for "work on discovery; telephone conference with Kimberly Ballard Washington; e-mail correspondence with Matthew LaValle, Chris Fedeli, and David Smith." (Doc. 368-1, p. 3.) Another example is Ms. Hance's entry on June 18, 2009 which bills 8.0 hours for "discovery from VSU; prepare responses and documents." (Doc. 368-1, p. 5.)   Courts have approved across-the-board reductions to offset the effects of this problematic billing practice.

Another 5% across-the-board reduction in hours is appropriate based on defense counsel's failure to exercise billing judgment. There are no redactions on defense counsel's billing records, which demonstrates a lack of revision of time entries before submitting them to the Court with the Motion for Fees. The proper remedy is to take an across-the-board reduction which is intended to substitute for the exercise of billing judgment. Tartaglia v. Big Apple Consulting USA, Inc., No. 6:09-cv-591-Orl-28DAB, 2011 WL 6937465 at *8 (M.D. Fla. Nov. 22, 2011).

A third 5% reduction is appropriate for the failure to properly eliminate clerical work from billing records submitted to the Court. Work that is "purely

47

clerical in nature, such as contacting court reporters, and mailing, filing, and delivering documents is not compensable." Montgomery v. Florida First Fin. Group, Inc., No. 6:06-cv-1639-Orl-31KRS, 2008 WL 3540374 at *13 (M.D. Fla. Aug. 12, 2008). This applies to attorneys and paralegals, as discussed *supra*. One example of clerical work included in defense counsel's billing records is a paralegal's entry on August 21, 2009 for "search 'memorials'; file organization; transcribe David's notes." (Doc. 368-1, p. 13.) Another example is a paralegal's entry from October 27, 2010 which reads "voicemail left for clerk at USCA; review letter regarding cross appeal; organize pleadings file and update pleadings index; create cross appeal file." (Doc. 368-1, p. 26.) An across-the-board reduction in the total number of hours is appropriate to account for this billing deficiency.

Based on the reasoning above, the total hours claimed by defense counsel must be reduced. Mr. Will originally claimed 559.50 hours, Ms. Hance claimed 858.70 hours, and paralegal hours claimed amounted to 168.90. A 33% reduction in these hours amounts to 374.87 hours for Mr. Will, 575.33 hours for Ms. Hance, and 113.16 for the paralegal. The first 5% reduction for block billing, which does not apply to the paralegal, lowers the amounts of hours to 356.13 for Mr. Will and 546.56 for Ms. Hance, with the paralegal hours remaining at 113.16. The second 5% reduction for the failure to exercise billing judgment lowers the hours to 338.32 for Mr. Will, 519.23 for Ms. Hance, and 107.50 for the paralegal. The final 5% reduction for the failure to redact clerical work from the billing

statements submitted to the Court brings the hours to 321.40 for Mr. Will, 493.27 for Ms. Hance, and 102.13 for the paralegal.

To calculate the amount of attorneys' fees due to the VSU Defendants' counsel, the lodestar approach mandates the multiplication of the rates times the hours. Thus, Mr. Will's 321.40 hours is multiplied by his rate of $250.00 per hour for a total of $80,350.00. Ms. Hance's 493.27 is multiplied by her rate of $175.00 per hour for a total of $86,322.25. The 102.13 hours worked by the paralegal is multiplied by the rate of $75.00 per hour for a total of $7,659.75. Based on these figures, the total amount of fees for VSU Defendants is $174,332.00.

Defense counsel for the VSU Defendants also claims expenses associated with this litigation. The expenses are reasonable, with a few exceptions. First, as explained *supra*, legal research fees are not included in expenses, which means that $157.68 in PACER charges must be deducted from the total of nontaxable expenses. Also, some of Mr. Will's and Ms. Hance's travel expenses are not properly documented. There are three entries for travel and meal expenses that include the phrase "see attached" next to the entry. However, there is no attachment to explain these expenses. These charges, all of which are in excess of $1,900.00 cannot be deemed reasonable when there is no detailed explanation of the charges. Thus, the three travel and meal expense charges ($1,913.77, $1,972.81, and $2,013.92) must be deducted from the total expenses. Defense counsel for the VSU Defendants claimed $20,453.25 in total

expenses. Subtracting the PACER fee and the travel and meal expenses, the total amount of expenses to which defense counsel is entitled is $14,395.07.

The total amount of fees and expenses properly claimed by the VSU Defendants, including VSU, Keppler, Mast, and Morgan, is $188,727.07.

### d. **Plaintiff Barnes** (Doc. 367)

A "prevailing party" within the meaning of § 1988 is one who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933 (1983). In this case, the Court finds that Barnes is a prevailing plaintiff based on his success with his procedural due process claim against Zaccari. The calculation of fees that should be awarded to Barnes is below.

### i. **Lodestar Approach**

To calculate attorney's fees for Barnes's counsel, the Court begins with an application of the lodestar approach. First, the Court looks to the rates charged by Barnes's counsel. Barnes was represented by three different law firms. Davis Wright Tremaine law firm ("DWT"), based in Washington, D.C., was lead counsel on the case. Five attorneys and two paralegals from DWT worked on the case. DWT initially requested hourly rates using Washington, D.C. as the relevant market, arguing that "special expertise of non-local counsel was essential to the case." (Doc. 367-1, p. 15.) Specifically, DWT argued that special skills were needed to litigate the First Amendment claims and that local counsel was unwilling to take a case that sought damages from the Board of Regents and a

university president. The Court finds that, despite DWT's arguments, the relevant community for purposes of calculating fees is Atlanta, Georgia. Cary S. Wiggins, co-counsel for Barnes, is an Atlanta attorney who declares in his affidavit that he has "worked for the advocacy of First Amendment rights since 1997." (Affidavit of Cary S. Wiggins, Doc. 367-11, p. 8.) He went on to state that "[his] practice has focused primarily on First Amendment and civil rights issues…." Id. Thus, based on Wiggins' testimony about his First Amendment experience and his obvious willingness to be involved in the case, the Court finds DWT's argument to be without merit. Thus, Atlanta, Georgia is deemed to be the relevant market for Plaintiff's counsel.

Given this decision about the relevant legal community, the Court ordered Plaintiff's counsel at DWT to supplement their original fee motion with additional evidence about appropriate billing rates in Atlanta. (Doc. 401.)[12] In response to this order, Plaintiff submitted a memorandum claiming that the rates originally requested were reasonable in the Atlanta market. In support, Plaintiff submitted the affidavit of attorney Michael J. Bowers, who stated that the rates claimed by the attorneys at DWT were within the range of reasonable rates in Atlanta. (Doc.

---

[12] The Court also authorized a five-page response from Defendants on the issue of the appropriate billing rates for Plaintiff's counsel in the Atlanta market. Defendant filed a response which included a Motion to Strike (Doc. 403). The Motion asked the Court not to consider any additional information in Plaintiff's memorandum outside of specific evidence about Atlanta billing rates. The Court did not consider any additional evidence, but that was not in response to Defendants' Motion. The Court was not looking for additional information from Plaintiff outside of billing rates, nor was the Court looking for additional motions from either party. Defendants' Motion to Strike is dismissed.

402-1.) The rates originally claimed by DWT's attorneys and paralegals are as follows: Robert Corn-Revere, $630.00 per hour; Brigham Bowen, $300.00 per hour; Christopher Fedeli, $435.00 per hour; Ronald London, $515.00 per hour; Erin Reid, $350.00 hour; Lisa Zycherman, $420.00 per hour; Elizabeth Rivard, paralegal, $155.00 per hour; Marni Shapiro, paralegal, $275.00 per hour.

Based on this Court's own knowledge and experience, the Court finds that the rates claimed by DWT's attorneys and paralegals are excessive and should be reduced. The reduced rates that the Court finds to be appropriate and in line with the Atlanta legal market are as follows: Robert Corn-Revere, $315.00 per hour; Brigham Bowen, $200.00 per hour; Christopher Fedeli, $215.00 per hour; Ronald London, $260.00 per hour; Erin Reid, $200.00 hour; Lisa Zycherman, $210.00 per hour; Elizabeth Rivard, paralegal, $100.00 per hour; Marni Shapiro, paralegal, $100.00 per hour.

After determining the appropriate rates for attorneys and paralegals at DWT, the Court looks to the rates charged by co-counsel associated with the case. Cary S. Wiggins, a member of the Wiggins Law Group who has been admitted to the practice of law since 1997, charges $300.00 per hour. His co-counsel, Ms. Irma Espino, charges $135.00, and his paralegal, Ms. Susan Julian, charges $125.00. The Court finds the rates for Mr. Wiggins and Ms. Espino to be reasonable rates for attorneys practicing in Atlanta with comparable levels of expertise, knowledge, and experience. However, the rate for Ms. Julian, the paralegal working on the case, shall be reduced to $100.00, which this Court

believes to be appropriate in light of its experience and knowledge. Darl H. Champion, a partner in the Warshauer Law Group who has been practicing since 2007, states that he typically charges $225.00 per hour. The Court finds this amount merits a reduction. Mr. Champion's billing rate for purposes of this fee motion shall be $200 per hour, which the Court finds to be reasonable for an attorney in the Atlanta market with his level of experience and education.

After determining the appropriate rates, the Court turns to the second step of the lodestar approach – determining the appropriate number of hours to be used for the fee determination. After review, the Court finds that the hours claimed by Barnes's attorneys are appropriate. Defendants' primary objection to the hours claimed by the three law firms is that the numbers are inflated based on a lack of billing judgment. Defendants assert that the case was "overstaffed and overworked" because of the number of attorneys who worked on the case and the number of hours billed. (Doc. 384, p. 5.)

After reviewing the records submitted by the three firms representing Plaintiff, the Court finds that the attorneys have exercised appropriate billing judgment in the hours submitted to the Court. DWT cut down the hours for which they seek fees from a raw number of 5,818.30 hours (*see* Doc. 367-7) to 3,707.30 hours (*see* Docs. 367-8, Docs. 402-2).[13] A comparison of Documents

---

[13] The 3,707.30 hours claimed by Plaintiff includes 274 supplemental hours billed from February 2, 2013 through June 27, 2013 for work on post-trial and fee motions. Plaintiff included his request for these additional hours in his latest

367-7, DWT's raw billing records, with Document 367-8, DWT's edited records that were submitted to the Court, demonstrates that a vast number of hours were cut. Mr. Corn-Revere, lead counsel on this case from DWT, stated in his affidavit that he took a strict approach to billing in this case and "erred on the side of excluding time." (Doc. 367-5, ¶¶16, 17.) He further stated that his firm decided to eliminate time entries from attorneys who made only minor contributions to the case. (Doc. 367-5, ¶ 18.) This is a proper exercise of billing judgment.

Mr. Wiggins also testified that he reduced the number of hours that he billed on this case. He stated in his affidavit that he billed only for time spent in the courtroom during the trial, billed at a half-rate for travel time from Atlanta, and reduced the number of hours billed by his associate attorney, Ms. Irma Espino, by more than half. (Doc. 367-11, p. 10-11, ¶¶ 13-16.) His billing records show numerous billing entries that are struck completely or reduced, visibly demonstrating his efforts to exercise billing judgment. (Doc. 367-11, p. 16-41.) Mr. Champion also testified via affidavit that he exercised billing judgment. Mr. Champion stated that he did not bill for several telephone calls and meetings, as well as time spent traveling from Atlanta to Valdosta for the pretrial conference and the trial. (Doc. 367-11, p. 47, ¶ 8.) Based on the testimony of these attorneys, the Court finds the billing records submitted by them to reflect an appropriate amount of hours. Thus, the appropriate hours worked by each of

memorandum filed on July 17, 2013 (Doc. 402). The Court finds it appropriate to include these additional hours in the final fee award.

Plaintiff's counsel are as follows: Robert Corn-Revere, 1,613.25 hours; Brigham Bowen, 93.40 hours; Christopher Fedeli, 333.40 hours; Ronald London, 16.20 hours; Erin Reid, 1,084.40 hours; Lisa Zycherman, 474.45 hours; Elizabeth Rivard, paralegal, 18.00 hours; Marni Shapiro, paralegal, 74.20 hours; Cary S. Wiggins, 232.20 hours; Irma Espino, 55.60 hours; Susan Julian, paralegal, 21.60 hours; Darl H. Champion, 23.90 hours.

Based on the hours and rates discussed above, the Court finds that the calculation of fees based on the lodestar approach is as follows:

Davis Wright Tremaine
- Robert Corn-Revere: 1,613.25 hours x $315.00 = $508,173.75
- Brigham Bowen: 93.40 hours x $200.00 = 18,680.00
- Christopher Fedeli: 333.40 hours x $215.00 = $71,681.00
- Ronald London: 16.20 hours x $260.00 = $4,212.00
- Erin Reid: 1,084.40 hours x $200.00 = $216,880.00
- Lisa Zycherman: 474.45 hours x $210.00 = $99,634.50
- Elizabeth Rivard, paralegal: 18.00 hours x $100.00 = $1,800.00
- Marni Shapiro, paralegal: 74.2 hours x $100.00 = $7,420.00

Wiggins Law Group
- Cary S. Wiggins: 232.20 hours x $300.00 = $69,660.00
- Irma Espino: 55.60 hours x $135.00 = $7,506.00
- Susan Julian, paralegal: 21.60 hours x $100.00 = $2,160.00

Warshauer Law Group
- Darl H. Champion: 23.90 hours x $200.00 = $4,780.00

### ii. **Across-the-board Adjustment**

Barnes's status as a prevailing party does not mean that his counsel is automatically entitled to the full amount of attorney's fees calculated using the lodestar approach. The Supreme Court has determined that

> [t]he product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upwards or downward, including the important factor of the 'results obtained.' This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief.

Hensley, 461 U.S. at 434, 103 S. Ct. at 1940. To determine whether an award should be reduced because of a plaintiff's limited success, courts are directed to look at whether the claims on which plaintiff failed were related to the claims on which he succeeded and whether the plaintiff achieved a certain level of success that justifies the total amount of hours claimed. Id.

In this case, the same set of facts served as the basis for all of Barnes's claims against Defendants. The hours expended by Barnes's attorneys on his successful claim overlapped with hours expended on the unsuccessful claims. The work on those claims that were ultimately unsuccessful could still be considered to go towards the ultimate result achieved. However, despite a common nucleus of facts, the level of success achieved by Barnes does not justify an award equivalent to the full lodestar amount.

Where a plaintiff has obtained "excellent results," his attorney should recover a fully compensatory fee. Id., 461 U.S. at 435, 103 S. Ct. at 1940. However, where a plaintiff achieves only partial or limited success, "the product of the hours reasonably expended on the litigation as a whole times a reasonably hourly rate may be an excessive amount." Id. at 436, 103 S. Ct. at 1941. "This will be true even where the plaintiff's claims were interrelated, non-frivolous, and

56

raised in good faith." Id. In this case, the Court finds the amount of attorney's fees under the lodestar approach to be excessive for several reasons.

First, the comparison of successful claims to unsuccessful claims supports a reduction in the total fee award based on limited success. Barnes succeeded on one claim against one Defendant, when his initial complaint alleged seven claims against eight Defendants. His initial claims were for violations of the First Amendment, substantive and procedural due process, the Rehabilitation Act, the Americans with Disabilities Act, and breach of contract. Prevailing on one of seven claims against one of eight original defendants constitutes limited success. Barnes disagrees that the success was limited because of the "significant public benefits" that result from the verdict in this case. (Doc. 367-1, p. 4.) Barnes contends that the vindication of a constitutional right in a civil rights case is an important victory, regardless of any amount of monetary damages. To support his contention about the importance of this case, Barnes submitted affidavits of Greg Lukianoff (Doc. 367-3) and Robert M. O'Neil (Doc. 367-4). Mr. Lukianoff, a First Amendment attorney and President of the Foundation for Individual Rights in Education ("FIRE"), states in his affidavit that that this case was "one of the most important decisions for student conduct administration in the past 25 years." (Doc. 367-3, p. 4.) He goes on to state that the $50,000 jury verdict will "send a powerful, clear, and much-needed message to university administrators around the country about the importance of respecting student rights." (Doc. 367-3, p. 5.) Mr. O'Neil's declaration similarly emphasizes the importance of this case in the

legal landscape. Mr. O'Neil, who previously served as the President of the University of Virginia and President of the University of Wisconsin System, states that a judicial finding of liability and civil fines imposed by a jury will serve to "convey a strong message" to other academic leaders and university administrators. (Doc. 367-4, p. 5.)

The Court has taken into consideration the declarations of Mr. Lukianoff and Mr. O'Neil, but the fact remains that six of Barnes's original claims were found to be completely meritless against all of the Defendants and the one successful due process claim was found to be meritless against all but one Defendant. "A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." Hensley, 461 U.S. at 440, 103 S. Ct. at 1943.

The second reason that the amount of attorney's fees under the lodestar approach is excessive is the vast disparity between the amount of damages sought by Barnes as compared with the actual amount of recovery. The Eleventh Circuit has held that "the relief a plaintiff requested is indeed relevant to determining the extent of that plaintiff's success." Popham v. City of Kennesaw, 820 F.2d 1570, 1581 (11th Cir. 1987). Courts are authorized to compare the relief requested to the relief ultimately obtained. Id. (citing Erkins v. Bryan, 785 F.2d 1538, 1545 (11th Cir. 1986)); see also Gray v. Bostic, --- F.3d ---, 2013 WL 3328918 (11th Cir. 2013) (comparing the $25,000 that plaintiff sought and the $1 nominal award of damages to illustrate the plaintiff's limited success).

In this case, Barnes originally sought damages in excess of a million dollars. When only one claim for a procedural due process violation remained at trial, Mr. Corn-Revere stated in his closing argument that at least a million dollars in damages was owed to Barnes. He estimated that the measure of the emotional tranquility taken from Barnes as a result of the violation of his due process rights was "worth a million dollars." (Transcript, Doc. 382, p. 74.) The Court can only assume that Barnes's ideal damage award for the seven original claims was in excess of this amount. Additionally, Barnes sought the imposition of punitive damages against Zaccari, which was ultimately denied by the jury. Barnes's total monetary recovery was $50,000.00, which is paltry when compared with Barnes's demand for damages and his efforts in seeking punitive damages from Zaccari. A comparison of his actual recovery and his desired recovery supports a finding of limited success and justifies a reduction in the amount attorney's fees.

Third, the Court finds that a reduction is justified based on a comparison of the amount of the award Barnes received as compared with the amount of attorney's fees being sought. A fee award that is significantly higher than the monetary award won by the plaintiff raises concerns about the amount of the attorney's fee. *See* Wales v. Jack M. Berry, Inc., 192 F. Supp. 2d 1313, 1328 (M.D. Fla. 2001) (comparing the amount of plaintiff's recovery with the amount of attorney's fees and finding that a fee that exceeded the plaintiff's recovery by more than $500,000 was unreasonable); Ramos v. Goodfellas Brooklyn's Finest

Pizzeria, LLC, 2009 WL 2143628 at *2 (S.D. Fla. July 16, 2009) (determining that attorney's fees in excess of nineteen times greater than the amount plaintiff recovered was unreasonable). In this case, the total amount of fees sought by Barnes is $1,883,412.00. This amount is more than thirty-eight times greater than Barnes's $50,000 recovery. This is clearly unreasonable. Even the amount of $1,012,587.20, which is the total amount of fees as determined under the lodestar approach using adjusted Atlanta billing rates, is still more than twenty times greater than Barnes's recovery. This indicates that a reduction is warranted.

For the three reasons listed above, the Court finds that a downward departure from the lodestar figure is appropriate. There is no precise rule or formula for making the determination about the appropriate reduction in a plaintiff's case that has experienced limited success. Hensley, 461 U.S. at 436, 103 S. Ct. at 1941. Instead, the court is given great discretion to make this equitable judgment. Id. The court has two options to reduce a lodestar amount that is deemed to be excessive: it may conduct an hour-by-hour analysis of the billing records submitted or it may reduce the hours with an across-the-board cut. Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008). In this case, where the billing records are voluminous, an across-the-board cut is more practical.

In determining reasonable attorney's fees, district courts "are not authorized to be generous with the money of others, and it is as much the duty of

60

the court to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded. Am. Civil Liberties Union v. Barnes, 168 F.3d 423, 428 (11th Cir. 1999). The Court's ultimate goal in considering an across-the-board reduction is to compensate Barnes's counsel for the time and effort reasonably incurred to achieve the partial victory. In light of this ultimate goal, the Court finds that an overall reduction of sixty percent is appropriate. The lodestar totals for each of the attorneys and paralegals assisting in representing Barnes will be reduced by this percentage. Section IV(d)(iv), *infra*, sets out these adjusted totals.

### iii.  **June 2009 Order Granting Sanctions**

Another factor to consider in calculating the final award of attorney's fees to which Barnes is entitled is a June 4, 2009 order from the Northern District regarding Plaintiff's motion for sanctions. (Doc. 87.) In that order, the Northern District found that monetary sanctions were warranted based on Defendants' failure to comply with discovery rules. The Northern District ordered counsel for Barnes to submit an affidavit setting forth the amount of fees and expenses related to the filing of the motion for sanctions. Barnes's counsel submitted an affidavit on September 3, 2009 that showed a total of 15.25 hours spent on the motion for sanctions. (Doc. 147-2.) No further action was taken in response to the submission of this affidavit.

In light of the Northern District's grant of the motion for sanctions, the Court finds that the most appropriate course of action is to compensate Plaintiff's

counsel fully for the 15.25 hours spent on the motion for sanctions. It is not appropriate to reduce these hours by any percentage since the Northern District's order intended these fees to be imposed on Defendants as a punishment. The billing records submitted by the law firm of Davis Wright Tremaine show that Mr. Corn-Revere billed 5.1 hours on the motion for sanctions, Mr. Fedeli billed 2.8 hours, and Ms. Reid billed 7.35 hours. As will be set out below, the 15.25 hours spent on the motion for sanctions shall be deducted from the total hours claimed by Mr. Corn-Revere, Mr. Fedeli, and Ms. Reid. The sixty percent reduction will not apply and each attorney shall receive full compensation for these hours. An amount reflecting full compensation for these hours shall be added to each attorney's award of fees after all other calculations are completed.

iv.  **Final Fee Calculation for Plaintiff**

The lodestar calculations of Plaintiff's counsel must be reduced across-the-board by sixty percent to account for Plaintiff's limited success. Exempt from this reduction is 15.25 hours billed by Mr. Corn-Revere, Mr. Fedeli, and Ms. Reid, as explained above. These hours shall not be reduced and shall be added in to the final totals as full compensation for the hours worked on the motion for sanctions.

The total fees for each of Plaintiff's attorneys are below, with the calculations supporting the fee award beneath each name.

<u>Davis Wright Tremaine law firm</u>

Robert Corn-Revere
- 1,608.15 x $315.00 = $506,567.25 - $303,940.35 (60%) = $202,626.90
- 5.1 hours x $315.00 = $1,606.50 (unreduced)
- <u>TOTAL</u>: $202,626.90 + $1,606.50 = $204,233.40

Brigham Bowen
- 93.40 hours x $200.00 = $18,680.00 - $11,208.00 (60%) = $7,472.00

Christopher Fedeli
- 330.60 hours x $215.00 = $71,079.00 - $42,647.40 (60%) = $28,431.60
- 2.8 hours x $215.00 = $602.00 (unreduced)
- <u>TOTAL</u>: $28,431.60 + $602.00 = $29,033.60

Ronald London
- 16.20 x $260.00 = $4,212.00 - $2,527.20 (60%) = $1,684.80

Erin Reid
- 1,077.05 x $200.00 = $215,410.00 - $129,246.00 (60%) = $86,164.00
- 7.35 hours x $200.00 = $1,470.00 (unreduced)
- <u>TOTAL</u>: $86,164.00 + $1,470.00 = $87,634.00

Lisa Zycherman
- 474.45 x $210.00 = $99,634.50 - $59,780.70 (60%) = $39,853.80

Elizabeth Rivard, paralegal
- 18.00 hours x $100.00 = $1,800.00 - $1,080.00 (60%) = $720.00

Marni Shapiro, paralegal
- 74.2 hours x $100 = $7,420.00 - $4,452.00 (60%) = $2,968.00

<u>Wiggins Law Group</u>

Cary S. Wiggins
- 232.20 hours x $300.00 = $69,660.00 - $41,796.00 (60%) = $27,864.00

Irma Espino
- 55.6 hours x $135.00 = $7,506.00 - $4,503.60 (60%) = $3,002.40

Susan Julian, paralegal
- 21.6 hours x $100.00 = $2,160.00 - $1,296.00 (60%) = $864.00

Warshauer Law Group

Darl H. Champion
-   23.9 hours x $200.00 = $4,780.00 - $2,868.00 (60%) = $1,912.00

Based on the calculations above, the total amount of fees owed to Barnes is $407,242.00.

### v. **Expenses**

The Court next looks to the expenses claimed by Barnes's counsel as part of their motion for fees. The law firm of DWT claimed a total of $74,103.51.[14] Of this amount, $44,371.56 was spent on court and discovery costs, $22,098.16 was spent on travel expenses, and $7,633.79 was spent on online research. As explained above, the costs associated with online research are not compensable. Thus, $7,633.79 shall be deducted from the total amount of expenses. The other costs associated with litigating this case, while high, are not unreasonable, especially considering that Plaintiff did not submit a Bill of Costs to the Court for reimbursement of taxable fees,[15] and instead chose to pursue all costs under § 1988. The total nontaxable fees to which DWT is entitled amounts to $66,469.72.

---

[14] In its most recent memorandum to the Court (Doc. 402), DWT claimed an updated amount of expenses. The original expense request was for $69,765.73. The newly added expenses amount to $4,337.78. There was no objection from Defendants as to the increased expenses, and thus the additional expenses, subject to the exclusions explained more fully above, have been included in the fee award.

[15] Defendant objects to expenses claimed by Plaintiff's counsel including transcripts and copying fees. These expenses are generally covered under a bill of costs as a taxable expense. *See* 28 U.S.C. § 1920. The Court finds no reason that these costs cannot be recovered under § 1988 instead of § 1920, so long as

The Wiggins Group claimed a total of $1,588.29, which is a reasonable amount of expenses and does not include any impermissible charges. The Warshauer Group claimed a total of $538.13, which accounts only for mileage and is reasonable.

Plaintiff's counsel also seeks to recover fees incurred by Barnes during the course of the litigation. Barnes submitted an affidavit claiming $2,918.44 in personal expenses that he sustained during this litigation.  Defendants stridently object to the reimbursement of these expenses, going so far as to write a limerick asking the Court to deny Barnes's out-of-pocket costs. (Doc. 384, p. 18.)

There is no direct precedent that instructs the Court as to whether Plaintiff's expenses are recoverable. The Eleventh Circuit has held that "with the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs under § 1988." Dowdell v. City of Apopka, Florida, 698 F.2d 1181, 1192 (11th Cir. 1983). The standard of reasonableness under § 1988 is given a "liberal interpretation." Id. However, despite the liberal interpretation under § 1988, this Court can find no case reimbursing a party for personal expenses associated with the litigation. Thus, the Court looks to the broad policy underlying § 1988 to determine whether reimbursing Barnes is appropriate.

---

there is no attempt at double recovery. In this case, Plaintiff's counsel has not submitted any expenses through a bill of cost, and therefore, the Court will allow the costs to be covered as a nontaxable expense compensable under § 1988.

Section 1988, which allows for recovery of attorney's fees and costs for litigation under § 1983, was created to "encourage citizens and members of the bar to engage in litigating when necessary to vindicate civil rights." Id. The Eleventh Circuit stated in Dowdell that § 1988 was designed to give victims of civil rights violations access to the justice system by encouraging attorneys to take civil rights cases, even in those cases where a plaintiff may not be financially able to pay attorney's fees. Id. at 1189. Any interpretation of "reasonable costs" serving to penalize attorneys for undertaking civil rights litigation was explicitly rejected. Id.; see also Webster Greenthumb Co. v. Fulton Cnty., Ga., 112 F. Supp. 2d 1339, 1379 (N.D. Ga. 2000) (stating that the fee-shifting framework of § 1988 allows those clients who ordinarily could not afford legal representation an avenue to retain counsel because of the promise of fees paid by an unsuccessful defendant). It seems, therefore, that § 1988 was created to ensure that attorneys, not parties, are compensated for engaging in cases under § 1983 and pursuing the vindication of important civil rights. The Court therefore finds that the policy underlying § 1988 does not support reimbursing a party for personal expenses and costs incurred as a result of litigation. Thus, Barnes's expenses shall not be included as nontaxable costs.

The total expenses owed to Plaintiff amount to $68,596.14.

## V.   CONCLUSION

In light of the reasoning stated more fully above, the following actions are ordered by this Court:

- Defendants' Motion for Qualified Immunity (Doc. 370) is DENIED;

- Plaintiff's Motion to Strike (Doc. 388) is GRANTED;

- Defendants' Motion for Judgment as a Matter of Law (Doc. 373) and the Supplemental Motion for Judgment as a Matter of Law (Doc. 397) are DENIED;

- Defendant Leah McMillan's Motion for Fees (Doc. 364) is GRANTED, and she is awarded $128,902.50 in fees and $4,356.57 in expenses, for a total award of $133,259.07;

- Defendant Laverne Gaskin's Motion for Fees (Doc. 366) is GRANTED, and she is awarded $92,990.00 in fees and $5,133.03 in expenses, for a total award of $98,123.03;

- Defendants' Motion for Fees (Doc. 368) is GRANTED as to Defendants VSU, Keppler, Mast, and Morgan and DENIED as to Defendants BOR and Zaccari, and prevailing Defendants are awarded $174,332.00 in fees and $14,395.07 in expenses, for a total award of $188,727.07;

- Plaintiff's Motion to File Sur-Reply (Doc. 393) is DENIED as moot;

- Defendants' Motion to Strike (Doc. 404) is DISMISSED and;

- Plaintiff's Motion for Fees (Doc. 367) is GRANTED, and he is awarded $407,242.00 in fees and $68,596.14 in expenses, for a total award of $475,838.14.[16]

_____

[16] This case is the result of considerable thought and effort. I am satisfied that the provisions of the order are substantially correct and reflect the current state of the law which embodies the will of Congress. Perhaps the Court of Appeals will disagree. I also believe that the end result of this case, insofar as it pertains to awards of attorney's fees, is absurd. If all the requests for attorney's fees are taken at face value, over two million dollars have been expended in this case. Plaintiff's counsel claim to have expended 4,040 hours on this case, while defense counsel claim to have expended 3,112 hours, a total effort for both sides of 7,152 hours. This amounts to 178.8 weeks of working on this case, or nearly three and one-half years of effort devoted to nothing but this case. Unfortunately, there is no way for a court to challenge a correctly presented bill for legal fees, except by the application of common sense and experience. Having become familiar with the pretrial proceedings and having tried the case, I find the hours claimed in this case incredible. I have no way of knowing just what the attorneys and paralegals did with their time, but based on my experience of almost fifty years as a lawyer and trial judge, I find it difficult to believe that so much time was reasonably and profitably spent on this case.

The facts of this case are simple and the law is not complex. There was never any question but that Defendant expelled Plaintiff Barnes from Valdosta State University and denied Barnes due process. In my opinion, the only question was whether Dr. Zaccari's action was somehow justified and it did not require a Clarence Darrow to deal with that. The law was known at the outset; Dr. Zaccari's in-house legal advisor, Laverne Gaskins, told Dr. Zaccari that what he proposed to do what a violation of law. As often happens, when it came to trial, mountains were created from molehills, but the basic character of the case remained unchanged. This case made no new law. The rights of one in Plaintiff's position were the same before and after the verdict. Justice was done insofar as Barnes received a fair award of compensatory damages; the jury gave him what he asked. The rest of the case was largely hot air.

Plaintiff took two calculated risks: first, that he could get a large award of punitive damages, and second, that if he failed to get punitive damages, he could offset that failure by way of attorney's fees. The jury did not award punitive damages, and this Court declines to adopt Plaintiff's position on attorney's fees. Plaintiff is

**SO ORDERED**, this 24th day of July, 2013.


                                        *s/Hugh Lawson*_____
                                        HUGH LAWSON, SENIOR JUDGE

ebrs

---

entitled to some attorney's fees, of course, but he is not entitled to shoot the moon (at least not with the imprimatur of this Court).

This case is an excellent example of one of the main problems with the practice of law in this country – the tail (time billing and fees) is wagging the dog (merits of the case and interests of the client). This case should have been settled long ago with an expenditure of attorney's fees commensurate with the results obtained.